SCOTT B. COHEN, SBA #014377
MICHAEL P. ROLLAND, SBA #030744
**ENGELMAN BERGER, P.C.**
2800 NORTH CENTRAL AVENUE, SUITE 1200
PHOENIX, ARIZONA 85004
————————
Ph: (602) 271-9090
Fax: (602) 222-4999
Email: sbc@eblawyers.com
Email: mpr@eblawyers.com

Attorneys for BS Property, LLC

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re | Case No. 2:19-BK-03235-DPC |
| EVEN STEVENS ARIZONA, LLC, *et al.* | Chapter 11 |
| Debtors. | (Jointly Administered) |
| This filing applies to: | **OBJECTION TO MOTION FOR AN ORDER APPROVING ASSUMPTION OF NON-RESIDENTIAL LEASES** |
| ☐ All Debtors | |
| ☒ Specified Debtors | |

BS Property, LLC ("Utah Landlord"), a creditor and party-in-interest for Even Stevens, Utah, LLC ("Utah Debtor"), hereby files this Objection to the "Motion for an Order Approving Assumption of Non-Residential Leases" filed on July 19, 2019 (DE 175) ("Assumption Motion"). The Assumption Motion must be denied because it does not provide adequate assurance to Utah Landlord that Utah Debtor will make the payments required by 11 U.S.C. § 365(b)(1) to cure its prior defaults, compensate Utah Landlord for its actual pecuniary losses resulting from prior defaults, and to comply with future performance required by the Lease Agreement.

Although Debtors claim they are in the process of negotiating debtor-in-possession ("DIP") financing that will fund their cure payments, they fail to provide any details whatsoever about the proposed deal. At this juncture, any proposed DIP financing is purely speculative and does not provide adequate assurance that Utah Debtor can or will make its

cure payments required by Section 365(b)(1). The Assumption Motion also proposes to make cure payments to Utah Landlord for unpaid base rent, but not for accrued interest and Utah Landlord's attorneys' fee and costs. Section 361(b)(1)(B) requires Utah Debtor to compensate Utah Landlord for its "actual pecuniary loss" resulting from its defaults, which includes both accrued interest on the past due amounts and attorneys' fees and costs incurred by Utah Landlord because of the default. In sum, as set forth in the below Memorandum of Points & Authorities which is incorporated herein, the Assumption Motion contains insufficient facts to satisfy the statutory requirements and must be denied at this time.

**MEMORANDUM OF POINTS & AUTHORITIES**

**I.    FACTUAL BACKGROUND.**

**A.    The Lease Agreement.**

1. Utah Landlord and Utah Debtor entered into that certain *Lease* dated October 31, 2016 ("Original Lease").

2. Utah Debtor agreed to lease certain real property and common areas located at or near 1346 E. Fort Unions Blvd., Cottonwood Heights, UT 84121 (the "Premises").

3. The Original Lease was amended by that certain *First Amendment to Fort Union Lease* dated January 6, 2017 ("1st Amendment"), *Second Amendment to Fort Union Lease* dated February 15, 2017 ("2nd Amendment"), *Third Amendment to Fort Union Lease* dated March 12, 2018 ("3rd Amendment"), *Fourth Amendment to Fort Union Lease* dated August 28, 2018 ("4th Amendment"), and the *Fifth Amendment to Fort Union Lease* dated January 1, 2019 ("5th Amendment").

4. The Original Lease as modified by the 1st Amendment, 2nd Amendment, 3rd Amendment, 4th Amendment, and 5th amendment shall be collectively referred to herein as the "Lease Agreement." A true and correct copy of the Original Lease and all amendments thereto is attached hereto collectively as **Exhibit "A"** and incorporated herein by reference

**B.    Utah Debtor Has Repeatedly Failed to Timely Pay Post-Petition Rent.**

5. After filing its petition for bankruptcy protection under Chapter 11 of Title 11

Engelman Berger, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

of the U.S. Code, Utah Debtor has repeatedly failed to timely make its rent payment due under the Lease Agreement. More particularly, the Utah Debtor has caused at least four (4) post-petition, monetary defaults.

6.     Specifically, Utah Debtor failed to timely make its rent payment for April 2019. Utah Landlord sent correspondence to Utah Debtor on April 17, 2019, notifying Utah Debtor of its non-payment and providing the current outstanding balance due for April 2019, including late fees and accrued interest. A true and correct copy of the April 17, 2019 notice is attached hereto as **Exhibit "B."** Utah Debtor thereafter paid the outstanding balance identified in the April 17, 2019 notice.

7.     In May 2019, Utah Debtor again failed to timely make its rent payment due under the Lease Agreement. Utah Landlord sent a second notice, dated May 15, 2019, notifying Utah Debtor of its non-payment and providing the current outstanding balance due for May 2019, including late fees and accrued interest. A true and correct copy of the May 15, 2019 notice is attached hereto as **Exhibit "C."** Utah Debtor thereafter made a check payment towards May rent.

8.     In June 2019, Utah Debtor again failed to timely make its rent payment due under the Lease Agreement. Utah Landlord sent a third notice, dated June 13, 2019, notifying Utah Debtor of its non-payment and providing the current outstanding balance due for June 2019, including late fees and accrued interest. A true and correct copy of the June 13, 2019 notice is attached hereto as **Exhibit "D."** Utah Debtor did not cure the delinquent rent, so Utah Landlord sent a follow up notice on June 21, 2019, notifying Utah Debtor that cure payments must be received no later than June 24, 2019, after which Utah Landlord would move for relief from the automatic stay. A true and correct copy of the June 21, 2019, correspondence is attached hereto as **Exhibit "E."** On June 24, 2019, Utah Debtor paid the delinquent outstanding balance identified in the June 13, 2019 notice.

9.     In July 2019, Utah Debtor **again** failed to timely make its rent payment due under the Lease Agreement. Utah Landlord sent a fourth notice, dated July 10, 2019,

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

notifying Utah Debtor of its non-payment and providing the current outstanding balance due for July 2019, including late fees and accrued interest. A true and correct copy of the July 10, 2019 notice is attached hereto as **Exhibit "F."** Utah Debtor did not cure the delinquent rent, so Utah Landlord sent a follow up communication notifying Utah Debtor that cure payments must be received no later than July 22, 2019, after which Utah Landlord would move for relief from the automatic stay. A true and correct copy of the correspondence is attached hereto as **Exhibit "G."** Utah Debtor thereafter made a check payment towards July rent, but failed to pay late charges due in the amount of $481.59.

10.     The Assumption Motion requests an order approving the assumption of, among other commercial leases, the Lease Agreement between Utah Debtor and Utah Landlord. Exhibit A to the Assumption Motion states that the estimated cure amount for the Lease Agreement is $6,735.42, equal to one month's base rent, but does not propose to provide cure payments for the 18% default rate interest accruing on unpaid pre-petition rent, or for Utah Landlord's attorneys' fees incurred due to Utah Debtor's defaults.

11.     The Assumption Motion also makes clear that the Debtors **do not** have funding in place to cure monetary defaults or to assure post-petition performance. Rather, Debtors claim they "are in the process of finalizing the terms and conditions of debtor-in-possession round $400,000-$500,000" which they will use to cure their defaults. Debtors do not provide any details about the terms of the proposed financing.

## II.     DEBTORS HAVE NOT PROVIDED ADEQUATE ASSURANCE THAT THEY WILL MAKE THE PAYMENTS REQUIRED BY SECTION 365(b)(1).

In the Assumption Motion, Debtors correctly acknowledge that, as a prerequisite to assumption of the Lease Agreement, 11 U.S.C. § 365(b)(1) requires Utah Debtor to:

A.     Cure, or provide adequate assurance that it will promptly cure, all monetary defaults;

B.     Compensate, or provide adequate assurance that it will promptly compensate, Utah Landlord for any actual pecuniary loss resulting from the default; and

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

1      C.    Provide adequate assurance of future performance under the Lease
2          Agreement.

3      Debtors have not satisfied any of these requirements. The only "assurance" provided

4  by Debtors is that it is "in the process" of finalizing terms for debtor-in-possession ("DIP")

5  financing. However, Debtors have not filed a motion to approve DIP financing, nor have they

6  provided any detail about the yet-to-be proposed DIP financing that would give this Court or

7  Utah Landlord any reason to believe it will be approved. Of course, any DIP financing must

8  satisfy 11 U.S.C. § 364, and may be approved by the Court only after notice and a hearing.

9  Without a Court order approving DIP financing, at least a written commitment from the DIP

10  lender memorialized in a motion to the Court, Debtors' proposed DIP financing is entirely

11  speculative and does not give Utah Landlord any assurance, let alone adequate assurance, that

12  Utah Debtor will make the payments required by Section 365.

13      Debtors also suggest that they have been diligent in making post-petition rent

14  payments, and that therefore the landlords should be adequately assured of future

15  performance. However, as set forth above, Utah Debtor has not been diligent in making its

16  post-petition rent payments to Utah Landlord. To the contrary, each post-petition payment by

17  Utah Debtor was late, and was made only after receiving one or more default notices.

18  Additionally, Utah Debtor still has not paid late charges due for July of 2019.

19      The Assumption Motion fails to mention any other source of funds, admitting through

20  implication that, without the DIP financing, Debtors cannot make the payments required by §

21  365. Accordingly, the Assumption Motion is premature, at best, and must be denied at this

22  time.

## III. DEBTORS MUST PAY FOR INTEREST, ATTORNEYS' FEES, AND COSTS TO COMPENSATE UTAH LANDLORD FOR ITS PECUNIARY LOSSES.

25      Utah Landlord further objects to the Assumption Motion on the grounds that it

26  proposes to make cure payments to Utah Landlord for outstanding monthly base rent, but not

27  for Utah Landlord's attorneys' fees, costs, late fees, or for interest accrued on prepetition

defaults.

Section 365(b)(1)(B) provides that Utah Debtor cannot assume the Lease Agreement unless it compensates, or provides adequate assurance that it will promptly compensate, Utah Landlord "for any actual pecuniary loss" resulting from such default. Where a lease agreement provides for the accrual of interest on past due rent, such interest accrued on a pre-petition lease default is an "actual pecuniary loss" that must be cured prior to assumption. *In re Hillsborough Holdings Corp.*, 126 B.R. 895, 898 (Bankr. M.D. Fla. 1991) ("Clearly, interest is an actual pecuniary loss flowing directly from the admitted default of the Debtor. Thus, it is a compensable item under § 365(b)(1)(B) of the Bankruptcy Code which must be paid as a condition precedent to the Debtor's assuming the Agreement").

Similarly, if the lease agreement entitles the landlord to recover its attorneys' fees and costs arising from the debtor's defaults, such fees and costs are also an "actual pecuniary loss" that must be cured prior to assumption. *In re Bullock*, 17 B.R. 438, 439 (B.A.P. 9th Cir. 1982) ("The court below found that the payment of KMR's attorney's fees incurred in the adversary proceeding should be paid as part of curing the default under 11 U.S.C. § 365(b)(1)(A) and in compensation for KMR's actual pecuniary loss under 11 U.S.C. § 365(b)(1)(B)."); *see e.g., In re Hillsborough Holdings Corp.,* 126 B.R. 895, 898 (Bankr. M.D. Fla. 1991) ("Several cases have dealt with the right to attorney fees under § 365 of the Bankruptcy Code and the majority of these cases holds that entitlement to attorney fees under § 365(b)(1)(B) of the Bankruptcy Code is conditioned on the existence of such an agreement between the parties for payment of attorney fees.").

Here, the Lease Agreement provides that interest accrues on unpaid amounts due under the Lease Agreement until paid in full:

> **31. INTEREST**. Except as expressly provided otherwise in this Lease, any sum owing under the terms and provisions of this Lease which shall not be paid when due or, if not due date is specified in this Lease, within ten (10) days after receipt of written notice, shall bear interest at the greater of: (i) eighteen percent (18%); or (b) the prime rate of interest then charged by Wells Fargo Bank, N.A. for short term (ninety [90] days) unsecured loans made to its preferred customers, plus ten percent (10%); and (ii) the highest legal rate of

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

interest permitted by law, per annum from and after the date the same becomes due and payable by the terms and provisions of this Lease or, if no due date is specified in this Lease, within ten (10) days after receipt of written notice, to and including the date payment is received ("Interest Rate"); provided, any amounts paid by Landlord or Tenant to third parties on behalf of the other or to cure any Default hereunder shall bear interest at the Interest Rate from the date such amounts are paid; and further provided, any obligation of Landlord or Tenant to pay shall continue to bear interest at the Interest Rate after any breach of this Lease.

Exhibit A, ¶31.

Utah Landlord is similarly entitled to recover its reasonable costs and attorneys' fees incurred in this bankruptcy proceeding:

38.9 **Attorneys' Fees**. In the event either Party brings or commences a legal action or proceeding to interpret or enforce any of the terms of this Lease, *the prevailing Party in such action or proceeding shall have the right to recover reasonable costs and attorneys' fees from the other Party* to be fixed by the court. The term "legal proceedings" shall include appeals from a lower court judgment as well as proceedings in the Federal Bankruptcy Court ("Bankruptcy Court"), whether or not they are adversary proceedings or contested matters. *The "prevailing Party": (i) as used in the context of proceedings in the Bankruptcy Court means the prevailing Party in an adversary proceeding or contested matter, or any other action taken by the non-bankruptcy Party which is reasonably necessary to protect its rights under this Lease*; and (ii) as used in the context of proceedings in any court other than the Bankruptcy Court shall mean the Party that prevails in obtaining a remedy or relief which most nearly reflects the remedy or relief which the Party sought (so that, for example, the prevailing Party may be a Party which is ordered to pay $100.00 where the obligation to pay $80.00 was undisputed and the other Party claimed that it was entitled to $1,000.00).

Exhibit A, ¶38.9 (emphasis added).

Accordingly, as a precondition to assumption of the Lease Agreement, Utah Debtor must not only cure its pre-petition defaults for unpaid rent pursuant to Section 365(b)(1)(A), but must also compensate Utah Landlord for its pecuniary losses in the form of accrued interest, attorneys' fees, and costs pursuant to Section 365(b)(1)(B). The estimated cure amounts itemized in the Assumption Motion fail to provide for these payments, and therefore it fails to comply with Section 365(b)(1)(B).

**IV.   CONCLUSION.**

Accordingly, BS Property, LLC respectfully requests that the Court enter an Order: (i) denying the Assumption Motion without prejudice; and (ii) granting such other, further, and

additional relief as is just under the circumstances.

     **DATED** this 6th day of August, 2019.

                           **ENGELMAN BERGER, P.C.**

                         By    /s/  *Scott B. Cohen, SBA 014377*
                             Scott B. Cohen
                             Michael P. Rolland
                             2800 North Central Avenue, Suite 1200
                             Phoenix, Arizona 85004
                             *Attorneys for BS Property, LLC*

**COPY** of the foregoing electronically filed
and served via method indicated this
6TH day of August 2019 to:

Pernell W. McGuire
Aubrey Laine Thomas
**DAVIS MILES MCGUIRE GARDNER PLLC**
Via Email:  pmcguire@davismiles.com
Via Email:  athomas@davismiles.com
*Attorneys for Debtor*

Benjamin W. Reeves
Emily Gildar Wagner
**SNELL & WILMER, L.L.P.**
Via Email:  breeves@swlaw.com
Via Email:  ewagner@swlaw.com
*Attorneys for Official Committee of*
*Unsecured Creditors*

Thomas H. Allen
Cody D. Vendewerker
**ALLEN BARNES & JONES, PLC**
Via Email:  tallen@allenbarneslaw.com
Via Email:cvandewerker@allenbarneslaw.com
*Attorneys for Skyline JSY, LLC*

James L. Ugalde
**QUARLES & BRADY, LLP**
Via Email:  jim.ugalde@quarles.com
*Attorneys for CBDG Grant Road Car*
*Wash, LLC*

George U. Winney, III
**GAMMAGE & BURNHAM**
Via Email:  gwinney@gblaw.com
*Attorneys for 40th Street Developers, LLC*
    *and E.N. Richmond Trust*

Susan M. Freeman
Nicholas S. Bauman
**LEWIS ROCA ROTHGERBER**
**CHRISTIE, LLP**
Via Email:  sfreeman@lrrc.com
Via Email:  nbauman@lrrc.com
*Attorneys for University Village LP*

Daniel J. Vecchio
**GARVEY SCHUBERT BARER, P.C.**
Via Email:  dvecchio@gsblaw.com
*Attorneys for University Village LP*

Kathryn Ore
**PIMA COUNTY ATTORNEY'S OFFICE**
Via Email:  Kathryn.Ore@pcao.pima.gov
Via Email:  pcaocvbk@Qpcao.pima.gov
*Attorneys for Pima County*

Michael S. Steck
**CLARIOR LAW**
Via Email:  michael@clariorlaw.com
*Attorney for Steven Down*

Jennifer A. Giaimo
**OFFICE OF THE U.S. TRUSTEE**
Via Email:  Jennifer.A.Giaimo@usdoj.gov
*Attorney for U.S. Trustee*

Dina L. Yunker
Assistant Attorney General
800 Fifth Ave., Ste. 2000
Seattle, WA 98104-3188

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

{0005999.0000/01010892.DOCX / }

COPY <u>mailed</u> to all parties on the
list of 20 largest unsecured creditors
in related jointly administered cases.


    /s/    Marie K. Kelly
          Legal Assistant

ENGELMAN BERGER, P.C.
2800 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

{0005999.0000/01010892.DOCX / }

# EXHIBIT "A"

LEASE

Between

BS Property LLC,
a Utah limited liability company
as Landlord

and

Even Stevens Utah, LLC
a Utah limited liability company

as Tenant

Dated:      October 3*1*, 2016
Address:    1346 E Fort Union Blvd
            Cottonwood Heights, UT 84121

# TABLE OF CONTENTS

**Section**                                                                                                                    **Page**

1.   PREMISES ............................................................................................................................ 1
2.   MASTER DOCUMENTS ..................................................................................................... 1
3.   TERM ................................................................................................................................... 2
    3.1   Intentionally deleted ................................................................................................. 2
    3.2   Original Term ........................................................................................................... 2
    3.3   Extended Term .......................................................................................................... 3
    3.4   Term .......................................................................................................................... 3
4.   CONSTRUCTION ............................................................................................................... 3
    4.1   Tenant's Construction ............................................................................................... 4
    4.2   Tenant Improvement Allowance ............................................................................... 4
5.   MINIMUM RENT ................................................................................................................ 5
    5.1   Minimum Rent .......................................................................................................... 5
    5.2   Proration of Rent ....................................................................................................... 5
    5.3   Additional Rent ......................................................................................................... 5
    5.4   Payment of Rent ........................................................................................................ 6
    5.5   Common Area Costs .................................................................................................. 6
6.   PARKING AND DRIVEWAY AREA ................................................................................. 7
7.   USES ..................................................................................................................................... 7
    7.1   Permitted Use ............................................................................................................ 7
    7.2   Prohibited Uses ......................................................................................................... 8
    7.3   Exclusive Use ........................................................................................................... 8
8.   HAZARDOUS MATERIALS ............................................................................................... 8
    8.1   Tenant's Covenants ................................................................................................... 8
    8.2   Definitions ................................................................................................................ 9
    8.3   Discovery of Hazardous Materials ......................................................................... 10
    8.4   Environmental Release and Indemnity ................................................................... 10
    8.5   Survival ................................................................................................................... 10
9.   COMPLIANCE WITH LAW ............................................................................................. 10
    9.1   Legal Requirements ................................................................................................ 10
    9.2   Compliance with Legal Requirements .................................................................... 10
10.  CONDITION OF THE PREMISES .................................................................................... 11
11.  ALTERATIONS .................................................................................................................. 11
    11.1   Tenant's Alterations .............................................................................................. 11
    11.2   Removal of Alterations ......................................................................................... 12
    11.3   Assignment of Warranties and Guarantees ........................................................... 12
12.  MAINTENANCE AND REPAIR ....................................................................................... 13
    12.1   Tenant's Obligations ............................................................................................. 13
    12.2   Landlord's Obligations ......................................................................................... 13
13.  LIENS ................................................................................................................................. 14
    13.1   No Liens ................................................................................................................ 14
    13.2   Right to Contest .................................................................................................... 14
    13.3   Notice of Non-Responsibility ............................................................................... 14
    13.4   Indemnification ..................................................................................................... 14
14.  OPERATION ...................................................................................................................... 14
15.  TENANT'S PROPERTY ..................................................................................................... 15
16.  UTILITIES .......................................................................................................................... 15
    16.1   Tenant's Obligations ............................................................................................. 15

|  | 16.2 | Landlord's Rights | 15 |
| 17. | | RULES AND REGULATIONS | 15 |
| 18. | | ENTRY BY LANDLORD | 15 |
| 19. | | TAXES | 16 |
|  | 19.1 | Personal Property and Rent Taxes | 16 |
|  | 19.2 | Real Estate Taxes | 16 |
| 20. | | INDEMNIFICATION; INSURANCE | 16 |
|  | 20.1 | Indemnification | 16 |
|  | 20.2 | Liability Insurance: Coverage and Limits | 17 |
|  | 20.3 | Policy Requirements | 17 |
|  | 20.4 | Contractor's Insurance | 18 |
|  | 20.5 | Workers' Compensation Insurance | 18 |
|  | 20.6 | Liquor Liability Insurance | 18 |
|  | 20.7 | Fire Insurance | 18 |
|  | 20.8 | Waiver of Certain Rights | 18 |
|  | 20.9 | Failure to Insure | 19 |
| 21. | | DAMAGE AND DESTRUCTION | 19 |
| 22. | | CONDEMNATION | 19 |
| 23. | | ADVERTISING | 20 |
|  | 23.1 | Placement of Signs | 20 |
|  | 23.2 | Sign Permits | 20 |
|  | 23.3 | Other Medium | 20 |
| 24. | | ASSIGNMENT, SUBLETTING AND ENCUMBRANCES | 20 |
|  | 24.1 | Landlord's Consent Required | 20 |
|  | 24.2 | Corporation or Partnership | 21 |
|  | 24.3 | Tenant's Application to Assign or Sublease | 22 |
|  | 24.4 | Assignment or Sublease Profit | 22 |
|  | 24.6 | Fees for Review | 22 |
|  | 24.6 | No Release of Tenant | 23 |
|  | 24.7 | Assumption of Obligations | 23 |
|  | 24.8 | Assignment | 23 |
| 25. | | HOLDING OVER | 23 |
|  | 25.1 | Holdover without Landlord's Consent | 23 |
|  | 25.2 | Indemnity | 23 |
| 26. | | QUIET ENJOYMENT | 23 |
| 27. | | SUBORDINATION & ATTORNMENT; ESTOPPEL CERTIFICATES | 24 |
|  | 27.1 | Subordination & Attornment | 24 |
|  | 27.2 | Estoppel Certificates | 24 |
| 28. | | DEFAULT BY TENANT | 24 |
|  | 28.1 | Defaults | 24 |
|  | 28.2 | Remedies | 25 |
|  | 28.3 | Accord and Satisfaction | 27 |
| 29. | | WAIVER OF NOTICE | 27 |
| 30. | | LATE CHARGES | 27 |
| 31. | | INTEREST | 27 |
| 32. | | LANDLORD'S DEFAULT | 28 |
|  | 32.1 | Landlord's Default | 28 |
|  | 32.2 | Notice to Lender | 28 |
|  | 32.3 | Satisfaction of Judgment | 28 |
| 33. | | BROKER'S COMMISSION | 28 |
| 34. | | SECURITY DEPOSIT | 29 |

| 35. | WAIVER OF DEFAULT | 29 |
|---|---|---|
| 36. | EFFECT OF CONVEYANCE | 29 |
| 37. | NOTICES AND PLACE FOR PAYMENT OF RENT | 29 |
| 38. | MISCELLANEOUS | 30 |
| | 38.1 Construction | 30 |
| | 38.2 Entire Agreement | 30 |
| | 38.3 Authority | 30 |
| | 38.4 Modification | 30 |
| | 38.5 Choice of Law | 30 |
| | 38.6 Recording | 30 |
| | 38.7 Remedies Cumulative | 30 |
| | 38.8 Force Majeure | 31 |
| | 38.9 Attorneys' Fees | 31 |
| | 38.10 No Partnership | 31 |
| | 38.11 Merger | 31 |
| | 38.12 Successors | 31 |
| | 38.13 Independent Covenants | 31 |
| | 38.14 Injunctive Relief | 32 |
| | 38.15 Waiver of Jury Trial | 32 |
| | 38.16 Confidentiality | 32 |
| | 38.17 Communications Equipment | 32 |
| | 38.18 Surrender | 32 |
| | 38.19 Joint and Several Obligation | 32 |
| | 38.20 Third Party Beneficiary | 32 |
| | 38.21 Waiver of Rights and Remedies | 32 |
| | 38.22 Additional Defined Terms | 33 |
| | 38.23 Mediation | 33 |
| | 38.24 Consents and Approvals | 36 |
| | 38.25 Guaranty | 36 |

| Exhibit A | - | Site Plan |
|---|---|---|
| Exhibit B | - | Legal Description of Landlord's Property |
| Exhibit C | - | Form of Guaranty |

<u>**LEASE**</u>

THIS LEASE ("**Lease**"), is made and entered into as of the _____ day of October, 2016 ("**Effective Date**"), by and between BS Property LLC a Utah limited liability company ("**Landlord**"), and Even Stevens Utah, LLC, a Utah limited liability company ("**Tenant**"), sometimes collectively referred to herein as the "**Parties**" or individually as a "**Party**".

1.        **PREMISES.**  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, those certain premises containing approximately Two thousand Six hundred (2,600) square feet of gross leasable area (the "**Premises**") located at 1346 E Fort Union Blvd Cottonwood Heights, UT 84121, the location, dimensions and approximate area of which are delineated and labeled as "Premises" on Exhibit "A" attached hereto and incorporated herein by reference ("**Site Plan**").  The Premises are a portion of an existing building/buildings as shown on the Site Plan ("**Building**").  The Premises and Building are part of a larger parcel of real property owned by Landlord, which real property and appurtenant right of way are shown on the Site Plan and more particularly described on Exhibit "B" attached hereto and incorporated herein by reference (collectively, "**Landlord's Property**").  The Parties agree that for purposes of this Lease, the gross leasable square footage of the Premises is 2,600 square feet.  Subject to compliance with applicable governmental requirements, Tenant shall have the exclusive right to construct and use an outdoor patio area (the "<u>Patio Area</u>"), the size and location of which shall be subject to the Landlord's prior approval.  The Patio Area may be used by Tenant's customers only for on-site consumption of items sold from the Premises.  Tenant shall, at its sole cost and expense, maintain the Patio Area in a neat, clean and orderly condition and otherwise in compliance with all of the terms and conditions of this Lease.  For all purposes under this Lease (including without limitation, maintenance, repair, liability and insurance) the Patio Area shall be deemed to be a part of the Premises but not for purposes of calculating Rent or any other amounts payable by Tenant hereunder that are based on square footage.

During the Original Term and any Extended Term (as defined in Section 3 below) Tenant shall have a one-time Right of First Refusal, and provided that (i) this Lease is in full force and effect, (ii) no Default then exists, (iii) Tenant has not previously declined or exercised its right of first refusal under this lease, if all or any part of the rear building on Landlord's Property (the"ROFR Property") is or becomes available for lease, and Landlord receives and desires to accept a letter of intent to lease such ROFR Property (the "ROFR Property LOI"), then Landlord shall give to Tenant notice (the "ROFR Notice") of the same prior to accepting such ROFR Property LOI . If Tenant gives Landlord notice of Tenant's interest in leasing the ROFR Property within five (5) business days after receipt of the ROFR Notice, the Parties shall enter into an amendment to this Lease covering such ROFR Property, which, unless otherwise agreed by the Parties, shall: (i) have a term that is coterminous with this Lease; (ii) provide a rental rate that is equivalent to the rate offered in the ROFR Property LOI, taking into account and equitably adjusting for any improvement allowances and other rent concessions included therein. If Tenant declines its right of first refusal or fails to timely respond to the ROFR notice, then the Landlord shall be free to enter into a lease at any time thereafter with any party on the terms of ROFR Property LOI.   Notwithstanding the foregoing, Landlord agrees that for the ROFR to be effective, the ROFR Property LOI must represent a bona fide, third party offer.  Furthermore, if Landlord fails to lease the ROFR Property on the terms of the ROFR Property LOI after Tenant has declined or failed to exercise its rights hereunder, then for a period of one year after the ROFR Notice, Landlord may not lease the ROFR property on terms more favorable to tenant than the ROFR Property LOI without first renewing Tenant's Right of First Refusal.

2.        **MASTER DOCUMENTS.**  Tenant further agrees that it will not violate, and agrees to be bound by, the provisions of any recorded instrument affecting the Premises.

## 3. **TERM.**

### 3.1 **INTENTIONALLY DELETED**

**3.2** **Original Term.** The original term of this Lease ("**Original Term**") shall commence upon Landlord's delivery of possession of the Premises to Tenant, which shall be no earlier than November 1, 2016 (the "**Commencement Date**"), and shall expire at 11:59PM, Mountain Time, on the expiration of the tenth (10th) Lease Year (defined below), unless earlier terminated pursuant to the terms of this Lease. Landlord shall exercise commercially reasonable efforts to cause the Commencement Date to occur. and if it fails to do so by January 1, 2017 then Tenant shall have the option to terminate this Lease by written notice delivered to Landlord. "**Lease Year**" means each consecutive period of twelve (12) full calendar months following the Rent Commencement Date (defined later). If the Rent Commencement Date is a date other than the first day of a calendar month, the first Lease Year will include the fractional portion of the calendar month in which the Rent Commencement Date occurs and the first full twelve (12) months thereafter. The first Lease Year will also include the period from the Commencement Date to the Rent Commencement.

### 3.3 **Extended Term.**

**3.3.1** Subject to the terms of this Lease, Tenant, at its option, may extend the Term for two (2) separate and consecutive periods of five (5) years (the "**Extended Term**"), so long as Tenant is not in "Default" (as hereinafter defined) at the time Tenant exercises such option or at the time such Extended Term commences. The Extended Term shall be on the same terms and conditions (except Rent and except as otherwise provided herein) set forth in this Lease. Tenant's option to extend shall be exercised by both Tenant giving written notice to Landlord not earlier than twelve (12) months but no fewer than six (6) months prior to the expiration of the Original Term and the execution by both parties of a lease amendment specifying the agreed upon Rent. Rent for the Extended Term shall be equal to the then current market rate, to be established as follows. Within thirty (30) days of Tenant delivering notice of its exercise of the option to extend, Landlord and Tenant shall attempt in good faith to negotiate the then fair market rental rate of the Premises for the Extension Term. If the parties are unable to reach an agreement within such thirty (30) day period, Landlord and Tenant shall mutually agree within ten (10) days thereafter upon a licensed broker with at least ten (10) years' experience in commercial retail leasing to determine such fair market rental rate, the cost of which opinion shall be shared equally by Landlord and Tenant. If the parties are unable to agree on the selection of such a broker, then each of Landlord and Tenant shall select a broker of its own choice within three (3) days thereafter, and such brokers shall in turn mutually select a third, independent broker, to determine the fair market rental rate, the cost of which shall also be split equally between Landlord and Tenant. The fair market rental rate determined by either agreement or broker as provided herein shall be final and binding on the parties with respect to the Extended Term in question.

**3.3.2** Notwithstanding the foregoing, Tenant's right to exercise its option for the Extended Term is expressly conditioned on each of the following additional items: (i) during the three hundred sixty (360) day period ending on the last day Tenant might otherwise elect to exercise its option to extend this Lease, Landlord shall not have given Tenant more than one (1) valid notice of any default in the timely payment of Minimum Rent under this Lease; and (ii) during the three (3) year period ending on the last day Tenant might otherwise elect to exercise its option to extend this Lease, Landlord shall not have given Tenant more than three valid (3) notices of default in the timely payment of Minimum Rent under this Lease.

2

**3.3.3** If Tenant is in Default at the time of its exercise of an option to extend or upon the commencement of an Extension Term or any of the foregoing conditions are not met, then any attempt by Tenant to exercise an option to extend hereunder shall be null and void and this Lease shall terminate on the expiration of the Original Term and both Parties shall be released from any and all liabilities and obligations imposed on them by this Lease, as of the date of expiration of the Original Term, except for any liabilities or obligations, actual or contingent, which arose prior to the date of expiration of the Original Term or which, by their express terms, survive the termination of this Lease.

**3.4** **Term.** The Preliminary Term and the Original Term and the Extended Term, if exercised, are sometimes individually and collectively referred to herein as the "**Term.**"

## 4. CONSTRUCTION.

### 4.1 Tenant's Construction.

**4.1.1** Tenant agrees to perform, or cause to be performed, such construction and/or renovation of the Premises as may be required for Tenant's intended use and occupancy of the Premises and for the operation of Tenant's business from the Premises ("**Tenant's Construction**"). Tenant shall, at its sole cost, prepare, or cause to be prepared, in accordance with all "Legal Requirements" (as hereinafter defined), plans and specifications for Tenant's Construction ("**Tenant's Construction Plans**"). At such time as Tenant's Construction Plans are completed, Tenant shall deliver a copy of Tenant's Construction Plans to Landlord. Landlord shall have ten (10) days from its actual receipt thereof to either reject or accept Tenant's Construction Plans ("**Construction Approval Period**"). Landlord's acceptance of Tenant's Construction Plans shall not be unreasonably withheld. If Landlord does not accept Tenant's Construction Plans in writing within the Construction Approval Period, Tenant's Construction Plans shall be deemed rejected by Landlord. The Parties shall cooperate in good faith and with due diligence to agree mutually on Tenant's Construction Plans. Landlord's approval of Tenant's Construction Plans shall not constitute an acknowledgment or warranty that Tenant's Construction Plans comply with any Legal Requirements. Tenant's Construction shall be completed at Tenant's sole cost and expense, in accordance with Tenant's Construction Plans approved by Landlord, and Tenant shall not make any material changes to Tenant's Constructions Plans approved by Landlord, without first having obtained the prior written consent of Landlord to such changes. Tenant agrees to provide Landlord with an electronic copy of construction marked plans and specifications for Tenant's Construction within thirty (30) days after completion of Tenant's Construction.

**4.1.2** Tenant shall, at its sole cost, obtain all licenses, consents, permits, approvals, variances and authorizations required for performance of Tenant's Construction (collectively "Permits"), provided that Landlord agrees to cooperate in the same to the extent that any action is required by Landlord in connection therewith. Tenant's Construction shall be undertaken promptly after Tenant's receipt of all necessary licenses, consents, permits, approvals, variances and authorizations, and shall be diligently and continuously prosecuted to completion, all at no cost or expense to Landlord. In the event that Tenant, after diligent effort through such administrative processes, as are reasonably and normally required, is unable to obtain said Permits in a form satisfactory for construction and operation of a typical Even Stevens Sandwiches restaurant, Tenant shall have the right to terminate this Lease and declare the same null and void and of no further force and effect and without further liability to either party thereafter arising therefore; provided however, that with regards to all Permit issues other than city parking approvals, Tenant must notify Landlord in writing prior to November 20, 2016 of its intent to terminate this lease under this section. The deadline for Tenant to terminate this Lease based on failure to obtain approval from the city with regards to parking requirements shall be January 6, 2017. If Tenant fails to notify Landlord in writing

3

prior to November 20, 2016 (or January 6, 2017 with respect to parking approvals) then this lease shall remain in full force and effect and section 4.1.2 shall have no effect.   In the event that Tenant terminates this lease under this section Tenant shall forfeit 100% of its security deposit to Landlord.

   **4.1.3** Tenant's Construction shall be completed: (i) in compliance with all Legal Requirements; and (ii) in a good and workmanlike manner, and shall not lessen the fair market value of the Premises and shall not impair the structural of the Premises.   In connection therewith, Tenant shall utilize new materials and/or used, but functional materials, which materials Tenant hereby warrants shall not contain "ACM" (as hereinafter defined) or other "Hazardous Materials" (as hereinafter defined). Notwithstanding anything to the contrary contained in this Lease, Tenant shall be solely responsible for the proper containment, removal and/or disposal of any ACM encountered during Tenant's Construction. Tenant shall exercise its best efforts to cause Tenant's Construction to be completed as soon as reasonably practicable after the Commencement Date.

   **4.1.4** During the course of Tenant's Construction, Tenant and Tenant's contractor shall give Landlord, its agents, contractors and employees access to and shall permit such agents, contractors and employees to inspect, Tenant's Construction and all materials used or to be used in Tenant's Construction, all at such time and as often as Landlord may reasonably request; provided, Landlord shall have no obligation to make any such inspections nor shall Landlord have any responsibility to Tenant or to any person, firm or corporation for any deficiency in Tenant's Construction or for any variance from Tenant's Construction Plans, which may be revealed by any such inspection, whether or not discovered by Landlord.

   **4.1.5** Subject to the provisions of the Section of this Lease entitled "Liens", Tenant hereby agrees to indemnify, defend (with counsel acceptable to Landlord) and hold harmless Landlord and its Related Parties (defined later) from and against any and all liabilities, claims, demands, damages, penalties, liens, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal) judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Landlord or any of Landlord's Related Parties which arise out of, or are alleged to have arisen out of, Tenant's Construction.

  **4.2**  **Tenant Improvement Allowance.** Upon substantial completion (defined below) of Tenant's Construction and opening of Tenant's business to the public, Tenant shall provide to Landlord reasonable details evidencing all costs expended for Tenant's Construction and satisfactory final lien releases or waivers from all potential lien claimants who supplied labor or materials in excess of $1,000.00 for Tenant's Construction, or other reasonable evidence that Tenant's Construction has been completed lien free.   Upon submission to Landlord of such information and documentation, and Landlord's reasonable approval of same, Landlord shall pay to Tenant the sum of Ten-Thousand and 00/100 Dollars ($10,000.00) ("**TI Allowance**"). All amounts payable in connection with Tenant's Construction in excess of the TI Allowance shall be the sole responsibility of Tenant and Tenant covenants to promptly pay all such sums to the persons entitled thereto.   For purposes of this Section, "**substantial completion**" means that Tenant's Construction has been completed with the exception of minor items which can be subsequently completed without material interference with Tenant's conduct of business.   In the event Landlord shall fail, refuse, or neglect to pay the TI Allowance in the manner and in the amount specified in this Section 4.2, Tenant may offset and deduct from the Base Annual Rent and the Minimum Rent, the amount of any TI Allowance owing until such time as the Allowance is completely exhausted, so long as Tenant has provided to Landlord all documents required under this Lease.

4

## 5. **RENT AND COMMON AREA COSTS.**

    **5.1**   **Minimum Rent.** During the Term, Tenant shall pay directly to Landlord, in advance, on or before the first day of each calendar month "**Minimum Rent**" as follows:

    (A)   For the first (1st) Lease Year, annual Minimum Rent shall be Thirty-Three Thousand Six-Hundred Dollars ($33,600.00), to be paid in equal monthly installments. Notwithstanding the foregoing, Minimum Rent shall be abated during the period commencing on the Effective Date and expiring on the date ("**Rent Commencement Date**") that is the earlier of (i) one hundred twenty (120) days after the Commencement Date, or (ii) the date Tenant opens for business to the general public at the Premises; provided, Tenant shall pay Landlord the first months' Minimum Rent on or before the Commencement Date which amount shall be applied to Tenant's Minimum Rent payment for the first month following the Rent Commencement Date.

    (B)   Commencing on the first day of the 2nd Lease Year and on the first day of every Lease Year thereafter, (each, an "**Adjustment Date**"), Minimum Rent shall be adjusted upward by two and one half percent (2.5%).

    (C)   In the event Tenant exercises the Extended Term options, as herein provided, Minimum Rent and annual increases will be at the then current market rate as determined pursuant to Section 3.3.1 above.

    **5.2**   **Proration of Rent.** If the Rent Commencement Date commences or the Term ends on a day other than the first or last day of a calendar month, the Minimum Rent for such partial month shall be prorated in the proportion that the number of days this Lease is in effect during such partial month bears to the total number of days in such calendar month, and such Minimum Rent shall be paid at the commencement of such partial month.

    **5.3**   **Additional Rent.** All amounts which Tenant is required to pay or discharge pursuant to this Lease in addition to Minimum Rent, including, but not limited to all sums owed by Tenant to Landlord or paid to third parties by Landlord on behalf of Tenant (e.g., repair and maintenance, real estate taxes and assessments and insurance premium payments pursuant to the Sections herein entitled "Parking and Driveway Area," "Real Estate Taxes" "Common Area Costs" and "Fire Insurance"), together with every fine, penalty, interest and cost which may be added for non-payment or late payment thereof, shall constitute "**Additional Rent**". Additional Rent shall be paid directly to Landlord at the address specified herein, or at such other place as Landlord may designate in writing. If Tenant fails to pay or discharge any Additional Rent, Landlord shall have all rights, powers and remedies provided herein and/or by law as in the case of non-payment of Rent.

    **5.4**   **Payment of Rent and Common Area Costs.** All Minimum Rent Additional Rent (sometimes collectively referred to herein as "**Rent**" or "**Rental**"), shall be paid by Tenant to Landlord in lawful money of the United States of America without right of offset (unless specifically provided for by this Lease) and without notice or demand at the address stated in the Section of this Lease entitled "Notices and Place for Payment of Rent" or to such other person or place as Landlord may designate from time to time in writing. Upon the occurrence of any Default, Landlord, at Landlord's option, shall have the right to require that any or all amounts due hereunder be paid to Landlord in immediately available funds (i.e., wire transfer, cashier's check or money order).

**5.5** <u>Common Area Costs</u>. Tenant agrees that it shall pay Landlord 60% of all costs and expenses incurred by Landlord for insurance, taxes and other similar costs of ownership of the Landlord's Property not contemplated herein, all relating to the Landlord's Property ("Common Area Costs"). Landlord shall make an estimate of the Common Area Costs at the start of each lease year and Tenant shall pay its' share of such costs on a Monthly basis. Initially, the parties agree that Tenant shall be solely responsible for the ordinary maintenance, repair, operation, security and management of the Protected Parking Area (defined in Section 6.1 below), and that either Landlord or the occupant of the rear portion of the Landlord's Property (the "Rear Occupant") shall be solely responsible for the maintenance and repair of the rest of the Landlord's Property (excluding the Premises and Protected Parking Area for which Tenant is responsible). Landlord shall be responsible for any capital repairs or replacements to Landlord's Property, provided that it may include an equitable share of the amortized costs of any capital expenditures benefiting Tenant as a Common Area Cost. Tenant agrees to cooperate in good faith with the Rear Occupant to equitably allocate costs of certain maintenance items for which it would be economical to share, such as snow removal and garbage removal. However, in the event that Tenant is unable to reach a reasonably acceptable agreement with the Rear Occupant, the Rear Occupant fails to pay its equitable share of such costs, or the rear portion of the Landlord's Property is developed in such a manner as to materially alter the current uses or character of Landlord's Property, then Tenant reserves the right to transfer such maintenance responsibilities to Landlord, in which case the costs shall be included in Common Area Costs and Tenant shall pay its 60% portion of the same. In the event that such shared maintenance items are performed by Landlord, Common Area Costs shall also include a reasonable management fee. The foregoing notwithstanding, Common Area Costs shall not include: (a) costs solely associated with any other building on Landlord's Property; (b) depreciation; (c) debt service pursuant to any mortgage or other financing on Landlord's Property or loans to Landlord and costs and expenses incurred in connection with such financing; (d) costs incurred in leasing space on Landlord's Property, including legal fees for preparation of leases, advertising or promotional expenses, and leasing or brokerage fees or commissions; (e) costs incurred in connection with the transfer or disposition of all or any part of Landlord's interest in Landlord's Property; (f) salaries or fringe benefits of personnel to the extent allocable to other properties on which such personnel performed work, based on the ratio of time spent at Landlord's Property over the total time of such personnel spent at all properties owned, operated or managed by Landlord, an affiliate of Landlord, or any other party directly or indirectly related to Landlord; (g) the cost of repairs or replacements incurred by reason of fire or other casualty or condemnation to the extent that Landlord is compensated therefor through proceeds of insurance or condemnation awards; (h) costs reimbursable to Landlord by other occupants of Landlord's Property; (i) costs for compliance with laws and regulations applicable to Landlord's Property (other than the Premises); (j) reserves for future expenditures or liabilities which would be incurred subsequent to the then current accounting year; (k) any bad debt loss, rent loss or reserves for bad debt or rent loss; (l) any duplication of charges; (m) expenses resulting from the negligence, willful misconduct or violation of any laws or contract by Landlord, its employees, contractors or other occupants of Landlord's Property; and (n) expenses in connection with services or other benefits provided on an ongoing basis to Landlord Property occupants that are not available to Tenant. Landlord shall provide an annual reconciliation of the expenses to Tenant within 90 days of the end of each lease year. Landlord shall issue credit to Tenant for any amounts in excess of actual costs and Tenant shall pay Landlord within 30 days for any costs in excess of the Common Area Payments as shown in the annual reconciliation. Within 90 days after receiving Landlord's reconciliation, Tenant may inspect supporting documentation in Landlord's (or Landlord's property manager's) office. If Tenant's inspection reveals that Tenant's share of Common Area Payments set forth in the reconciliation exceeded by more than ten percent (10%) the amount that actually was due, Landlord shall reimburse Tenant for

the lesser of the actual cost of such examination or the reasonable charges of such examination based on a qualified accountant's reasonable hourly charge (even if such person is actually paid on some other basis), together with other reasonable expenses incurred by such Tenant in connection therewith. Subject to the Tenant's foregoing right of inspection, the reconciled statement shall be final for all purposes for the period in question with respect to both parties. Landlord estimates Tenant's Share of First Year Common Area Expenses as $450 per month which shall be paid monthly as additional rent.

6. **PARKING AND DRIVEWAY AREA.**

6.1 **Parking and Driveway Area.** "Parking and Driveway Area" means that portion of Landlord's Property that is developed from time to time for vehicular ingress, egress and parking on Landlord's Property. Tenant, and its employees, agents, servants, customers, and other invitees shall have, pursuant to the terms and conditions of this Lease, the nonexclusive right in common with Landlord, other tenants and occupants of Landlord's Property (and their respective employees, agents, servants, customers, and other invitees) to use the Parking and Driveway Area for the sole purpose of vehicular and pedestrian ingress, egress and parking during business hours (i.e., overnight parking is not permitted except for Tenant's catering vehicle). Notwithstanding the foregoing, a portion of the Parking and Driveway Area marked on Exhibit A, attached hereto shall be reserved for the exclusive use of Tenant, its agents, employees and guests (the "Protected Parking Area"). Except for the Protected Parking Area, the remainder of the Parking and Driveway Area shall be subject to the sole and exclusive control and management of Landlord. Landlord shall notify Tenant of any reasonable changes to the rules and regulations regarding the Parking and Driveway Area. Tenant agrees to comply with such reasonable rules and regulations which may include restricting employee parking outside of the Protected Parking Area. Notwithstanding the foregoing or anything else in this Lease to the contrary, Landlord agrees that it shall not make any alteration to the exterior of the Premises, to the Protected Parking Area, or to access points from adjoining roads, or otherwise alter Landlord's Property in such a manner that would materially and adversely interfere with accessibility, visibility, or the reasonable operation of the Premises for the Permitted Use (collectively "Protected Changes"). Subject to the Protected Changes, Landlord, at any time, may change the shape, size, location, number and extent of the parking spaces and other improvements shown on the Site Plan and eliminate, add or relocate any parking stalls and other improvements to any portion of Landlord's Property, and may add land to and/or withdraw land from Landlord's Property, and may lease parking stalls for the exclusive use of other its Landlord's other tenants. Tenant shall use the Parking and Driveway Area for ingress, egress and normal parking of vehicles, and for such other purposes as Landlord may specifically permit in writing, but for no other purposes. Landlord agrees to maintain the Parking and Drive Area in good condition and repair. Notwithstanding anything else in this Lease to the contrary, Landlord and Tenant agree to reseal and restripe the Parking and Driveway Area during the period in which Tenant is completing Tenant's Construction or at such other time as the parties may mutually agree. The contractor performing such work shall be mutually agreed upon by Landlord and Tenant and the cost of such work shall be divided equally between Landlord and Tenant with Landlord's contribution not to exceed $2,000.

7. **USES.**

7.1 **Permitted Use.** Subject to the restrictions set forth in this Lease, the Premises shall be used only as a restaurant (which may include office as an ancillary use to the operation of the restaurant) and for no other purpose. Notwithstanding the foregoing, as a compliment to Tenant's permitted use of the Premises, Tenant intends to host live music performances within the Premises up to three (3) evenings per week as it does in its affiliated Even Stevens Sandwich locations. So long as: (1) Tenant complies with

7

applicable laws, local codes and ordinances; and (2) the performances do not rise to the level of a private or public nuisance, then Tenant shall be allowed to host such performances within the Premises as a compliment to the uses permitted by this Section 7.1. For clarity, no business or other operations shall be located or conducted on the roof of the Premises. Tenant shall obtain, at its sole cost and expense, all licenses, consents, permits and approvals which may be required of any governmental entity for Tenant's permitted use.

**7.2** **Prohibited Uses.**

**7.2.1** Tenant shall not use, or allow the Premises to be used, for any unlawful purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises.

**7.2.2** Tenant shall not install, maintain or use an underground storage tank.

**7.2.3** Tenant shall not do or permit anything to be done which will invalidate or increase the cost of any fire, extended coverage or any other insurance policy covering the Premises. Tenant shall promptly reimburse Landlord, as Additional Rent, the full amount of any additional premium charged Landlord for any insurance policy by reason of Tenant's failure to comply with this Section and/or the Section of this Lease entitled "Compliance with Law"; provided that, except in the case of a use by Tenant that is expressly permitted by the terms of this Lease, such reimbursement shall not be Landlord's exclusive remedy, nor shall it limit or compromise any other rights granted Landlord by this Lease or by law or equity.

**7.2.4** Tenant shall not use the Premises for any use which materially increases noise or the emission of dust, odor, smoke or gases, or naturally increases fire, explosion or radioactive hazards on the Premises, beyond that of a commercially reasonable restaurant.

**7.3** **Exclusive Use.** Provided that Tenant is open and operating its business, is not otherwise in material default under this Lease beyond any applicable cure period, and there has been no change in Tenant's Permitted Use, during the Term of this Lease Landlord agrees not to lease space to any other tenant on Landlord's Property whose primary business is the sale of sandwiches and salads. For purposes hereof, "primary business" means a business which generates more than thirty percent (30%) of its gross revenue in any calendar quarter from the sale of said items.

**8.** **HAZARDOUS MATERIALS.**

**8.1** **Tenant's Covenants.**

**8.1.1** Tenant covenants that Tenant and anyone acting by, through, or under Tenant, including, but not limited to, Tenant's Agents, will not, through its acts or omissions, cause or permit any "Hazardous Materials" (as hereinafter defined) to be "Released" (as hereinafter defined) on, under, at or about the Premises.

**8.1.2** Notwithstanding the foregoing, Tenant shall be permitted to store and use within the Premises, a reasonable quantity of cleaning and maintenance products as is necessary for use in the ordinary course of maintaining and cleaning the Premises ("**Cleaning Supplies**"); provided, the use of such Cleaning Supplies, as well as the disposal thereof, used or unused (including any effluents containing such Cleaning Supplies) and any containers in which such Cleaning Supplies are held, shall, in all respects, comply with all "Environmental Laws" (as hereinafter defined).

8

**8.2****Definitions.**

**8.2.1**"**Hazardous Materials**" means any substance or material which is defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "acutely hazardous wastes", "restricted hazardous waste", "toxic substances", or "known to cause cancer or reproductive toxicity" (or words of similar import), petroleum products (including crude oil or any fraction thereof), PCB's, urea-formaldehyde, lead-based paint or any other chemical, substance or material which is prohibited, limited or regulated under any federal, state or local law, ordinance, regulation, order, permit, license, decree, common law or treaty now or hereafter in force regulating, relating to or imposing liability or standards concerning materials or substances known or suspected to be toxic or hazardous to health and safety, the environment or natural resources ("**Environmental Laws**").

**8.2.2**"**Release(d)**" means any actual or threatened spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migrating on or from the Premises or adjacent property, or disposing of Hazardous Materials into the environment.

**8.3****Discovery of Hazardous Materials.**

**8.3.1**Anything in this Lease to the contrary notwithstanding, in the event any Hazardous Materials or Hazardous Materials Release is discovered on, under, at or about the Premises whether or not caused by an act or omission of Tenant or Tenant's Agents or Landlord or Landlord's Agents, Tenant or Landlord, as the case may be, shall immediately notify the other of any such discovery.

**8.3.2**If the Hazardous Materials have been placed, held, located, Released or disposed of by the acts or omissions of Tenant or Tenant's Agents, whether such Release is discovered by Landlord during the Term or following the termination of this Lease, Tenant shall, at its sole cost and expense, comply with all Environmental Laws to remedy the situation, including, without limitation, promptly conducting a site assessment, taking immediate action required for containment of the Hazardous Materials, and preparing and implementing a plan for the clean-up of the Hazardous Materials. Furthermore, if Tenant fails to promptly remedy the Release, Tenant shall reimburse Landlord for Landlord's costs to remove and/or remediate such Release. If the Hazardous Materials have been placed, held, located, Released or disposed of by the acts or omissions of any party other than Tenant or Tenant's Agents, whether such Release is discovered by Landlord or Tenant during the Term or following the termination of this Lease, Landlord shall, at its sole cost and expense, comply with all Environmental Laws to remedy the situation, including, without limitation, promptly conducting a site assessment, taking immediate action required for containment of the Hazardous Materials, and preparing and implementing a plan for the clean-up of the Hazardous Materials.

**8.3.3**Landlord may, at any time during the Term of this Lease upon reasonable prior notice to Tenant (except in the case of emergency) and in a manner so as, to the extent commercially reasonable, to minimize disruption with the conduct of Tenant's business (provided that Tenant acknowledges that there will necessarily be some disruption of its business), inspect the Premises for the existence of Hazardous Materials placed, held, located, Released or disposed of by the acts or omissions of Tenant or Tenant's Agents. If Landlord discovers Hazardous Materials on the Premises placed, held, located, Released or disposed of by the acts or omissions of Tenant or Tenant's Agents in violation of applicable Environmental Laws, Tenant shall, at its sole cost and expense and upon demand of Landlord, reimburse Landlord for its costs to inspect the Premises.

**8.4    Environmental Representation and Indemnity.**

    **8.4.1**    Landlord, to the best of its knowledge as of the date of this Lease, represents to Tenant that no Hazardous Materials are present in the Premise in violation of Environmental Laws or have been concealed within, buried beneath, released on or from, or removed from and stored off-site of the Premise in violation of Environmental Laws.

    **8.4.2**    Tenant hereby agrees to indemnify, defend and hold harmless Landlord and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal), judgments proceedings and causes of action imposed upon, incurred by, or asserted against Landlord or any of Landlord's Related Parties which arise out of, or are alleged to have arisen out of:  (i) the violation of any Environmental Laws by Tenant or Tenant's Agents; (ii) the presence, use, generation, storage, remediation or Release of Hazardous Materials on, under, at or about the Premises attributable to the acts or omissions of Tenant or Tenant's Agents; (iii) any violation of the obligations of Tenant contained in this Section 8; or (iv) any violation of the obligations of Tenant contained in this Lease regarding asbestos containing materials ("ACM").  Without limitation of the foregoing, this indemnification shall include any and all costs for any investigations of the Premises and any cleanup, removal, repair, remediation or restoration and the preparation of any work plans required or permitted by any governmental authority.  Landlord hereby agrees to indemnify, defend and hold harmless Tenant and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal), judgments proceedings and causes of action imposed upon, incurred by, or asserted against Tenant or any of Tenant's Related Parties which arise out of, or are alleged to have arisen out of:  (i) the violation of any Environmental Laws by Landlord or Landlord's Agents; or (ii) the presence, use, generation, storage, remediation or Release of Hazardous Materials on, under, at or about the Premises attributable to the acts or omissions of Landlord or Landlord's Agents.  Without limitation of the foregoing, this indemnification shall include any and all costs for any investigations of the Premises and any cleanup, removal, repair, remediation or restoration and the preparation of any work plans required or permitted by any governmental authority.

    **8.5**    **Survival.**  Landlord and Tenant's representations, warranties, releases indemnifications and obligations under this Section shall survive the expiration or termination of this Lease.

## 9.    COMPLIANCE WITH LAW.

    **9.1**    **Legal Requirements.**  Tenant shall not use the Premises or permit anything to be done in or about the Premises which will in any way conflict with any "Legal Requirements".  "**Legal Requirements**" means all laws, statutes, codes, acts, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits, licenses, authorizations, directions and requirements of and agreements with all governments, departments, commissions, boards, courts, authorities, agencies, officials and officers, foreseen or unforeseen, ordinary or extraordinary, including, without limitation, any Environmental Laws, which now or at any time hereafter may be applicable to the Premises or any part thereof, and the provisions of the Americans with Disabilities Act of 1990, together with all amendments thereto and all rules and regulations promulgated thereunder.

    **9.2**    **Compliance with Legal Requirements.**  Tenant shall, at its sole cost and expense, promptly comply (and shall so cause the Premises and the business conducted thereon to comply) with all Legal Requirements and the requirements of any board of fire underwriters or other similar body now or

10

hereafter constituted in relation to or affecting the condition, use or occupancy of the Premises. The judgment of any court of competent jurisdiction or the admission of Tenant in any action against Tenant, whether Landlord be a party thereto or not, that Tenant has violated any Legal Requirements shall be conclusive of the fact as between Landlord and Tenant. Tenant shall promptly provide to Landlord copies of all documents, including, but not limited to, reports, submissions, notices, orders, directives, findings and correspondence, made by Tenant to any person or governmental authority, or given by any governmental authority or person to Tenant pursuant to Legal Requirements. If any governmental authority requires any repairs, improvements or alterations to be made to the Premises, during the Term, Tenant shall make and pay for such repairs, improvements and alterations. All such repairs, improvements and/or alterations shall be done in accordance with plans and specifications approved by Landlord.

10. **CONDITION OF THE PREMISES.** Tenant represents to Landlord that Tenant has inspected the Premises and has found the same to be satisfactory for all purposes hereunder and TENANT ACCEPTS THE PREMISES IN THEIR EXISTING CONDITION, "AS IS", "WHERE IS", SUBJECT TO ALL LEGAL REQUIREMENTS, ANY STATE OF FACTS WHICH AN ACCURATE SURVEY OR PHYSICAL INSPECTION OF THE PREMISES MIGHT REVEAL, WITHOUT WARRANTIES, EITHER EXPRESS OR IMPLIED, "WITH ALL FAULTS", INCLUDING BUT NOT LIMITED TO BOTH LATENT AND PATENT DEFECTS, AND THE EXISTENCE OF ACM AND HAZARDOUS MATERIALS, IF ANY (BUT SUBJECT TO LANDLORD'S REPRESENTATION AND INDEMNITY IN SECTION 8.4 ABOVE). TENANT HEREBY WAIVES ALL WARRANTIES, EXPRESS OR IMPLIED, REGARDING THE TITLE, CONDITION AND USE OF THE PREMISES, INCLUDING, BUT NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

_____ Tenant's Initials

11. **ALTERATIONS.**

11.1 **Tenant's Alterations.**

11.1.1 Tenant shall not make or allow to be made any additions, alterations or improvements, structural or non-structural, interior or exterior (sometimes hereinafter referred to collectively as "Alterations"), to or of the Premises, or any part thereof of total cost exceeding $20,000 per Calendar year, without, in each instance, first obtaining the written consent of Landlord, which consent shall not unreasonably be withheld. Tenant shall, at its sole cost and expense, prepare, or cause to be prepared, in accordance with all Legal Requirements, plans and specifications ("Tenant's Plans"). At such time as Tenant's Plans are completed, Tenant shall deliver a copy of Tenant's Plans to Landlord. Landlord shall have ten (10) days from its actual receipt thereof to either reject or accept Tenant's Plans ("Approval Period"). If Landlord does not accept Tenant's Plans in writing within the Approval Period, Tenant's Plans shall be deemed rejected by Landlord. The Parties shall cooperate in good faith and with due diligence to mutually agree on Tenant's Plans. Landlord's approval of Tenant's Plans shall not constitute an acknowledgment or warranty that Tenant's Plans comply with any Legal Requirements. All Alterations shall be completed in accordance with Tenant's Plans approved by Landlord, and Tenant shall not make any changes to Tenant's Plans so approved by Landlord without first having obtained the prior written consent of Landlord to such changes. Tenant agrees to provide Landlord with an electronic copy of construction marked plans and specifications for all Alterations within thirty (30) days after completion of such Alterations.

11.1.2 Tenant shall, at its sole cost and expense, obtain all licenses, consents, permits, approvals, variances and authorizations required for performance of all Alterations. All Alterations shall

11

be undertaken promptly after Tenant's receipt of all necessary licenses, consents, permits, approvals, variances and authorizations, and shall be diligently and continuously prosecuted to completion.

11.1.3 All Alterations shall be completed: (i) in compliance with all Legal Requirements; and (ii) in a good and workmanlike manner; shall not lessen the fair market value of the Premises; and shall not impair the structural integrity or change the essential architectural character of the Premises. In connection therewith, Tenant shall utilize new materials and/or used, but functional, materials, which materials Tenant hereby warrants shall not contain ACM, lead-based paint or other Hazardous Materials. Tenant shall use its best efforts to cause all Alterations to be completed as soon as possible after Tenant's receipt of all licenses, consents, permits, approvals, variances and authorizations required therefor.

11.1.4 During the course of constructing any Alterations, Tenant and Tenant's contractor shall give Landlord, its agents, contractors and employees access to, and shall permit such agents, contractors and employees to inspect, all Alterations and all materials used or to be used in such Alterations, all at such time and as often as Landlord may reasonably request; provided, Landlord shall have no obligation to make any such inspections nor shall Landlord have any responsibility to Tenant or to any person, firm or corporation for any deficiency in such Alterations or for any variance from Tenant's Plans which may be revealed by any such inspection, whether or not discovered by Landlord.

**11.2** **Removal of Alterations.** All Alterations shall become the property of Landlord and shall be surrendered with the Premises as a part thereof at the expiration of the Term or earlier termination of this Lease without any obligation of Landlord to pay Tenant for such Alterations. Notwithstanding the foregoing, Landlord may, as part of its approval of the Alterations (but specifically excluding Tenant's Construction), require that Tenant remove such Alterations at the expiration of the Term or earlier termination of this Lease, and if so required, then Tenant upon the expiration of the Term or earlier termination of this Lease shall immediately remove such Alterations and shall repair and restore the portion of the Premises so altered to its original condition, broom clean, ordinary wear and tear excepted.

**11.3** **Assignment of Warranties and Guarantees.** Tenant hereby assigns to Landlord (to the extent assignable) all warranties and guarantees, together with all proceeds resulting from the enforcement of such warranties and guarantees, for any labor or services performed, or materials furnished, by or for Tenant to the Premises to the extent, but only to the extent, any associated additions, alterations or improvements are required to be operated, maintained, repaired or replaced by Landlord pursuant to this Lease. Tenant agrees, at Tenant's sole cost and expense, to cooperate with Landlord and to take all action reasonably required to enforce all such warranties and guarantees.

**12.** **MAINTENANCE AND REPAIR.**

**12.1** **Tenant's Obligations.**

12.1.1 Tenant shall, at Tenant's sole cost and expense, keep the interior and non-structural exterior elements and all structural elements that tenant adds or modifies as part of its tenant construction of the Premises and every part thereof, in good condition and repair, including without limitation, the maintenance and repair of all interior walls, interior surfaces of exterior walls, ceilings, roof, store front, doors, entrances, vestibules, window casements and glass, showcases, skylights, window glazing, plumbing, mechanical and electrical systems, sprinkler system (i.e., that portion of the sprinkler, plumbing, mechanical and electrical systems located in the Premises and exclusively serving the Premises), sewers, drains, wiring, conduits and any other facilities through which utility services are supplied to the

12

Premises, gutters and drainage devices (which obligation shall include keeping such gutters and devices unobstructed and free of debris), damage thereto by fire, earthquake or other casualty, act of God or the elements excepted.

**12.1.2** Tenant shall be responsible for the maintenance of, and for any repair(s) or replacements to the HVAC system and units exclusively serving the Premises.

**12.1.3** Tenant agrees to sweep and clean and remove all snow, dirt and debris from the Premises and the Protected Parking Area on a regular basis, as frequently as necessary to keep such areas in a clean and sightly condition.

**12.1.4** Tenant shall provide adequate trash receptacles and pay for regular pick-up for trash removal, and shall not permit or cause to be permitted any accumulation of trash at the Premises. Tenant agrees to reasonably cooperate with Landlord and its other tenants to minimize the number of dumpsters and other trash receptacles on the Landlord's Property (i.e., negotiate a shared use of dumpsters and trash receptacles on Landlord's Property).

**12.1.5** In addition to its other obligations hereunder, Tenant shall maintain all planting and landscaped areas on the Premises (if any) in a neat and attractive condition (which obligation shall include mowing of grass and re-planting if necessary).

**12.1.6** Tenant shall also make and pay for all maintenance, repairs and replacements, ordinary and extra-ordinary, foreseen and unforeseen, necessary to keep all portions of the exterior walls of the Premises in good condition and repair (which obligation shall include painting, staining, removal of graffiti, etc., but shall exclude structural repairs reserved to Landlord under Section 12.2.1 below).

**12.1.7** If Tenant does not maintain the Premises as required hereunder, following the expiration of any applicable grace or cure period expressly provided in this Lease, Landlord may, but need not do so, and Tenant shall, upon demand, pay Landlord's cost therefor.

## 12.2    Landlord's Obligations.

**12.2.1** Except for those repairs which are the responsibility of Tenant as set forth in Section 12.1, Landlord shall make or cause to be made all necessary repairs to the structural portions of the Premises including foundations, walls, columns, beams, floor slabs and masonry, all service entry utility lines, unless such repairs are necessitated by the willful or negligent act or omission of Tenant or Tenant's Agents, in which event the cost of all such repairs shall be paid by Tenant.

**12.2.2** Subject to its recoupment of Tenant's share of the Common Area Costs, Landlord shall also be responsible for maintaining the Parking and Driveway Area, and all other common areas and facilities on Landlord's Property, in good working order and repair, unless such repairs are necessitated by the willful or negligent act or omission of Tenant or Tenant's Agents, in which event the cost of all such repairs shall be paid by Tenant.

**12.2.2** Landlord shall not be required to make, or cause to be made, any repairs unless and until Tenant has notified Landlord in writing of the need for such repairs.   Landlord shall have a reasonable time thereafter to make, or cause to be made, such repairs.

13

## 13. **LIENS.**

**13.1** **No Liens.** Tenant shall keep the Premises free from any liens arising out of any labor or services performed, materials furnished, or obligations incurred by or for Tenant. Tenant shall require any contractor or other person performing work on the Premises to be licensed by the State in which the Premises are located.

**13.2** **Right to Contest.** Tenant may contest the validity and/or amount of any lien imposed on the Premises provided Tenant has caused such lien to be released of record by payment or by posting of a proper bond. If Tenant shall be in default in paying any charge for which a bond or other security has been filed and shall not have given Landlord alternative security to protect the Premises, then Landlord may, but shall not be obligated to, pay the claim or to post a bond. Any costs and attorneys' fees incurred by Landlord in connection therewith shall be immediately due and owing from Tenant to Landlord.

**13.3** **Notice of Non-Responsibility.** Notice is hereby given that Landlord shall not be liable for any labor or services performed, or materials furnished, to or for Tenant or anyone holding or claiming an interest in the Premises by, through or under Tenant, and that no mechanic's, materialman's or other liens for any such labor, services or materials shall attach to or affect the interest of Landlord in and to the Premises. Landlord shall have the right to post and record notices of non-responsibility with respect to such work. Tenant shall give written notice to Landlord at least thirty (30) days prior to the commencement of any Alterations in order that Landlord shall have the opportunity to post and record such notices.

**13.4** **Indemnification.** Tenant hereby agrees to indemnify, defend (with counsel acceptable to Landlord) and hold harmless Landlord and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, liens, expenses (including, without limitation, reasonable costs and attorneys' fees on any appeal), judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Landlord or any of Landlord's Related Parties which arise out of, or are alleged to have arisen out of, any work performed on the Premises by or for Tenant. Landlord hereby agrees to indemnify, defend and hold harmless Tenant and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, liens, expenses (including, without limitation, reasonable costs and attorneys' fees on any appeal), judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Tenant or any of Tenant's Related Parties which arise out of, or are alleged to have arisen out of, any work performed on the Premises by or for Landlord.

## 14. **OPERATION.**

Once Tenant has opened for business to the public, if no business shall be conducted at the Premises for a continuous period in excess of three (3) months (except by reason of strikes, fire, casualty, repairs or remodeling), Landlord shall have the right to terminate this Lease by the delivery of written notice to Tenant, in which event this Lease shall be terminated on the thirtieth (30th) day following the date such notice is deemed to have been given. Tenant shall utilize high quality trade fixtures and furnishings within the area of the Premises open to customers and the public, and at such time(s) as Tenant is operating its business on the Premises, Tenant shall conduct its business consistent with reputable business standards and practices.

Tenant shall not vacate or abandon the Premises at any time during the Term of this Lease, and, if Tenant shall abandon, vacate, cease to operate or surrender the Premises, or be dispossessed by process of law or otherwise, then after receipt by Tenant of not less than ten (10) days prior notice from Landlord, "Tenant's Property" (as hereinafter defined) and any other personal property belonging to Tenant left on the

14

Premises shall be deemed abandoned and shall, at Landlord's election in its sole and absolute discretion, be conclusively presumed to have been conveyed by Tenant to Landlord without compensation, allowance or credit to Tenant.

**15.     TENANT'S PROPERTY.**   Tenant shall have the right to place any trade fixtures and equipment, inventory and other personal property (collectively, "**Tenant's Property**"), in the Premises, and Tenant's Property shall remain the property of Tenant.   Tenant covenants to repair any damage caused by the removal of Tenant's Property.   Landlord agrees that Tenant shall have the right, at any time or from time to time, to remove any or all of Tenant's Property.

**16.     UTILITIES.**

       **16.1     Tenant's Obligations.**   Commencing on the Commencement Date, Tenant shall contract in its name and shall pay directly to the utility company, before delinquency, all utility deposits and fees including any present or future installation, hook-up and/or service charges, together with any taxes thereon, for water, electricity, sewage, gas, telephone and any other utility services supplied to the Premises.   Tenant shall not install any equipment which will exceed or overload the capacity of utility facilities.   If any equipment installed by Tenant shall require additional utility facilities, Tenant shall first obtain Landlord's written consent to such installation and such installation shall be at Tenant's sole cost and expense.   If any Utilities are delivered in common with other Tenants of the Property, Tenant agrees to cooperate with other Tenants to equitably share the joint costs.

       **16.2     Landlord's Rights.**   If any utility charges are not paid when due (taking into account any express grace period), Landlord may pay the same and any amount so paid by Landlord shall be immediately due and owing from Tenant to Landlord as Additional Rent.   In the event any utilities are furnished by Landlord, Tenant shall pay Landlord, upon demand, Tenant's pro rata share of such utilities as Additional Rent, which share shall be estimated by Landlord on an equitable and commercially reasonable basis.   Landlord and Landlord's Related Parties shall not be liable to Tenant in damages or otherwise if any utility services are interrupted or terminated, nor shall any such interruption or termination relieve Tenant of the performance of any of its obligations hereunder; however, in the event that an interruption of the utility services is within Landlord's reasonable control and such interruption causes the Premises to be inoperable for a period of at least five (5) consecutive business days, Minimum Rent shall be thereafter abated proportionately until such services are restored.

**17.     RULES AND REGULATIONS.**   Omitted.

**18.     ENTRY BY LANDLORD.**   In addition to its rights otherwise provided in this Lease, Landlord reserves and shall, at any and all reasonable times upon at least twenty four (24) hours prior notice, except in the case of an emergency, have the right to enter the Premises to inspect the same, to remediate Hazardous Materials, to perform ACM surveys, to submit the Premises to prospective purchasers or tenants, to post notices of non-responsibility, and to alter, improve or repair the Premises, all without abatement of Rent.   In connection with any such action, Landlord may erect scaffolding and other necessary structures where reasonably required by the character of the work to be performed.   In connection with any such entry described above, Landlord shall endeavor to minimize disruption to Tenant's use of the Premises, and Tenant shall be entitled to a proportionate abatement of Minimum Rent and Additional Rent if any entry hereunder prevents Tenant's reasonable operation of the Premises for the permitted use for more than two (2) consecutive business days, or seven (7) business days in any Lease Year (unless such entry was necessitated due to the negligent act or omission of Tenant in which case no abatement shall apply).   Tenant shall have the right to have a representative present at the time of any entry

hereunder (except in an emergency). Except as provided above or in the case of breach by Landlord of the express terms of this Section, Tenant hereby waives any claim for damages for any injury or inconvenience to or interference with Tenant's business, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned by Landlord's entry as provided in this Section. Landlord shall have the right to use any and all means which Landlord may deem proper to open such doors in an emergency in order to obtain entry to the Premises, and any entry to the Premises obtained by Landlord shall not be construed or deemed to be a forcible or unlawful entry into or a detainer of the Premises, or an eviction of Tenant from the Premises. During the last ninety (90) days of the Original Term, Tenant shall permit Landlord to place upon the Premises signs advertising the Premises for rent or lease.

19. **TAXES.**

      **19.1**   **Personal Property and Rent Taxes.**  Tenant shall pay or cause to be paid, before delinquency, any and all taxes levied or assessed during the Term: (i) upon all Rental paid by Tenant to Landlord; and (ii) upon all leasehold improvements, inventory, and merchandise, equipment, furniture, fixtures, and other personal property located in the Premises, except that which is owned by Landlord.

      **19.2**   **Real Estate Taxes.**

      **19.2.1**  Tenant shall pay 60% of all "Real Estate Taxes" levied or assessed by lawful taxing authorities against the land, buildings, and improvements comprising Landlord's Property. "**Real Estate Taxes**" shall mean all taxes, assessments, levies, and charges, whether special, extraordinary, or otherwise, whether foreseen or unforeseen, which may be levied, assessed, or imposed on, on account of or with respect to: (i) the ownership of and/or all other taxable interests in all land situated in Landlord's Property; (ii) all buildings, structures, and other improvements situated on such land; (iii) rents or rental income, whether such tax is levied on Landlord or Tenant; and (iv) this Lease or the transaction evidenced by this Lease.

      **19.2.3**  Taxes for the first and last years of the Original Term shall be prorated between Landlord and Tenant.

20. **INDEMNIFICATION; INSURANCE.**

      **20.1**   **Indemnification.**

      **20.1.1**  Tenant hereby agrees to indemnify, defend (with counsel acceptable to Landlord) and hold harmless Landlord and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, liens, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal), judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Landlord or any of Landlord's Related Parties which arise out of, or are alleged to have arisen out of: (i) the injury to or death of any person or the damage to or destruction of any property occurring in, on or about the Premises or Landlord's Property and caused by the willful or negligent act or omission of Tenant or Tenant's Agents; (ii) the use and occupancy of the Premises or Landlord's Property by Tenant or Tenant's Agents; (iii) any breach or default in the performance of any of the terms or provisions of this Lease by Tenant or Tenant's Agents (including, without limitation, failure to comply with Legal Requirements); or (iv) the breach of any warranty or representation on the part of Tenant under this Lease, unless in each case caused by the willful or negligent act or omission of Landlord or Landlord's Agents. Landlord hereby agrees to indemnify, defend and hold harmless Tenant and its Related Parties from and against any and all liabilities, claims, demands,

16

damages, penalties, liens, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal), judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Tenant or any of Tenant's Related Parties which arise out of, or are alleged to have arisen out of:   (a) the injury to or death of any person or the damage to or destruction of any property occurring in, on or about Landlord's Property and caused by the willful or negligent act or omission of Landlord or Landlord's Agents; (b) the use and Landlord's Property by Landlord or Landlord's Agents; (c) any breach or default in the performance of any of the terms or provisions of this Lease by Landlord or Landlord's Agents (including, without limitation, failure to comply with Legal Requirements); or (d) the breach of any warranty or representation on the part of Landlord under this Lease, unless in each case caused by the willful or negligent act or omission of Tenant or Tenant's Agents.

**20.1.2**   The obligations with respect to indemnification hereunder shall remain effective notwithstanding the expiration or termination of this Lease, as to claims or liability arising or accruing prior to the expiration or termination of this Lease.

**20.2    Liability Insurance:   Coverage and Limits.**   Tenant shall provide and maintain comprehensive general liability insurance with broad form coverage endorsement (including broad form property damage endorsement) insuring it against claims for personal injury, bodily injury, death and property damage occurring on, in or about the Premises, with a "Split Limit" (covering personal injury liability, bodily injury liability and property damage liability) of not less than One Million Dollars ($1,000,000.00) for any one occurrence, and Two Million Dollars ($2,000,000.00) in the aggregate.

All insurance required to be provided by Tenant under this Section may be in the form of blanket liability coverage so long as the blanket policy does not reduce the limits nor diminish the coverage required herein.

Any insurance policy required to be maintained by Tenant under this Section shall be written by insurance companies which are qualified and licensed to do business in the State in which the Premises are located.   Tenant shall cause a certificate providing such information as reasonably requested by Landlord evidencing the existence and limits of its insurance coverage with respect to the Premises to be delivered to Landlord upon the commencement of this Lease.   Thereafter, Tenant shall cause similar certificates evidencing renewal policies to be delivered to Landlord at least thirty (30) days prior to the expiration of the term of each policy and at such other times as reasonably requested by Landlord.

The insurance limits in this Section shall be subject to increase from time to time by such amounts as Landlord may reasonably determine is necessary or desirable, as evidenced by the practice of similarly situated properties and so long as such coverage requirements do not exceed the typical requirements of other Tenant restaurant locations.

The insurance policies to be maintained by Tenant hereunder shall be obtained prior to the commencement of Tenant's Construction (and in no event later than the Rent Commencement Date), provided however, that during the period of Tenant's Construction, Tenant's insurance requirements may be satisfied by a builder's risk policy held by Tenant's general contractor which names Tenant and Landlord as additional insureds and provides substantially equivalent coverage.

**20.3    Policy Requirements.**   All policies of liability insurance shall insure the performance by Tenant of the indemnity agreements contained herein and shall contain a provision that the insurance company will furnish Landlord thirty (30) days' advance written notice of any cancellation or lapse, or the effective date of any reduction in the amounts or scope of coverage (provided however, that only ten (10)

17

days advance notice shall be required in the case of any cancellation for failure to pay premiums). Each Party shall promptly notify the other Party of any asserted claim with respect to which such Party is or may be indemnified against hereunder and shall deliver to such Party copies of process and pleadings.

Tenant's policies shall name Landlord and Landlord's lender as additional insureds or loss payees under said policies.

**20.4   Contractor's Insurance.**  During the period of any construction on the Premises by or at the request of Tenant, Tenant agrees to obtain or require its contractor to obtain and thereafter maintain, so long as such construction activity is occurring, at least the following minimum insurance coverage:  (i) Workers' compensation - statutory limits; (ii) Employer's liability - One Hundred Thousand Dollars ($100,000.00); (iii) Commercial general liability and commercial automobile liability as follows:  (1) **"Split Limit"** (covering personal injury liability, bodily injury liability, and property damage liability) in any one occurrence of not less than One Million Dollars ($1,000,000.00); (2) "Broad Form" Property Damage Endorsements; (3) "Personal Injury" Endorsements; and (4) "Blanket Contractual Liability" Endorsement.

**20.5   Workers' Compensation Insurance.**  Tenant agrees to maintain and keep in force, during the Term hereof, all Workers' Compensation and Employers' Liability Insurance required under applicable Workers' Compensation Acts.

**20.6   Liquor Liability Insurance.**  Tenant shall also maintain such liquor liability or "dram shop" insurance as is required by law.

**20.7   Fire Insurance.**

**20.7.1**  During the Term, Landlord shall provide and maintain a policy or policies of fire and casualty insurance covering the Premises, which may include endorsements of Landlord's selection, and any other coverage required by Landlord's lender or governmental authorities, and which may also include rental insurance covering any period(s) of Rent abatement under this Lease.  Tenant shall reimburse Landlord, within thirty (30) days after receipt of an invoice from Landlord, for its Proportionate Share of the premium for such insurance policy or policies, or, at Landlord's option, Tenant shall reimburse Landlord one twelfth (1/12th) of Tenant's Share of the annual premium estimated by Landlord for such insurance with each monthly Minimum Rent payment due hereunder, all of which shall constitute Additional Rent.  If Landlord elects to have Tenant reimburse monthly based on an annual premium estimate, Landlord shall provide Tenant with a statement at the end of each calendar year setting forth all expenses actually incurred and shall make any appropriate adjustments.

**20.7.2**  During the Term, Tenant shall also provide and maintain, a policy or policies of fire and casualty insurance covering Tenant's Property.   Tenant agrees that Tenant's Property and leasehold improvements located on the Premises shall be provided and maintained by Tenant at its sole risk and expense, and under no circumstance other than Landlord's gross negligence or willful misconduct shall Landlord be liable to Tenant for damages to Tenant's Property or leasehold improvements located on the Premises regardless of cause or origin.

**20.8   Waiver of Certain Rights.**  Notwithstanding any other provisions of this Lease, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been

18

occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a waiver of subrogation provision in their respective policies in order to implement this Section.

      **20.9**   **Failure to Insure.** If either Party fails to provide and maintain during the Term of this Lease all or any of the policy or policies of insurance described in this Lease, then the other Party may, at its option and in its sole and absolute discretion, obtain all or any of such insurance and keep the same in full force and effect, and the responsible Party shall reimburse the procuring Party the premium cost of such insurance within thirty (30) days after receipt of an invoice from the procuring Party, all of which, in the event of Tenant's failure, shall constitute Additional Rent.

      **21.**   **DAMAGE AND DESTRUCTION.** If all of the Premises is totally destroyed by fire or any other event ("Casualty"), then this Lease shall terminate at the option of either Landlord or Tenant by written notice to the other party within sixty (60) days following the date of Casualty, and the Rent shall be abated for the unexpired portion of the Lease effective as of the date of Casualty. If the Premises is partially damaged by Casualty, and if the Premises are damaged to such extent that the damage cannot, in the parties' reasonable judgment, be rebuilt or repaired economically (taking into account the time necessary to receive any insurance proceeds and using normal construction methods without overtime or other premium) within two hundred seventy (270) days after the date of Casualty, then this Lease shall terminate at the option of Landlord or Tenant by written notice to the other party within thirty (30) days following the date of Casualty, and the Rent shall be abated for the unexpired portion of the Lease effective as of the date of Casualty. Notwithstanding anything contained herein to the contrary, if the Premises is partially damaged by Casualty and either (i) insurance proceeds are not made available to Landlord or are inadequate for restoration, or (ii) Landlord determines that the Premises or Landlord's Property is no longer reasonably suitable for use as a retail commercial use, then Landlord shall have the right to terminate this Lease by written notice to Tenant within thirty (30) days following the date of Casualty, and the Rent shall be abated for the unexpired portion of the Lease effective as of the date of Casualty. If this Lease is not terminated pursuant to this Section, then Landlord shall, at its sole expense, proceed with reasonable diligence, rebuild or repair the Premises (including improvements made or paid for by Tenant, the loss of which is covered by insurance carried by Landlord, but excluding Tenant's trade fixtures and personal property), and other improvements within the Landlord's Property to as near the condition in which they existed immediately prior to the date of Casualty as reasonably possible. If the Premises are to be rebuilt or repaired and are unsuitable for the reasonable operation of the Permitted Use in whole or in part during the period of such repair or rebuilding, then the Rent payable under this Lease during the period for which the Premises are unsuitable shall be abated in proportion to the areas of the Premises rendered unsuitable (as reasonably and equitably determined by the parties) from the date of Casualty until restoration is completed by Landlord

      Tenant shall not be entitled to any portion of the insurance proceeds in connection with any fire or other casualty, except for those proceeds from Tenant's own insurance policies with respect to Tenant's Property.

    **22.**   **CONDEMNATION.** If all or any portion of the Premises or any easements, rights or appurtenances thereto, shall be taken or condemned by any public authority or by any other person or corporation under any statute, by eminent domain, or by any transfer in lieu thereof, and such taking or condemnation renders the remainder of the Premises, or any part thereof, unsuitable for the conduct of business operations, Landlord or Tenant may, within sixty (60) days after the occurrence of such taking or condemnation, notify the other in writing of such party's election, to terminate this Lease. If neither party elects to terminate the lease as provided herein, then Landlord shall restore such improvements

(excluding any and all improvements installed by Tenant) to substantially the same condition as is reasonably practical taking into account such taking or condemnation.

If, as a result of the occurrence of such taking or condemnation, Tenant is deprived of the use and occupancy of any part of the Premises, Minimum Rent shall be reduced according to the extent Tenant is deprived of its use and occupancy of the Premises, which reduction shall be reasonably determined by Landlord.

Tenant shall have no claim or right to any portion of any award given in a condemnation proceeding, provided that so long as the same does not in any manner reduce Landlord's award Tenant shall have the right to any award granted to Tenant specifically for its moving, relocation and other expenses, and Tenant shall be allowed to assert its claim for such losses (specifically excluding any claim for loss of the leasehold estate) in a separate claim with the condemning authority.

## 23. ADVERTISING.

**23.1** **Placement of Signs.** Subject to all Legal Requirements, Tenant may place signs on or in the Premises; provided, Tenant shall obtain the prior written approval of Landlord as to the location and design of any exterior signs and window display signs. Any permitted sign shall be of a neat character and design, and shall advertise or refer only to the kind and character of business which Tenant is permitted to conduct on the Premises. In addition to the foregoing, Tenant shall have the non-exclusive right, at its own expense, to use the existing pylon sign on the Landlord's Property, and if approved by the city, to construct and use a monument sign at Tenant's expense at a location reasonably acceptable to Landlord. Notwithstanding the foregoing, no signs shall be placed on the roof of the Premises and no aerial, antenna, banner or flag shall be placed on the roof or exterior walls of the Premises, except that subject to applicable laws, rules and regulations, Tenant shall be permitted to display its customary "Coming Soon", "Grand Opening" or "Now Hiring" banners on the Premises from the date forty five (45) days prior to the Rent Commencement Date through the date forty five (45) days following the Rent Commencement Date. Any such banners shall be tastefully and professionally prepared, and in accordance with all applicable laws, rules and regulations and Tenant shall comply with the same.

**23.2** **Sign Permits.** Prior to the installation or erection of any sign at the Premises, Tenant shall, at its cost, obtain all necessary licenses, consents, permits and approvals from all applicable governmental authorities. Tenant shall, at its sole cost and expense, maintain its signs in good and presentable and shall remove the same upon the expiration or termination of this Lease and repair any damage caused by such removal.

**23.3** **Other Medium.** No other advertising medium shall be utilized by Tenant in, on or from the Premises which can be heard or experienced outside the Premises, including, without limitation, flashing lights, search lights, loud speakers, phonographs, radio or television. This Section shall not affect Tenant's ability to operate an outdoor dining or seating area on the sidewalk area in front of the Premises, subject to compliance with all of the other terms of this Lease and applicable laws, codes, ordinances, rules and regulations.

## 24. ASSIGNMENT, SUBLETTING AND ENCUMBRANCES.

**24.1** **Landlord's Consent Required.** Tenant shall not voluntarily or involuntarily, whether by operation of law or otherwise: (a) mortgage, pledge or encumber this Lease or any interest therein; or (b) assign or transfer this Lease or any interest therein, or sublet the Premises or any part thereof, without the

prior written consent of Landlord. Any attempt to assign this Lease or sublet the Premises without such consent shall be voidable by Landlord and, at Landlord's election, shall constitute a Default under this Lease. Subject to the conditions set forth in this Section, Landlord's consent shall not be withheld; provided, Landlord may withhold its consent, in its sole and absolute discretion if the Premises are to be used for any purpose other than the use(s) described the Section herein entitled "Use". In determining whether or not to grant consent, Landlord may consider: (a) the financial worth and credit worthiness of the proposed sublessee or assignee; (b) the character of the sublessee or assignee (including, whether its business is consistent with the use restrictions contained in this Lease, whether the type of business is restricted under any existing encumbrances or other agreements pertaining to the Premises and/or whether the business of the proposed sublessee or assignee requires the use or disposal of Hazardous Materials); (c) the business experience of the proposed sublessee or assignee; and (d) the general business reputation of the proposed sublessee or assignee (including its reputation and record for paying its obligations as they become due). The foregoing considerations are not intended to be exclusive and Landlord may deny consent based on any other consideration. The Parties acknowledge and agree that the foregoing considerations are reasonable.

Notwithstanding anything to the contrary contained in this Section 24 or the Lease, and provided that Tenant is not in default hereunder, Tenant may transfer this Lease without Landlord's consent and without any payment of transfer consideration to (i) any corporation, limited liability company, partnership or other business entity that controls, is controlled by, or is under common control with Tenant (specifically including, but not limited to an internal corporate reorganization of Tenant constituting a mere change in its entity form, such as converting to a corporation); (ii) any corporation, limited liability company, partnership or other business entity resulting from the merger or consolidation with Tenant; (iii) any entity that acquires substantially all of Tenant's assets; (iv) a transfer of ownership or control in Tenant which applies to substantially all restaurants operated by Tenant; or (v) any issuance or subsequent transfer of voting stock to the public through a listing on a "national securities exchange" as defined in the Securities Exchange Act of 1934 (each of (i) through (v) is individually referred to herein as a "Permitted Transfer" to a "Permitted Transferee"). Any Permitted Transferee shall expressly assume in writing the obligations of Tenant hereunder; provided, however, Tenant and Guarantor, shall remain liable under this Lease following such transfer unless Tenant demonstrates to Landlord's reasonable satisfaction that the Permitted Transferee's net worth equals or exceeds the greater of Tenant's and Guarantor's net worth as of the date hereof. Tenant shall provide to Landlord a fully executed copy of the transfer of this Lease within thirty (30) days of such transfer, together with such other information as Landlord shall reasonably require to confirm that the transfer in fact qualifies as a Permitted Transfer. In no event shall Tenant strategically structure a Permitted Transfer, or use a series or combination of Permitted Transfers, to intentionally circumvent Tenant's obligation to obtain the prior written consent of Landlord to a Transfer that would otherwise require Landlord's consent under this Lease, it being understood and agreed that Tenant shall act reasonably and in good faith with respect to effectuating any Permitted Transfers.

**24.2    Corporation or Partnership**. If Tenant shall be a corporation or partnership, any transfer of voting stock or partnership interest (other than a Permitted Transfer) resulting in the person(s) who, on the date of this Lease shall have owned a majority of such corporation's shares of voting stock or the general partners' interest in such partnership, as the case may be, ceasing to own a majority of such shares of voting stock or general partners' interest, as the case may be (except as the result of transfers by inheritance) shall be deemed to be an assignment of this Lease as to which Landlord's consent shall have been required, and in any such event Tenant shall so notify Landlord, except that this provision shall not be applicable to any corporation all the outstanding voting stock of which is listed on a national securities exchange (as defined in the Securities Exchange Act of 1934, as amended). For the purposes of this

21

Section, the term "voting stock" shall refer to shares of stock regularly entitled to vote for the election of directors of the corporation.

**24.3** <u>Tenant's Application to Assign or Sublease.</u>  If Tenant desires at any time to assign this Lease or to sublet the Premises or any portion thereof in any manner other than a Permitted Transfer, Tenant shall submit to Landlord, at least sixty (60) days prior to the proposed effective date of the assignment or sublease ("**Proposed Effective Date**"), in writing:  (i) a notice of intention to assign or sublease setting forth the Proposed Effective Date, which shall be no less than sixty (60) days and no more than one hundred eighty (180) days after Landlord's receipt of such notice; (ii) the name of the proposed subtenant or assignee; (iii) the nature of the proposed subtenant's or assignee's business to be carried on in the Premises; (iv) the terms and provisions of the proposed sublease or assignment; (v) such financial information as Landlord may require concerning the proposed subtenant or assignee, including but not limited to, a financial statement of the proposed subtenant or assignee; and (vi) references Landlord may call to verify any representations made with respect to the proposed sublessee or assignee, as well as its reputation for timely payment of obligations.   Landlord will notify Tenant of its approval or disapproval of the proposed sublease or assignment at least thirty (30) days prior to the Proposed Effective Date.

**24.4** <u>Assignment or Sublease Profit.</u>  In the event of any approved assignment or sublease of all or any portion of the Premises to anyone other than a Permitted Transferee, where the rent reserved in the assignment or sublease exceeds the Rent or pro rata portion of the Rent, as the case may be, for such space reserved in this Lease, Tenant shall pay Landlord monthly, as additional rent, at the same time as the payment of Minimum Rent required hereunder, one-hundred percent (100%) of the excess of the rent reserved in the assignment or sublease over the Rent reserved in this Lease and applicable to the assigned or subleased space, provided that any excess Rent received by Landlord shall be credited to reduce any remaining obligations of Tenant under the Lease, it being the intent of the parties that if Tenant is called upon to satisfy any unpaid obligations of the assignee or sublessee, Tenant shall also get credit for prior payments made by such assignee or sublessee which were in excess of the rent due from Tenant over such period of time. In the event of any approved assignment or sublease of this Lease or the Premises, Tenant shall pay Landlord, immediately upon receipt, one hundred percent (100%) of any additional consideration received by Tenant in lieu of rent for the Premises.

**24.5** <u>Fees for Review.</u>  In the event Tenant shall request approval for an assignment or sublease, Tenant shall pay to Landlord, all reasonable costs incurred by Landlord in connection with such review.   At the time Tenant shall submit its request for approval for such assignment or sublease, Tenant shall include the sum of Five Hundred and 00/100 Dollars ($500.00) as a non-refundable fee for Landlord's time incurred in connection with reviewing such application, which amount shall be applied toward, but shall not limit, Tenant's responsibility for costs set forth in the immediately preceding sentence.   Failure to pay such fee at the time set forth above shall constitute reasonable grounds for Landlord's disapproval of Tenant's request.

**24.6** <u>No Release of Tenant.</u>  No consent by Landlord to any assignment or subletting by Tenant shall relieve Tenant of any obligation to be performed by Tenant under this Lease, whether occurring before or after such consent, assignment or subletting, and Tenant shall remain primarily liable to Landlord under this Lease notwithstanding any such assignment or subletting.   The acceptance of Rent by Landlord from any other person shall not be deemed to constitute consent to any assignment or subletting, or to constitute a waiver by Landlord of any provision, or other transfer, or a release of Tenant from any obligation under this Lease.   Consent to one assignment, subletting, or transfer shall not be deemed to constitute consent to any subsequent assignment, subletting, or transfer.   The termination of this Lease

22

shall, at Landlord's option, to be exercised in its sole and absolute discretion, result in the automatic termination of any sublease.

**24.7    Assumption of Obligations.**  Each assignee or transferee, other than Landlord, shall assume all obligations of the tenant under this Lease and shall be and remain liable jointly and severally with Tenant for the payment of Rent, and for the due performance of all the terms, covenants, conditions and agreements contained herein on Tenant's part to be performed, for the Term of this Lease, including payment of the full amount of Rent set forth in the assignment or sublease.   No assignment shall be binding on Landlord unless and until such assignee or Tenant shall deliver to Landlord a counterpart of such assignment fully executed by the Parties which contains a covenant of assumption by the assignee reasonably satisfactory in substance and form to Landlord consistent with the above requirements (but the failure or refusal of the assignee to execute such instrument of assumption shall not release or discharge the assignee from the above obligations).

**24.8    Assignment.**  For the purpose of this Section 24, and without limiting the foregoing, each of the following shall constitute an "assignment," specifically excluding, however, any Permitted Transfer as defined above:  (i) if Tenant is a partnership, a withdrawal or change, voluntary, involuntary, or by operation of law, of any partner or the dissolution of the partnership; (ii) if Tenant is a limited liability company, any liquidation, dissolution, merger, consolidation or other reorganization of Tenant, or the sale, exchange, trade, assignment, hypothecation or other transfer of an aggregate of fifty percent (50%) or more of the membership interest of Tenant, (iii) if Tenant consists of more than one person, a purported assignment, voluntary, involuntary, or by operation of law, from one person to another; and (iv) if Tenant is a corporation (whose stock is not traded through an exchange or over the counter), any liquidation, dissolution, merger, consolidation or other reorganization of Tenant, or the sale, exchange, trade, assignment, hypothecation or other transfer of an aggregate of fifty percent (50%) or more of the capital stock of Tenant, or the sale of an aggregate of fifty percent (50%) or more of the value of the assets of Tenant.

## 25.    HOLDING OVER.

**25.1    Holdover without Landlord's Consent.**  If Tenant holds the Premises after the expiration of the Term or earlier termination of this Lease without the consent of Landlord, Tenant shall become a tenant of sufferance only at a rental rate that shall be equal to two-hundred percent (200%) of the Minimum Rent paid by Tenant to Landlord immediately prior to such expiration or termination, and otherwise upon all of the other terms, covenants and conditions of this Lease, including, without limitation, the payment of Additional Rent and all other charges payable by Tenant hereunder.  Acceptance by Landlord of Rent after such expiration or earlier termination shall not constitute a consent to a holdover hereunder or result in a renewal of this Lease.   The provisions of this Section 25 are in addition to and do not affect Landlord's right of re-entry or any other rights of Landlord hereunder or as otherwise provided by law.

**25.2    Indemnity.**  If Tenant fails to surrender possession of the Premises to Landlord upon the expiration of the Term or earlier termination of this Lease, Tenant hereby agrees to indemnify, defend (with counsel acceptable to Landlord) and hold harmless Landlord and its Related Parties from and against any and all liabilities, claims, demands, damages, penalties, expenses (including, without limitation, reasonable costs and attorneys' fees including reasonable costs and attorneys' fees on any appeal), judgments, proceedings and causes of action imposed upon, incurred by, or asserted against Landlord or any of Landlord's Related Parties which arise out of, or are alleged to have arisen out of, such failure, including, without limiting the generality of the foregoing, any claims made by a succeeding tenant.

23

**26.    QUIET ENJOYMENT.**    Subject to the terms of this Lease and provided Tenant is not in default of any of its obligations hereunder (beyond any applicable cure period), Landlord covenants that, during the Term hereof, Tenant shall have the quiet and peaceful possession of the Premises, and shall enjoy all rights and privileges granted herein, in each case without interference by Landlord or anyone acting by, through or under Landlord, or who is subject to Landlord's control.

**27.    SUBORDINATION & ATTORNMENT; ESTOPPEL CERTIFICATES.**

   **27.1    Subordination & Attornment.**    Tenant agrees, upon request, to subordinate Tenant's leasehold interest and estate in this Lease to any mortgage, deed of trust or other security instrument which may become a lien on the fee title to the Premises ("**Security Lien**"), provided that all parties to such financing execute, deliver and cause to be recorded an attornment and non-disturbance agreement, in form and substance approved by Tenant, which provides that (i) this Lease shall not be terminated and the possession of Tenant and its rights hereunder shall not be disturbed or diminished by reason of any foreclosure, sale, deed in lieu of foreclosure or other proceeding or action taken in connection with the Security Lien, and (ii) the Security Lien shall not affect any property owned or leased by Tenant.

   **27.2    Estoppel Certificates.**    Tenant shall at any time and from time to time, upon not less than ten (10) days' prior notice from Landlord, execute, acknowledge and deliver to Landlord, or any proposed mortgagee, beneficiary, purchaser, transferee or successor-in-interest of the Premises, or any part thereof or interest therein, a statement in writing certifying whether or not this Lease is unmodified and in full force and effect (or if there have been modifications, that the same are in full force and effect as modified and stating the modifications) and the dates to which Minimum Rent, Additional Rent and other charges have been paid, if any, and stating whether or not, to the best knowledge of Tenant, Landlord is in default in the performance of any covenant, condition or agreement contained in this Lease and, if so, specifying each such default of which Tenant may have knowledge, and stating such other reasonable matters as Landlord may request.    Tenant acknowledges that any such statement delivered pursuant to Section 27.2 may be relied upon by Landlord, any prospective mortgagee, beneficiary, purchaser, transferee, successor, lessor or lessee or other like encumbrancer thereof or any assignee of any such encumbrancer of the Premises, or any party thereof or interest therein.

**28.    DEFAULT BY TENANT.**

   **28.1    Defaults.**    The occurrence of any one (1) or more of the following events shall be deemed a default ("**Default**"):

      **(i)    Monetary Defaults.**    Tenant shall fail to pay any Rent or amounts to Landlord when the same is due, and such failure continues for five (5) days after Landlord has given Tenant written notice specifying the amount due (it being agreed, however, that Landlord shall have no obligation to give Tenant more than two (2) of such notices in any twelve (12) month period); provided, any such notice shall be in lieu of, and not in addition to, any statutory unlawful detainer notice provided for in the State in which the Premises are located.

      **(ii)    Non-Monetary Defaults.**    Tenant shall fail to observe and perform any other provision of this Lease to be observed or performed by Tenant, where such failure continues for twenty (20) days (except where a different period of time is specified in this Lease) after written notice by Landlord to Tenant; provided, that any such notice shall be in lieu of, and not in addition to, any statutory unlawful detainer notice provided for in the State in which the Premises are located.    If the nature of such Default is

24

such that the same cannot be cured within such twenty (20) day period, Tenant shall not be deemed to be in Default if Tenant shall, within such period, commence such cure and thereafter diligently and continuously prosecute the same to completion.

           **(iii)**   **Voluntary Bankruptcy.**  Tenant shall file a voluntary petition in bankruptcy or a petition or answer seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or other relief of the same or different kind under any provision of the bankruptcy laws, or, Tenant shall make an assignment for the benefit of creditors.

           **(iv)**   **Involuntary Bankruptcy.**  An involuntary petition in bankruptcy against Tenant, or a petition or answer made by a person other than Tenant seeking a reorganization, arrangement, composition, readjustment, liquidation, dissolution or other relief against Tenant of the same or different kind under any provision of the bankruptcy laws, is filed, or, if a receiver is appointed having jurisdiction of the business property or assets of Tenant on the Premises, and, in any of such events, if Tenant shall not properly commence and expeditiously pursue action to dismiss any such involuntary petition or answer or to vacate such receivership, and, if after diligently exhausting Tenant's remedies, such petition shall not be dismissed or the receivership vacated.

           **(v)**   **Release of Liens.**  Tenant fails to cause a release (including at Tenant's option by payment of adequate bond), within twenty (20) days after receipt by Tenant of a notice informing Tenant of the filing, of any lien against the Premises arising out of any work performed, materials furnished or obligations incurred by or for Tenant.

           **(vi)**   **Assignment/Transfer/Sublease.**  Tenant attempts to transfer, assign, sublet or permit the occupancy of the Premises in contravention of Section 24.

           **(vii)**   **Abandonment.**  Tenant abandons the Premises.

   **28.2**   **Remedies.**  In any of such events of Default, Landlord shall have the immediate right to re-enter the Premises and expel Tenant or any person or persons occupying the same, with or without legal process, and, in any such event, Tenant agrees to peacefully and quietly yield-up and surrender the Premises to Landlord and to immediately remove Tenant's Property from the Premises.

     In the event of a Default, Landlord may elect to either terminate this Lease by giving written notice to Tenant, or, from time to time and without terminating this Lease (or Tenant's right to possession of the Premises), attempt to relet the Premises or any part thereof for such term or terms (which may be for a term extending beyond the Term of this Lease) and at such rental and upon such other terms and conditions as Landlord deems advisable; provided, Landlord shall use its good faith efforts to obtain the best terms and conditions available thereon using reasonable business judgment under the circumstances.  Upon any such reletting, Tenant shall immediately vacate the Premises and Tenant shall be immediately liable to pay to Landlord: (i) the cost and expense of such reletting including but not limited to the cost of any alterations and repairs reasonably deemed necessary by Landlord to affect such reletting and which are not covered by the rental received from such reletting, and (ii) the amount, if any, by which the Rent reserved in this Lease for the period of such reletting (but not beyond the Term of this Lease then in effect) exceeds the amount agreed to be paid as rent for the Premises for such period of reletting.

     If Landlord elects to terminate this Lease, Landlord may recover from Tenant:

(i)     The worth at the time of award of the unpaid Rent (including interest pursuant to Section 31) which had been earned at the time of termination;

(ii)     The worth at the time of award of the amount (including interest pursuant to the Section entitled "Interest") by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided;

(iii)     The worth at the time of award of the amount by which the unpaid Rent for the balance of the Term then in effect after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; and

(iv)     Any other amounts necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

(v)     At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law of the State in which the Premises are located.

The "worth at the time of award" of the amounts referred to in "(i)", "(ii)" and "(iii)" immediately above shall be computed by discounting such amount at a rate equal to one percent (1%) plus the discount rate then in effect at the Federal Reserve Bank of San Francisco.   If any law shall limit the amount of such liquidated final damages to less than the amount above agreed upon, Landlord shall be entitled to the maximum amount allowable under such law.

If a Default occurs and Landlord elects not to terminate this Lease, as provided above, this Lease shall continue in effect for so long as Landlord does not terminate Tenant's right to possession, and Landlord may enforce all its rights and remedies under this Lease, including the right to recover Rent as it becomes due under this Lease.

Notwithstanding any reletting without termination by Landlord because of any Default, Landlord may at any time after such reletting elect to terminate this Lease for any such Default.   No acceptance by Landlord of a lesser sum than that due by Tenant nor any endorsement or statement or any check or letter accompanying any check shall be deemed an accord and satisfaction.

If a Default occurs, Landlord shall have the right in any action or proceeding to cause a receiver to be appointed to take possession of the Premises and/or to collect the rents and/or profits derived from the Premises.   Said receiver may, to the extent it is necessary or convenient to collect such rents and/or profits, conduct the business on the Premises and use and apply such rents and/or profits in conducting such business.   Neither the application for, nor the appointment of, such receiver shall constitute on election on the part of Landlord to terminate this Lease unless and until written notice of such election is given to Tenant.

Whenever Landlord shall re-enter the Premises pursuant to this Lease, any personal property, not the property of Landlord, which remains in or about the Premises upon the expiration of the Term of this Lease (or within forty eight (48) hours after a termination by reason of Tenant's Default or abandonment), shall be considered abandoned and Landlord may retain and use the same as its own property in every respect, or at its option, may remove any or all of such items and dispose of the same in any manner or

respect or store the same in a public warehouse or elsewhere for the account and at the expense and risk of Tenant. If Tenant shall fail to pay the cost of storing such property after it has been stored for a period of ten (10) days or more, Landlord, at its option, may sell any or all such property at public or private sale in such manner and at such times and places as Landlord, in its sole and absolute discretion, may deem proper without notice to or demand upon Tenant for the payment of all or any part of such charges, or the removal of any such property. Landlord shall apply the proceeds of such sale: first, to the cost and expense of such sale, including reasonable attorneys' fees; second, to the payment of the costs of or charges for storing such property; third, to the payment of any sums of money which may then or thereafter be due to Landlord from Tenant under any of the terms hereof; and fourth, the balance, if any, to Tenant. Subject to Landlord's compliance with the terms of this Section 28, Tenant hereby waives all claims for damages that may be caused by Landlord's re-entering and taking possession of the Premises or removing, storing, releasing or disposing of the property belonging to Tenant or to any other person or firm as herein provided, and Tenant shall indemnify, defend and hold harmless Landlord therefrom. No such re-entry shall be considered or construed to be a forcible entry.

The rights of Landlord hereunder are cumulative and non-exclusive and Landlord may pursue any and all rights and remedies permitted under the law of the State in which the Premises are located.

**28.3    Accord and Satisfaction.** No payment by Tenant or acceptance by Landlord of a lesser amount than the stipulated Rent or other sum due hereunder shall be deemed to constitute anything other than a payment on account of the earliest Rent or other sum due hereunder. No endorsement or statement on any check, notice or other writing accompanying said payment shall constitute an accord and satisfaction, and Landlord may accept such payment without prejudice to Landlord's right to recover the balance of such Rent or other sum or to pursue any other rights or remedies contained herein.

**29.    WAIVER OF NOTICE.** Notwithstanding any other provision contained in this Lease relating to notice: if the Premises require emergency repairs which Tenant would otherwise be obligated to make under this Lease, but which Tenant is then unable or unwilling to make, Landlord may, without notice, elect to make such repairs for the account and at the expense of Tenant. Any amount so paid shall be immediately due and owing from Tenant to Landlord as Additional Rent.

**30.    LATE CHARGES.** Tenant acknowledges that late payment by Tenant to Landlord of any amount due hereunder will cause Landlord to incur costs not contemplated by this Lease, the exact amount of such costs being extremely difficult and impractical to fix. Such costs include, without limitation, processing and accounting charges, and later charges that may be imposed on Landlord by the terms of any encumbrance or note secured by any encumbrancer covering the Premises. Therefore, if any amount due hereunder from Tenant is not received by Landlord within ten (10) days after its due date or, if no due date is specified in this Lease, within ten (10) days after receipt of written notice from Landlord, Tenant shall pay to Landlord an additional sum of six percent (6%) of the overdue amount as a late charge. The Parties agree that this late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of late payment by Tenant. Acceptance of any late charge shall not constitute a waiver of Tenant's Default with respect to the overdue amount nor prevent Landlord from exercising any of the other rights and remedies of the Landlord under this Lease.

**31.    INTEREST.** Except as expressly provided otherwise in this Lease, any sum owing under the terms and provisions of this Lease which shall not be paid when due or, if not due date is specified in this Lease, within ten (10) days after receipt of written notice, shall bear interest at the greater of: (i) eighteen percent (18%); or (b) the prime rate of interest then charged by Wells Fargo Bank, N.A. for short term (ninety [90] days) unsecured loans made to its preferred customers, plus ten percent (10%); and (ii) the

27

highest legal rate of interest permitted by law, per annum from and after the date the same becomes due and payable by the terms and provisions of this Lease or, if no due date is specified in this Lease, within ten (10) days after receipt of written notice, to and including the date payment is received ("**Interest Rate**"); provided, any amounts paid by Landlord or Tenant to third parties on behalf of the other or to cure any Default hereunder shall bear interest at the Interest Rate from the date such amounts are paid; and further provided, any obligation of Landlord or Tenant to pay shall continue to bear interest at the Interest Rate after any breach of this Lease.

## 32.   **LANDLORD'S DEFAULT.**

**32.1     Landlord's Default.**   In the case of a monetary default, Landlord shall have a period of thirty (30) days after written notice thereof from Tenant to cure such monetary default.   If Landlord fails to cure such monetary default within such thirty (30) day period, Tenant shall have the right to terminate this Lease in addition to the remedies provided below.   In the case of a non-monetary default, Landlord shall commence to cure such default within thirty (30) days after receipt of written notice from Tenant specifying the nature of such default and shall thereafter diligently prosecute the same to completion.   In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies: (a) to pursue the remedy of specific performance; (b) to seek money damages for loss arising from Landlord's failure to discharge its obligations under the Lease provided, Tenant shall have no right to sue for indirect or consequential damages including, without limitation, lost profits; or (c) to terminate the Lease.   Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section be construed to obligate Tenant to perform Landlord's repair obligations.

**32.2     Notice to Lender.**   Omitted.

**32.3     Satisfaction of Judgment.**   In the event Tenant should recover a money judgment against Landlord, such judgment shall be satisfied only out of Landlord's interest in Landlord's Property, including but not limited to any rights to income derived by Landlord therefrom, and neither Landlord nor any of Landlord's Related Parties shall be liable for any deficiency.   In no event shall Tenant have the right to levy execution against any property of Landlord other than Landlord's interest in the Premises.   Tenant's right of execution shall always be subordinate to all mortgages, deeds of trust and other security instruments of any kind now or hereafter placed upon the Premises, or any part thereof, alone or with additional property, and to all advances made or hereafter to be made upon the security thereof.   Neither Landlord nor any of Landlord's Related Parties shall in any event or at any time be personally liable for the payment or performance of any obligation of Landlord under this Lease or any document executed in connection herewith.   No attachment, execution, writ or other process shall be sought or obtained, and no judicial proceeding shall be initiated by or on behalf of Tenant, against Landlord, or Landlord's assets (other than Landlord's interest in the Premises) or any of Landlord's Related Parties as a result of any default by Landlord under this Lease and neither Landlord nor any of Landlord's assets (other than Landlord's interest in the Premises) nor any of Landlord's Related Parties shall be liable for a deficiency).

## 33.   **BROKER'S COMMISSION.**

Landlord and Tenant each represents and warrants to the other that there is no obligation to pay any brokerage fee, commission, finder's fee or other similar charge in connection with this Lease, other than a fee due to Tony Coop and Lori Coburn of Coldwell Bank Commercial Advisors ("Broker"), which is the responsibility of Landlord.   Broker's total commission shall be equal to three percent (3%) of the total Minimum Rent payable by Tenant for Lease Years one through five, plus one and one half percent (1.5%) of the total Minimum Rent payable by Tenant for Lease Years six through nine.   Such commission shall be

payable by Landlord within five (5) business days of the Rent Commencement date (and for the avoidance of confusion, shall not be payable if the Rent Commencement Date fails to occur). Each party covenants that it will defend, indemnify and hold harmless the other party from and against any loss or liability by reason of any other brokerage or similar services alleged to have been rendered to, at the instance of, or agreed upon by said indemnifying party. Notwithstanding anything herein to the contrary, Landlord and Tenant agree that there shall be no brokerage fee or commission due on expansions, options or renewals by Tenant.

**34.** **SECURITY DEPOSIT.** Contemporaneously with the execution of this Lease by Tenant, Tenant shall deposit with Landlord the sum of Four-Thousand Dollars ($4,000.00) which shall be held by Landlord without liability for interest as security for the faithful performance by Tenant of all of the terms and provisions of this Lease. If any of the Rent herein reserved or any other sum payable by Tenant to Landlord shall be overdue and unpaid or should Landlord make payments on behalf of Tenant, or Tenant fails to perform any of the terms of this Lease, then Landlord may, at its option and without prejudice to any other remedy which Landlord may have on account thereof, appropriate the entire amount of said deposit and apply said entire amount or so much thereof as may be necessary to compensate Landlord toward the payment of Rent or loss or damage sustained by Landlord due to such breach on the part of Tenant. If only part of said funds are needed to be applied toward such payment(s), then the rest of said funds shall be held as a security deposit and Tenant shall immediately upon demand restore said deposit to the sum of Four Thousand Dollars ($4,000.00). Landlord shall not be required to keep such deposit in a separate account, but may commingle such deposit with other funds of Landlord as Landlord deems appropriate in its sole and absolute discretion.

**35.** **WAIVER OF DEFAULT.** The waiver by either Party of any default in the performance by the other of any term or provision contained herein shall not be construed to be a waiver of any preceding or subsequent default of the same or any other term or provision contained herein. The subsequent acceptance of Rent or other sum due hereunder by Landlord shall not be deemed a waiver of any preceding Default other than the failure of Tenant to pay the particular Rent or other sum or portion thereof so accepted, regardless of Landlord's knowledge of such preceding Default at the time of acceptance of such Rent or other sum. The acceptance of any partial payment of Rent or other sum due hereunder by Landlord shall constitute payment on account only and shall not constitute a waiver or cure of any preceding Default by Tenant or a waiver of any of Landlord's rights or remedies contained herein, and shall not serve to reinstate this Lease.

**36.** **EFFECT OF CONVEYANCE.** If during the Term of this Lease Landlord sells or conveys its interest in the Premises or this Lease, then from and after the effective date of such sale or conveyance, Landlord shall be released and discharged from any and all further obligations and liabilities under this Lease, except those accrued of which Landlord has notice at the time of such sale or conveyance.

**37.** **NOTICES AND PLACE FOR PAYMENT OF RENT.** All notices, requests, demands, and other communications hereunder shall be in writing and shall be given by: (i) established express delivery service which maintains delivery records; (ii) hand delivery; or (iii) certified or registered mail, postage prepaid, return receipt requested, to the applicable Party at the following addresses, or at such other address as the Party may designate by written notice in the above manner. Communications may also be given by fax, provided the communication is concurrently given by one of the above methods.

29

To Landlord:

> BS Property LLC
> 1535 Wasatch Drive
> SLC, UT 84108
> Attn: Russ Taylor

With a Copy to:

> BS Property LLC
> 2015 Laird Drive
> SLC, UT 84108
> Attn: Rocky Taylor

To Tenant:

> Even Stevens Sandwiches, LLC
> 2030 South 900 East, Suite A
> Salt Lake City, Utah
> Attn: Director of Real Estate

Notices are effective upon receipt, or upon attempted delivery if delivery is refused or if delivery is impossible because of failure to provide a reasonable means for accomplishing delivery.

Rent shall be paid to Landlord at the address set forth in this Section or as otherwise directed by Landlord.

## 38. MISCELLANEOUS.

**38.1 Construction.** The captions and headings in this Lease are for reference only and shall not be deemed to define or limit the scope or intent of any of the terms or provisions of this Lease. Whenever the context so requires, the singular shall include the plural, the plural shall include the singular, the use of a gender shall include all other genders.

**38.2 Entire Agreement.** This Lease constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, with respect thereto. There shall be no presumption or standard of construction in favor of or against either Party.

**38.3 Authority.** The individuals executing this Lease warrant and represent that they are duly authorized to execute this Lease on behalf of Landlord or Tenant, as the case may be, that the Parties named are all the necessary and proper parties required to effectuate the terms of this Lease, and that no other act, signature or authorization is necessary to bind such entity or the Premises to the provisions of this Lease.

**38.4 Modification.** This Lease cannot be modified in any respect whatsoever or terminated, in whole or in part, except by an instrument in writing executed by both Landlord and Tenant.

**38.5 Choice of Law.** This Lease shall be governed by and construed in accordance with the laws of the State in which the Premises are located.

**38.6 Recording.** This Lease shall not be recorded, but, at Landlord's request, Landlord and Tenant shall execute a memorandum of lease which shall be recorded.

**38.7  Remedies Cumulative.**  The various rights and remedies of Landlord and Tenant contained in this Lease shall be cumulative and no one of them shall be construed as exclusive of any of the other rights or remedies (whether legal or equitable) set forth in this Lease or provided by law. Notwithstanding anything in this Lease to the contrary, in no event shall Landlord or Tenant ever be liable to the other for consequential damages, punitive or special damages.

**38.8  Force Majeure.**  In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party (a "Required Act"), and such delay or hindrance is due to causes entirely beyond its control such as riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, governmental restrictions or other casualty or acts of God (but not financial) then the performance of such Required Act shall be excused for the period of delay, and the time period for performance of the Required Act shall be extended by the lesser of (i) the same number of days in the period of delay, or sixty (60) days.

**38.9  Attorneys' Fees.**  In the event either Party brings or commences a legal action or proceeding to interpret or enforce any of the terms of this Lease, the prevailing Party in such action or proceeding shall have the right to recover reasonable costs and attorneys' fees from the other Party to be fixed by the court.  The term **"legal proceedings"** shall include appeals from a lower court judgment as well as proceedings in the Federal Bankruptcy Court (**"Bankruptcy Court"**), whether or not they are adversary proceedings or contested matters.  The **"prevailing Party"**:  (i) as used in the context of proceedings in the Bankruptcy Court means the prevailing Party in an adversary proceeding or contested matter, or any other action taken by the non-bankruptcy Party which is reasonably necessary to protect its rights under this Lease; and (ii) as used in the context of proceedings in any court other than the Bankruptcy Court shall mean the Party that prevails in obtaining a remedy or relief which most nearly reflects the remedy or relief which the Party sought (so that, for example, the prevailing Party may be a Party which is ordered to pay $100.00 where the obligation to pay $80.00 was undisputed and the other Party claimed that it was entitled to $1,000.00).

**38.10  No Partnership.**  Landlord shall not in any way or for any purpose be deemed a partner, joint venturer, or member of any joint enterprise with Tenant.

**38.11  Merger.**  The voluntary or other surrender of this Lease by Tenant or a mutual cancellation of this Lease shall not affect a merger and shall, at Landlord's option, terminate all existing subtenancies or operate as an assignment to Landlord of any or all of such subtenancies.

**38.12  Successors.**  Each and every covenant and condition of this Lease shall bind and shall inure to the benefit of the Parties and their respective heirs, personal representatives, successors, transferees and assigns.

**38.13  Independent Covenants.**  The Parties agree that each provision set forth herein pursuant to which Tenant is required to pay Rent, shall be and is a covenant of Tenant independent of any other term, covenant, condition or agreement contained in this Lease.   In the event Tenant shall claim any breach or default by Landlord of any term, covenant, agreement, warranty or representation of this Lease, Tenant shall not be entitled to offset the claimed amount of damages against any Rent or other payments due hereunder unless otherwise specifically stated in the Lease, it being expressly agreed that such covenant to pay such amount shall be independent of any obligation of Landlord hereunder.

Each and every term, covenant, condition and agreement contained in this Lease shall be construed to be a separate term, covenant, condition or agreement.   If any term, covenant, condition or agreement of

this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, covenant, condition or agreement to any person or circumstance other than those as to which such term, covenant, condition or agreement is invalid or unenforceable, shall not be affected thereby and each and every term, covenant, condition and agreement of this Lease shall be valid and enforceable to the extent permitted by law.

   **38.14**   **Injunctive Relief.**   The Section herein entitled "Use" defines the sole and exclusive use of the Premises allowed under the terms of this Lease.   In the event of a violation or threatened violation by any person of any of the restrictions set forth in this Lease, Landlord shall have the right to enjoin such violation or threatened violation in a court of competent jurisdiction.   The right of injunction shall be in addition to all other remedies (whether legal or equitable) set forth in this Lease or provided by law.

   **38.15**   **Waiver of Jury Trial.**   Landlord and Tenant each acknowledges that it is aware of and has had the advice of counsel of its choice with respect to its rights to trial by jury under the constitutions of the United States and the State in which the Premises are located, and each Party hereby expressly and knowingly waives and releases all such rights to trial by jury in any action, proceeding or counterclaim brought by either Party against the other (or against their officers, directors, employees, agents or subsidiary or affiliated entities) on any matters whatsoever arising out of or in any way connected with this Lease and any dispute arising from or connected with such matter shall not be tried by jury.

   **38.16**   **Confidentiality.**   In the event of a dispute under this Lease, Landlord and Tenant agree to keep both the substance and the existence of such dispute confidential except as such disclosure to third persons or entities is: (i) reasonably required to defend or prosecute such dispute; or (ii) required by law. Landlord and Tenant agree to exercise commercially reasonable efforts to maintain the confidentiality of, and to not intentionally disclose, the business terms of this Lease, other than:   (a) as required by law; (b) to attorneys, accountants and other professionals associated with this transaction; and (c) to entities controlling, controlled by, or under common control with Landlord and/or Tenant; provided, Landlord may disclose the terms of this Lease to any person or entity acquiring Landlord's interest in the Premises.

   **38.17**   **Communications Equipment.**   Landlord and Landlord's Agents shall have the exclusive right, at no cost or expense to Tenant, to install, operate, maintain, repair, replace and remove communications equipment on or about the Premises, including, but not limited to, the roof of the Premises. **"Communications equipment"** shall include, but is not limited to, satellite and microwave dishes, antennas, transceivers, cables, backup power sources, utility connections and any associated mounting equipment, structures or enclosures.   Landlord and Landlord's Agents shall have the right to enter the Premises (including the right to access and perform acts on the roof of the Premises) at reasonable times for the purposes described in this Section.   Landlord covenants that such entry and the installation and use of communications equipment shall not unreasonably interfere with or otherwise materially and adversely Tenant's use and enjoyment of the Premises.

   **38.18**   **Surrender.**   Tenant shall, upon the expiration of the Term or earlier termination of this Lease, surrender the Premises to Landlord in the same condition as the Premises are in as of the date of this Lease, broom clean, ordinary wear and tear and damage by casualty and condemnation excepted.

   **38.19**   **Joint and Several Obligation.**   If either Party is composed of more than one (1) person, each such person shall be jointly and severally liable hereunder.

**38.20    Third Party Beneficiary.**  This Lease is not intended to create, nor shall it be in any way interpreted or construed to create, any third party beneficiary rights in any person nor a party hereto unless otherwise expressly provided herein.

**38.21    Waiver of Rights and Remedies.**  The failure of a person to insist upon strict performance of any of the terms or provisions contained in this Lease shall not be deemed a waiver of any rights or remedies that said person may have, and shall not be deemed a waiver of any subsequent breach or default in the performance of any of the terms or provisions contained herein by the same or any other person.

**38.22    Additional Defined Terms.**  As used in this Lease, "Related Parties" means the officers, directors, shareholders, trustees, members, partners, limited partners, agents or employees of a Party or any affiliate of such Party.  "Affiliate" of a designated person means any person which, directly or indirectly, controls, is controlled by, or is under common control with such designated person. "Person" means any natural person, corporation, general or limited partnership, limited liability company or other business organization, trust, union, association or public or governmental authority.

**38.23    Mediation.**  If any dispute or claim in law or equity arises out of this Lease, not involving, in Landlord's opinion, the need to terminate this Lease as provided in Section 28.2, above, Tenant and Landlord agree in good faith to attempt to settle such dispute or claim by mediation under the Commercial Mediation Rules of the American Arbitration Association.

**38.24    Consents and Approvals.**  Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably withhold, condition or delay such consent.  In the event that any such consent, is specifically withheld, the withholding party shall set forth in writing its reasons for such withholding, which reasons must be reasonable under the circumstances presented.

**38.25    Guaranty.**  Even Sevens Sandwiches ("Tenant Owner"), hereby agree to unconditionally guaranty the full and prompt payment and performance of each of Tenant's obligations under this Lease and shall execute, concurrently with the execution of this Lease, as a condition precedent to the effectiveness of this Lease, a guaranty in the form attached hereto as Exhibit "C".  Tenant's Owner shall also provide to Landlord, concurrently with Tenant's execution of this Lease, complete and current financial statements prepared in accordance with generally accepted accounting principles.  Tenant's Owner shall promptly respond to Landlord's reasonable request for additional information concerning such financial statements.

*[remainder of page left blank to accommodate signatures]*

33

**IN WITNESS WHEREOF**, the Parties have executed this Lease as of the day and year first above written.

TENANT ACKNOWLEDGES THAT, BEFORE SIGNING THIS LEASE, IT THOROUGHLY REVIEWED THIS LEASE ITSELF AND WITH COUNSEL, UNDERSTANDS THAT IT MAY BE JOINTLY AND SEVERALLY LIABLE WITH OTHERS FOR THE OBLIGATIONS SET FORTH HEREIN AND THAT IT MAY BE WAIVING CERTAIN RIGHTS AND/OR REMEDIES PROVIDED BY LAW, AND AGREES TO ABIDE BY ALL OF THE TERMS AND PROVISIONS OF THIS LEASE.

Even Stevens Utah, LLC,
a Utah limited liability company

By: Even Stevens Sandwiches, LLC
Its: Manager

By: _____
Name: Steve Down
Its: Manager

**"Tenant"**

BS Property LLC
a Utah LLC

By: _____
Name:
Its: member
**"Landlord"**

**EXHIBIT "A"**

Site Plan and Parking Exhibit

[See attached]



= Prote ━━━━━━ ed
Parki ━━━━━━ Area

= Premises



Google

Imagery ©2016 State of Utah, Map    data ©2016 Google    20 ft

**EXHIBIT "B"**

<u>Legal Description of the Landlord's Property</u>

Beginning at the intersection of the intersection of the center of a four-rod street, bearing North 83°30' West and the East line of Section 20, Township 2 South, Range 1 East, Salt Lake Base and Meridian, at a point also knows as North 703.9 feet from the Southeast corner of said Section 20 and running thence South 298.5 feet to Salt Lake City property (the right of way of East Jordan Canal); thence South 59° West 82 feet; thence North 67° West 25 feet to the Little Cottonwood Tanner Ditch; thence following down said ditch North 12° East 85 feet; thence North 7°30' West 85 feet; thence North 23 feet; thence North 16°24' East 118.1 feet to the South line of said street; thence North 6°30'; East 33.0 feet; thence South 83°30' East 50 feet to the place of beginning.

Also, Commencing at the above place of beginning and running thence South 83°30' East 22 feet; thence South to Salt lake City Property, (the right of way of East Jordan Canal); thence South 59° West to the East line of Section 20, Township 2 South, Range 1 East, Salt Lake Meridian and running thence North 298.5 feet to the place of beginning.

Less and Excepting:

Said parcel of land is situated in the Southeast quarter of Southeast quarter of Section 20, Township 2 South, Range 1 East, Salt Lake Base and Meridian, described as follows:

Beginning at a point at the Centerline of Fort Union Boulevard and the East Section line, said point being North 00°41'42" West along said Section line 694.604 feet (Deed=703.9) from the Southeast corner of Section 20, Township 2 South, Range 1 East, Salt Lake Base and Meridian and running thence South 82°54'58" East along said Centerline 22.00 feet; and running thence South 01°07'02" West 42.76 feet; thence North 89°31'40" West 80.25 feet; thence North 16°59'02" East 19.05 feet; thence South 82°54'58" East along said Centerline 50.00 feet to the point of beginning.

Less and Excepting therefrom any portion lying within the ERMA M. LINDER property as deed in Book 4449 at page 1401 of Official Records.

## EXHIBIT "C"

### GUARANTY

In consideration of BS Property LLC., a Utah limited liability company ("Landlord"), entering into that certain Lease dated as of _____, 2016 ("Lease"), with Even Stevens Utah LLC, a Utah limited liability company  ("Tenant"), with respect to certain premises located at 1346 E Fort Union Blvd Cottonwood Heights, UT 84121, Even Stevens Sandwiches, LLC (a "Guarantor"), hereby unconditionally and irrevocably, jointly and severally, guarantee to Landlord the full performance of each and all of the terms, covenants and conditions of the Lease to be kept and performed by Tenant, including the payment in full of all charges or sums (however designated in the Lease) that accrue thereunder ("Guaranteed Obligations"), during the Term (as defined in the Lease), of the Lease.

Guarantor's obligations under this Guaranty shall in no way be impaired by reason of the happening from time to time of any of the following, whether or not with notice to, or the further consent of, Guarantor:

        (a)      the waiver or release by Landlord of the performance by Tenant or any other guarantor of any of the agreements, covenants, terms or conditions contained in the Lease, this Guaranty or any other agreement;

        (b)      any failure, omission or delay on the part of any party to enforce, assert or exercise any right, power or remedy conferred on or available in or by the Lease or this Guaranty or any other agreement, or any action granting an indulgence or extension in any form whatsoever;

        (c)      the voluntary or involuntary liquidation, dissolution, sale of all or substantially all of the assets, marshaling of assets and liabilities, receivership, conservatorship, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceeding affecting Tenant, any other guarantor of Tenant's obligations contained in the Lease, or any of their assets.

Guarantor agrees that the liabilities and obligations of Guarantor hereunder are primary, and are enforceable before, simultaneously with or after proceeding against Tenant or any other guarantor of Tenant's obligations contained in the Lease and without necessity of proceeding against Tenant or any other guarantor of Tenant's obligations contained in the Lease.  Guarantor agrees that Guarantor shall have no right of subrogation and no right of contribution against any other guarantor of Tenant's obligations contained in the Lease unless and until all of the Guaranteed Obligations have been satisfied.  Guarantor's liability under this Guaranty shall continue until the satisfaction of all the Guaranteed Obligations.  Notice of acceptance of this Guaranty and notice of any obligations or liabilities contracted or incurred by the Tenant, and demand for payment or performance are hereby waived by Guarantor.  Guarantor hereby waives, to the extent permitted by law, any statute of limitations affecting any Guarantor's liability hereunder or the enforcement hereof.

In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantor shall be obligated to pay all charges, costs and expenses (including reasonable attorneys' fees) incurred by Landlord, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

Every provision of this Guaranty is intended to be severable. In the event any term or provision herein is declared to be illegal, invalid or unenforceable for any reason whatsoever by a court of competent jurisdiction, such illegality, invalidity or unenforceability shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain in full force and effect.

If Guarantor consists of more than one person, each person shall be jointly and severally liable hereunder. Landlord may, without notice, assign this Guaranty in whole or in part and no assignment or transfer of the Lease shall operate or diminish the liability of the undersigned hereunder.

This Guaranty shall continue in favor of Landlord notwithstanding any extension, modification or alteration of the Lease, or notwithstanding any assignment of the Lease, with or without the consent of Landlord, and no extension, modification, alteration or assignment of the Lease shall in any manner release or discharge the Guarantor.

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be executed as of the date set forth above.

Even Stevens Sandwiches, LLC

By: Steve Down, its Manager

"Guarantor"

# FIRST AMENDMENT TO FORT UNION LEASE

This First Amendment to Lease (this "**Amendment**") is entered into as of January 6, 2017 ("**Effective Date**"), by and between BS PROPERTY, LLC, a Utah limited liability company ("**Landlord**"), and EVEN STEVENS UTAH, L.L.C., a Utah limited liability company ("**Tenant**").

## RECITALS

A.     Landlord and Tenant are parties to that certain Lease dated October 31, 2016 (the "**Original Lease**"), pursuant to which Landlord leases to Tenant, and Tenant leases from Landlord, certain space consisting of approximately 2,600 rentable square feet (the "**Premises**") in the building located in the City of Cottonwood Heights, State of Utah, as such Premises is more particularly described in the Original Lease.

B.     Landlord and Tenant desire to amend the Original Lease to in accordance with the terms and conditions set forth below.

## AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     Defined Terms; Recitals.  All capitalized terms used herein but not specifically defined in this Amendment shall have the meanings ascribed to such terms in the Original Lease.  The term "Lease" where used in the Original Lease and this Amendment shall hereafter refer to the Original Lease, as amended hereby.

2.     Amendment of Parking Permit Contingency Date.  Section 4.1.2 of the Original Lease is hereby amended to extend the deadline for Tenant to terminate the Lease based on failure to obtain approval from the city with regards to parking requirements from January 6, 2017 until February 15, 2017.

3.     Amendment of Rent Commencement Date.  Section 5.1(A) of the Original Lease is hereby amended to fix the Rent Commencement Date on April 1, 2017.

4.     Non-Refundable Prepayment of Rent.  Within three (3) business days of mutual execution of this Amendment, Tenant shall pay to Landlord Three-Thousand Two-Hundred Fifty Dollars ($3,250.00) as non-refundable prepaid rent. This sum shall be held by Landlord and applied to Rent beginning in the second month following the Rent Commencement Date, unless Tenant exercises his option to terminate the Lease for failure to obtain city parking approvals, in which case Tenant shall forfeit this sum to Landlord along with the security deposit as stated in Section 4.1.2.

5.     Authority.  Each party signing below has full power and authority to enter into this Amendment and the person signing on behalf of such party has been fully authorized to do so by all necessary corporate or partnership action on the part of Tenant.

6.     Original Lease in Full Force.  Except for those provisions which are inconsistent with this Amendment and those terms, covenants and conditions for which performance has heretofore been completed, all other terms, covenants and conditions of the Original Lease shall remain unmodified and in full force and effect.  Landlord and Tenant ratify the Original Lease, as amended hereby.

1

7.    _Facsimile/PDF; Counterparts_.  Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity.  This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

*[SIGNATURE PAGE FOLLOWS]*

2

IN WITNESS WHEREOF, this Amendment has been executed by Landlord and Tenant as of the Effective Date.

**LANDLORD**:

BS PROPERTY, L.L.C.,
a Utah limited liability company

By: _____
Name: <span style="color:red">Rocky Taylor</span>
Title: _____


**TENANT**:

EVEN STEVENS UTAH, L.L.C.,
a Utah limited liability company,

By: Even Stevens Sandwiches, LLC
Its: Manager

By: _____
Name: Steve Down
Title: Manager

3

# FIRST AMENDMENT TO FORT UNION LEASE

This Second Amendment to Lease (this "**Amendment**") is entered into as of February 15, 2017 ("**Effective Date**"), by and between BS PROPERTY, LLC, a Utah limited liability company ("**Landlord**"), and EVEN STEVENS UTAH, L.L.C., a Utah limited liability company ("**Tenant**").

## RECITALS

A.     Landlord and Tenant are parties to that certain Lease dated October 31, 2016, as amended by a First Amendment to Fort Union Lease dated January 6, 2017 (collectively the "**Original Lease**"), pursuant to which Landlord leases to Tenant, and Tenant leases from Landlord, certain space consisting of approximately 2,600 rentable square feet (the "**Premises**") in the building located in the City of Cottonwood Heights, State of Utah, as such Premises is more particularly described in the Original Lease.

B.     Landlord and Tenant desire to amend the Original Lease to in accordance with the terms and conditions set forth below.

## AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     <u>Defined Terms; Recitals</u>. All capitalized terms used herein but not specifically defined in this Amendment shall have the meanings ascribed to such terms in the Original Lease. The term "Lease" where used in the Original Lease and this Amendment shall hereafter refer to the Original Lease, as amended hereby.

2.     <u>Amendment of Parking Permit Contingency Date</u>. <u>Section 4.1.2</u> of the Original Lease (as amended) is hereby amended to extend the deadline for Tenant to terminate the Lease based on failure to obtain approval from the city with regards to parking requirements from February 15, 2017 until April 7, 2017.

3.     <u>Authority</u>. Each party signing below has full power and authority to enter into this Amendment and the person signing on behalf of such party has been fully authorized to do so by all necessary corporate or partnership action on the part of Tenant.

4.     <u>Original Lease in Full Force</u>. Except for those provisions which are inconsistent with this Amendment and those terms, covenants and conditions for which performance has heretofore been completed, all other terms, covenants and conditions of the Original Lease shall remain unmodified and in full force and effect. Landlord and Tenant ratify the Original Lease, as amended hereby.

5.     <u>Facsimile/PDF; Counterparts</u>. Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity. This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

### *[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, this Amendment has been executed by Landlord and Tenant as of the Effective Date.

**LANDLORD**:

BS PROPERTY, L.L.C.,
a Utah limited liability company

By: _____
Name: _____
Title: _____


**TENANT**:

EVEN STEVENS UTAH, L.L.C.,
a Utah limited liability company,

By: Even Stevens Sandwiches, LLC
Its: Manager

By: _____
Name: Steve Down
Title: Manager

# THIRD AMENDMENT TO FORT UNION LEASE

This Third Amendment to Lease (this "**Amendment**") is entered into as of March __, 2018 ("**Effective Date**"), by and between BS PROPERTY, LLC, a Utah limited liability company ("**Landlord**"), and EVEN STEVENS UTAH, L.L.C., a Utah limited liability company ("**Tenant**").

## RECITALS

A.      Landlord and Tenant are parties to that certain Lease dated October 31, 2016, as amended by a First Amendment to Fort Union Lease dated January 6, 2017 and further amended by a Second Amendment to Fort Union Lease date February 15, 2017, (collectively the "**Original Lease**"), pursuant to which Landlord leases to Tenant, and Tenant leases from Landlord, certain Premises in the Building on Landlord's' Property, each of which terms are defined in the Original Lease.

B.      Currently, Landlord's Property is jointly occupied by Tenant and a second occupant. Landlord and Tenant desire to amend the Original Lease on the terms and conditions set forth herein such that Tenant shall become the sole occupant of Landlords Property, and the entirety thereof shall become the Premises for all purposes of the Lease.

## AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.      _Defined Terms; Recitals_.  All capitalized terms used herein but not specifically defined in this Amendment shall have the meanings ascribed to such terms in the Original Lease.  The term "Lease" where used in the Original Lease and this Amendment shall hereafter refer to the Original Lease, as amended hereby.

2.      _Expansion Area_. On the date that Landlord is delivers exclusive right of possession of the entirely of Landlord's Property to Tenant (the "**Expansion Date**"), Tenant agrees to accept exclusive possession thereof, and as of such Expansion Date, the "Premises" as defined in the Original Lease, shall mean the entirety of the Landlord's Property, as the same is more specifically designated on Exhibit A of the Original Lease.

3.      _Additional Rent_. Beginning on the date that is ninety (90) days after the Expansion Date, Tenant agrees that Minimum Rent shall be increased to Five Thousand Six Hundred Seventy and No/100 Dollars per month ($68,040 annualized) for the remainder of the 2nd Lease Year (any partial month being pro-rated), all of which shall be subject to the upward adjustments of each Adjustments Date, as described in the Lease.

4.      _Common Areas Costs_. Effective as of the Expansion Date, Tenant shall be responsible for 100% of the Common Area Costs, and shall be responsible for ordinary maintenance, repair, operation and security of the Premises; provided, however that Landlord shall remain responsible for capital repairs and replacements to Landlord's Property, an equitable amortized portion of which may be passed through to Tenant as part of the Common Area Costs.

5.      _Parking and Driveway Area_.  Effective as of the Expansion Date, Tenant shall have exclusive right to use of the Parking and Driveway areas, and the entirety thereof shall be deemed Protected Parking Area, and subject to the limitation on Protected Changes, as each such term is defined in the Original Lease.

1

6.     <u>Alterations</u>. Tenant shall accept the expanded area of the Premises in its existing condition, and shall be permitted to demolish the rear building structure at its own cost and improve such area as it may determine for additional parking or other use in Tenant's operations. Tenant shall bear all costs related to such alterations and shall be responsible for obtaining all permits required for any such alteration to the rear portion of Landlord's Property.

7.     <u>Signs</u>. Tenant shall have exclusive rights to all signage on Landlord's Property.

8.     <u>Existing Occupancy</u>. Landlord represents and warrants to Tenant that it has delivered to Tenant a complete and accurate copy of the current lease for the other current occupant of Landlord's Property ("Mr. Finds"). By its terms Mr. Finds' lease is set to expire on or before August 31, 2018 ("Mr. Finds' Termination Date"), subject to any renewal which may be agreed to by Landlord and Mr. Finds. Landlord agrees to approach Mr. Finds after execution of this Amendment to discuss the termination of Mr. Finds' lease. Tenant agrees that it will accept possession of the remainder of Landlord's Property up to sixty (60) days prior to Mr. Finds' Termination Date, or sixty (60) days after Mr. Find's termination date, in order to accommodate Landlord's negotiation of such date with Mr. Finds.

9.     <u>Authority</u>. Each party signing below has full power and authority to enter into this Amendment and the person signing on behalf of such party has been fully authorized to do so by all necessary corporate or partnership action on the part of Tenant.

10.     <u>Original Lease in Full Force</u>. Except for those provisions which are inconsistent with this Amendment and those terms, covenants and conditions for which performance has heretofore been completed, all other terms, covenants and conditions of the Original Lease shall remain unmodified and in full force and effect. Landlord and Tenant ratify the Original Lease, as amended hereby.

11.     <u>Facsimile/PDF; Counterparts</u>. Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity. This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

*[SIGNATURE PAGE FOLLOWS]*

2

IN WITNESS WHEREOF, this Amendment has been executed by Landlord and Tenant as of the Effective Date.

**LANDLORD**:

BS PROPERTY, L.L.C.,
a Utah limited liability company

By: _____
Name: _____
Title: _____


**TENANT**:

EVEN STEVENS UTAH, L.L.C.,
a Utah limited liability company,

By: Even Stevens Sandwiches, LLC
Its: Manager

    By: _____
    Name: Steve Down
    Title: Manager

3

# FOURTH AMENDMENT TO FORT UNION LEASE

This Fourth Amendment to Fort Union Lease (this "**Amendment**") is entered into as of August **26**, 2018 ("**Effective Date**"), by and between BS PROPERTY, LLC, a Utah limited liability company ("**Landlord**"), and EVEN STEVENS UTAH, L.L.C., a Utah limited liability company ("**Tenant**").

## RECITALS

A.     Landlord and Tenant are parties to that certain Lease dated October 31, 2016 (the "**Original Lease**"), as amended by a First Amendment to Fort Union Lease dated January 6, 2017 and further amended by a Second Amendment to Fort Union Lease date February 15, 2017, and further amended by a Third Amendment dated March 12, 2018 (the "**Third Amendment**" and collectively the "**Lease**")

B.     Pursuant to the Lease, Landlord leases to Tenant, and Tenant leases from Landlord, certain premises comprising approximately 2600_square feet (the "**Existing Premises**") on Landlord's property located at 1346 Fort Union Boulevard, Cottonwood Heights, Utah (herein, "**Landlord's Property**").

B.     As discussed in the Third Amendment, Landlord's Property is jointly occupied by Tenant and a second occupant described therein as "Mr. Finds" who leases the rear building on the southern portion of Landlord's Property located at 1346 Fort Union Boulevard, Cottonwood Heights, Utah (herein, the "**Expansion Space**"). Landlord and Tenant now desire to amend the Lease to expand the Existing Premises to include the Expansion Space such that Tenant shall become the sole occupant of Landlords Property, and the entirety thereof shall become the "Premises" for all purposes of the Lease, and otherwise modify the Lease, all upon the terms and conditions hereinafter set forth.

## AGREEMENT

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     Defined Terms; Recitals. All capitalized terms used herein but not specifically defined in this Amendment shall have the meanings ascribed to such terms in the Lease. The term "Lease" where used in the Lease and this Amendment shall hereafter refer to the Lease, as amended hereby.

2.     Addition of Expansion Space. Notwithstanding anything in the Third Amendment to the contrary, commencing on the date "Expansion Date" (as defined in Paragraph 3 below) , the Existing Premises shall be expanded to include the Expansion Space for a term that shall expire coterminously with the expiration of the Lease (i.e., on October 31, 2026). Therefore, for purposes of the Lease, effective as of the Expansion Date (a) Tenant agrees to accept exclusive possession of the Expansion Space in its current "As-Is" condition without any agreements, representations, understandings or obligations on the part of Landlord to perform or pay for any alterations, repairs or improvements to the Expansion Space, and (b) the "Premises" shall mean the Existing Premises together with the Expansion Space, constituting the entirety of the Landlord's Property.

3.     Expansion Date. Notwithstanding anything in the Third Amendment to the contrary, the "**Expansion Date**" shall mean the date that Landlord delivers exclusive possession of the Expansion Space to Tenant, , but in no event earlier than December 1, 2018. As described in the Third Amendment, the Mr. Finds lease of the Expansion Space is set to expire on or before August 31, 2018, but Landlord

1

agrees to use its reasonable efforts to extend the Mr. Finds lease after execution of this Amendment to terminate on or about December 31, 2018; provided that Landlord's failure to extend the Mr. Finds lease shall not be a condition of this Amendment. The date that the Expansion Date actually occurs shall be confirmed by the parties in writing.

4.     <u>Payment of Rent and Common Areas Costs for the Expansion Space</u>. Notwithstanding anything in the Third Amendment to the contrary, commencing on the Expansion Date, (a) Tenant shall pay Minimum Rent for the Expansion Space together with the Minimum Rent payable for the Existing Premises in the amount equal to Five Thousand Six Hundred Seventy and No/100 Dollars per month ($68,040 annualized) for the remainder of the 2nd Lease Year (any partial month being pro-rated), all of which shall be subject to the upward adjustments of each Adjustments Date, as described in the Lease and (b) Tenant shall be responsible for 100% of the Common Area Costs.

5.     <u>Authority</u>. Each party signing below has full power and authority to enter into this Amendment and the person signing on behalf of such party has been fully authorized to do so by all necessary corporate or partnership action on the part of Tenant.

6.     <u>Original Lease in Full Force</u>. Except for those provisions which are inconsistent with this Amendment and those terms, covenants and conditions for which performance has heretofore been completed, all other terms, covenants and conditions of the Lease shall remain unmodified and in full force and effect. Landlord and Tenant ratify the Lease, as amended hereby.

7.     <u>Facsimile/PDF; Counterparts</u>. Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity. This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

*[SIGNATURE PAGE FOLLOWS]*

2

IN WITNESS WHEREOF, this Amendment has been executed by Landlord and Tenant as of the Effective Date.

**LANDLORD**:

BS PROPERTY, L.L.C.,
a Utah limited liability company

By: _____

Name: John Russel Taylor
Title: Manager


**TENANT**:

EVEN STEVENS UTAH, L.L.C.,
a Utah limited liability company,

By:  Even Stevens Sandwiches, LLC
Its: Manager

   By: _____
   Name: J. Spencer Viehs
   Title: ~~Manager~~ Chief Strategy Officer

3

# FIFTH AMENDMENT TO FORT UNION LEASE

This Fifth Amendment to Fort Union Lease (this "**Amendment**") is made and effective as of January 1, 2019 ("**Effective Date**"), by and between BS PROPERTY, LLC, a Utah limited liability company ("**Landlord**"), and EVEN STEVENS UTAH, L.L.C., a Utah limited liability company ("**Tenant**").

## RECITALS

A.     Landlord and Tenant are parties to that certain Lease dated October 31, 2016 (the "**Original Lease**"), as amended by (i) a First Amendment to Fort Union Lease dated January 6, 2017, (ii) a Second Amendment to Fort Union Lease date February 15, 2017, (iii) a Third Amendment dated March 12, 2018 (the "**Third Amendment**") and (iv) a Fourth Amendment dated August 28, 2018 (the "**Fourth Amendment**" and collectively the "**Lease**").

B.     Pursuant to the Lease, Landlord leases to Tenant, and Tenant leases from Landlord, certain premises comprising approximately 2600_square feet (the "**Existing Premises**") on Landlord's property located at 1346 Fort Union Boulevard, Cottonwood Heights, Utah (herein, "**Landlord's Property**").

C.     As discussed in the Third Amendment, Landlord's Property is jointly occupied by Tenant and a second occupant described as Arthur & Broderick Hansen, DBA Fantastic Mr. Finds (herein, "**Mr. Finds**") who leases the rear building on the southern portion of Landlord's Property located at 1346 Fort Union Boulevard, Cottonwood Heights, Utah (herein, the "**Expansion Space**").

D.     Landlord and Tenant entered into the Fourth Amendment to document their agreement to expand the Existing Premises to include the Expansion Space such that Tenant would become the sole occupant of Landlords Property, and the entirety thereof shall become the "Premises" for all purposes under Lease.

E.     The parties now desire to further amend the Lease to (i) memorialize the occurrence of the Expansion Date (as such term is defined in the Third Amendment), (ii) acknowledge and consent to the continued occupancy of the Expansion Space by Mr. Finds pursuant to a sublease (the "**Sublease**") between Tenant, as "Sublessor," and Mr. Finds, as "Sublessee," thru March 31st, 2019 and (iii) otherwise modify the Lease, all upon the terms and conditions hereinafter set forth..

## AGREEMENT

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.     <u>Defined Terms; Recitals</u>.  All capitalized terms used herein but not specifically defined in this Amendment shall have the meanings ascribed to such terms in the Lease.  The term "Lease" where used in the Lease and this Amendment shall hereafter refer to the Lease, as amended hereby.

2.     <u>Delivery of Expansion Space; Expansion Date</u>. Notwithstanding anything in the Lease to the contrary, Landlord and Tenant hereby acknowledge and agree that (a) Tenant accepts the Expansion Space in its current existing condition with Mr. Finds remaining in possession of such space pursuant to the Sublease and without any agreements, representations, understandings or obligations on the part of Landlord to perform or pay for any alterations, repairs or improvements to the Expansion Space and (b) the Expansion Date shall be deemed to mean January 1, 2019.

1

3.    Payment of Rent and Common Areas Costs for the Expansion Space.  Commencing on the January 1, 2019, (a) Tenant shall pay Minimum Rent for the Expansion Space together with the Minimum Rent payable for the Existing Premises in the amount equal to Five Thousand Six Hundred Seventy and No/100 Dollars per month ($68,040 annualized) for the remainder of the 2nd Lease Year (any partial month being pro-rated), all of which shall be subject to the upward adjustments of each Adjustments Date, as described in the Lease and (b) Tenant shall be responsible for 100% of the Common Area Costs.

4.    Landlord's Consent to Sublease.  Landlord hereby consents to the Sublease, upon the following terms and conditions to each of which Tenant and Sublessee expressly agree:

(a)    such consent is given without prejudice to Landlord's rights under the Lease, as amended hereby;

(b)    neither the sublease nor Landlord's consent shall be deemed to be the consent to or authorization for any further subletting or parting with or sharing possession or occupancy of all or any part of the Lease or the Premises;

(c)    except as expressly provided in this Amendment, nothing contained herein shall be construed as modifying, waiving, impairing or affecting any of the provisions, covenants, and conditions in the Lease, as amended hereby, or any of Landlord's rights or remedies under the Lease, as amended hereby, or waiving any covenant of the Tenant in the due keeping, performance or observance thereof; and

(d)    Tenant shall remain fully liable for the payment of all rent and for the performance of all of the obligations of the Tenant under the Lease.

5.    Effect of Tenant's Late Payment of Rent.  Notwithstanding anything in the Lease to the contrary, and without waiving any of Landlord's rights and remedies at law or under the Lease due to Tenant's failure to timely pay the Rent thereunder, Tenant agrees that if any payments of Rent under the Lease shall not be paid in a timely manner, Tenant shall pay Landlord as a additional late fee due under the Lease (a) 50% of the monthly sublease rental under the Sublease for the first late payment, (b) 75% of the monthly sublease rental under the Sublease for the second late payment, and (c) 100% of the monthly sublease rental under the Sublease for the third and any future late payment under the Lease.  Tenant acknowledges and agrees that money damages set forth in this paragraph is fair, equitable and adequate.

6.    Authority.  Each party signing below has full power and authority to enter into this Amendment and the person signing on behalf of such party has been fully authorized to do so by all necessary corporate or partnership action on the part of Tenant.

7.    Original Lease in Full Force.  Except for those provisions which are inconsistent with this Amendment and those terms, covenants and conditions for which performance has heretofore been completed, all other terms, covenants and conditions of the Lease shall remain unmodified and in full force and effect.  Landlord and Tenant ratify the Lease, as amended hereby.

8.    Facsimile/PDF; Counterparts.  Each party hereto, and their respective successors and assigns shall be authorized to rely upon the signatures of all of the parties hereto on this Amendment which are delivered by facsimile or PDF as constituting a duly authorized, irrevocable, actual, current delivery of this Amendment with original ink signatures of each person and entity.  This Amendment may be executed in counterparts, each of which shall be deemed an original part and all of which together shall constitute a single agreement.

2

IN WITNESS WHEREOF, this Amendment has been executed by Landlord and Tenant as of the Effective Date.

**LANDLORD**:

BS PROPERTY, L.L.C.,
a Utah limited liability company

By: _____

Name: John Russel Taylor
Title: Manager


**TENANT**:

EVEN STEVENS UTAH, L.L.C.,
a Utah limited liability company,

By:  Even Stevens Sandwiches, LLC
Its: Manager

     By: _____
     Name:
     Title: Manager

3

# EXHIBIT "B"



ENGELMAN | BERGER, PC
ATTORNEYS AT LAW

SCOTT B. COHEN
(602) 222-4960
sbc@eblawyers.com

April 17, 2019

<u>VIA U.S. MAIL AND E-MAIL</u>

M. Preston Gardner
Pernell W. McGuire
**DAVIS MILES MCGUIRE GARDNER PLLC**
40 E. Rio Salado Pkwy., Suite 425
Tempe, AZ 85281
Email: pgardner@davismiles.com
Email: pmcguire@davismiles.com

Aubrey Laine Thomas
**DAVIS MILES MCGUIRE GARDNER PLLC**
9 W. Cherry Avenue, Suite B
Flagstaff, AZ 86001
Email: athomas@davismiles.com

**Re:**  *In re: Even Stevens Arizona, LLC. et al,* **Case No. 2:19-bk-03235-DPC ("Bankruptcy Case") | Lease of 1346 E. Fort Unions Blvd, Cottonwood Heights, UT 84121 ("Premises) | Notice of Default for Nonpayment of Rent to Tenant and Guarantor**

### *FOR NOTICE PURPOSES ONLY*
*This statement is not intended to collect, assess, or demand payment from any person protected by the U.S. Bankruptcy Code. Be advised that this communication is for informational purposes only.*

Mssrs. Gardner, McGuire, and Ms. Thomas,

As you know, this firm represents BS Property, LLC ("BS Property") with respect to the Bankruptcy Case and the lease agreement dated October 31, 2016, as amended from time-to-time thereafter ("Lease") between Even Stevens Utah, LLC ("Even Stevens") and BS Property. In connection with the Lease, Even Stevens Sandwiches, LLC ("Guarantor") executed the *Guaranty*, thereby personally guarantying the payment and performance of all obligations of Even Stevens under the Lease.

**Even Stevens and Guarantor are hereby notified that Even Stevens has failed to pay rent due under the Lease for April 2019. If April rent remains unpaid for five (5) days from the date of this notice, Even Stevens and Guarantor shall be in default pursuant to paragraph 28.1 of the Lease.**

In particular, under Article 5 of the Lease, Even Stevens is obligated to pay rent in advance on the first day of each month without notice or demand. Under Article 30, failure to timely pay any installment of rent when due results in a late charge equal to 6% of the overdue

{0005999.0000/00979196.DOCX / }
3636 NORTH CENTRAL AVE. | STE 700 | PHOENIX, AZ 85012 | 602.271.9090 TEL | 602.222.4999 FAX | EBLAWYERS.COM

Case 2:19-bk-03236-DPC   Doc 63   Filed 08/06/19   Entered 09/30/19 14:59:44   Desc
Main Document      Page 69 of 84

amount. Interest accrues on all delinquent charges at an interest rate not less than 18.00% per annum, as set forth in Article 31. As of April 16, 2019, the outstanding amount owed by Even Stevens under the Lease is **$7,385.95** ("Outstanding Balance"), composed of April Base Rent of $5,670, Common Area Costs of $1,065.42, Late Fees on delinquent April rent of $404.13, and accrued interest of $211.20. Interest continues to accrue on the delinquent charges at the rates prescribed in the Lease until paid in full.

This letter is not and shall not be construed to constitute a demand, an attempt to collect a debt, or as an act that otherwise violates 11 U.S.C. § 362(a). This letter is sent for notice purposes only to inform Even Stevens and Guarantor that a default shall arise under the Lease in the event the Outstanding Balance is not paid within five (5) days.

Payment of only a portion of the Outstanding Balance will not prevent a default from occurring, and BS Property's acceptance of an amount less than the Outstanding Balance will not constitute a waiver, or an accord and satisfaction. Landlord does not waive and expressly reserves all rights and remedies under the Lease, at law, or in equity. Without limiting the foregoing, BS Property will be moving for relief from the automatic stay in the event the Outstanding Balance is not timely cured. Alternatively, BS Property will consider an offer to surrender the Premises, subject to a reservation of rights and preservation of BS Property's monetary claim.

Sincerely,

**ENGELMAN BERGER, P.C.**

Scott B. Cohen

SBC/mkk
cc:    R. Taylor

# EXHIBIT "C"



ENGELMAN | BERGER, PC
ATTORNEYS AT LAW

SCOTT B. COHEN
(602) 222-4960
sbc@eblawyers.com

May 15, 2019

<u>VIA U.S. MAIL AND E-MAIL</u>

M. Preston Gardner
Pernell W. McGuire
**DAVIS MILES MCGUIRE GARDNER PLLC**
40 E. Rio Salado Pkwy., Suite 425
Tempe, AZ 85281
Email: pgardner@davismiles.com
Email: pmcguire@davismiles.com

Aubrey Laine Thomas
**DAVIS MILES MCGUIRE GARDNER PLLC**
9 W. Cherry Avenue, Suite B
Flagstaff, AZ 86001
Email: athomas@davismiles.com

Re:  *In re: Even Stevens Arizona, LLC. et al,* Case No. 2:19-bk-03235-DPC ("Bankruptcy Case") | Lease of 1346 E. Fort Unions Blvd, Cottonwood Heights, UT 84121 ("Premises") |<u>Second</u> Notice of Default for Nonpayment of Rent to Tenant and Guarantor

### *FOR NOTICE PURPOSES ONLY*

*This statement is not intended to collect, assess, or demand payment from any person protected by the U.S. Bankruptcy Code.  Be advised that this communication is for informational purposes only.*

Messrs. Gardner, McGuire, and Ms. Thomas,

As you know, this firm represents BS Property, LLC ("BS Property") with respect to the Bankruptcy Case and the lease agreement dated October 31, 2016, as amended from time-to-time thereafter ("Lease") between Even Stevens Utah, LLC ("Even Stevens") and BS Property. In connection with the Lease, Even Stevens Sandwiches, LLC ("Guarantor") executed the *Guaranty*, thereby personally guarantying the payment and performance of all obligations of Even Stevens under the Lease.

**Even Stevens and Guarantor are hereby notified that Even Stevens has failed to pay rent due under the Lease for May 2019.  If May rent remains unpaid for five (5) days from the date of this notice, Even Stevens and Guarantor shall be in default pursuant to paragraph 28.1 of the Lease.**

In particular, under Article 5 of the Lease, Even Stevens is obligated to pay rent in advance on the first day of each month without notice or demand. Under Article 30, failure to

timely pay any installment of rent when due results in a late charge equal to 6% of the overdue amount. Interest accrues on all delinquent charges at an interest rate not less than 18.00% per annum, as set forth in Article 31. As of May 15, 2019, the outstanding amount owed by Even Stevens under the Lease is **$7,139.55** ("Outstanding Balance"), composed of May Base Rent of $5,670, Common Area Costs of $1,065.42, Late Fees on delinquent May rent of $404.13, and accrued interest of $56.33. Interest continues to accrue on the delinquent charges at the rates prescribed in the Lease until paid in full.

This letter is not and shall not be construed to constitute a demand, an attempt to collect a debt, or as an act that otherwise violates 11 U.S.C. § 362(a). This letter is sent for notice purposes only to inform Even Stevens and Guarantor that a default shall arise under the Lease in the event the Outstanding Balance is not paid within five (5) days.

Payment of only a portion of the Outstanding Balance will not prevent a default from occurring, and BS Property's acceptance of an amount less than the Outstanding Balance will not constitute a waiver, or an accord and satisfaction. Landlord does not waive and expressly reserves all rights and remedies under the Lease, at law, or in equity. Without limiting the foregoing, BS Property will be moving for relief from the automatic stay in the event the Outstanding Balance is not timely cured. Alternatively, BS Property will consider an offer to surrender the Premises, subject to a reservation of rights and preservation of BS Property's monetary claim.

Sincerely,

**ENGELMAN BERGER, P.C.**

Scott B. Cohen

SBC/mkk
cc:    R. Taylor

# EXHIBIT "D"

| From: | Scott B. Cohen |
|---|---|
| Sent: | Thursday, June 13, 2019 1:26 PM |
| To: | 'pgardner@davismiles.com'; 'pmcguire@davismiles.com'; 'athomas@davismiles.com' |
| Cc: | 'rockyhtaylor@me.com'; Marie K. Kelly; Michael P. Rolland |
| Subject: | RE: Even Stevens; Nonpayment of Late Fees; Third Notice of Default |
| Attachments: | BS Property LLC Rent Statement 06-10-19.pdf |

Preston, Pernell, and Aubrey,

As you know, we represent BS Property, LLC as landlord ("Landlord") for Even Stevens Utah, LLC ('Debtor") concerning the lease of 1346 E. Fort Unions Blvd, Cottonwood Heights, UT 84121. The Landlord has previously issued two post-petition notices of default for monetary defaults. It also issued a reservation of rights regarding the nonpayment of late fees.

This email shall constitute the third notice of default.  Attached please find the June rent statement.   June rent remains unpaid as well as the late fees for May.  Interest and attorneys' fees continue to accrue.

Pernell, on June 11th at the hearing on the Motion for Substantive Consolidation, I asked you to do your best to ensure that the Debtor stays current on its rental obligations to the Landlord.  No sooner did I return to the office to find that the Debtor had defaulted (for the third time).  Please have the Debtor rectify this default ASAP.  This email shall trigger any cure period that the Debtor has under the Lease as amended.

The Landlord reserves all of its rights and remedies under the Lease (as amended) and under the U.S. Bankruptcy Code.  Thank you in advance for your attention to this matter.

Scott B. Cohen
**ENGELMAN BERGER, P.C.**
2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004
602.222.4960 | eblawyers.com | sbc@eblawyers.com | bio | vcard | linkedin

**Engelman Berger has moved to 2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004.  Please update your records. Thank you.**

# BS Property, LLC

1535 Wasatch Drive SLC, UT  84108
801-244-9908

**6/10/2019**

## BILL TO

Even Stevens Utah, LLC
1225 E Fort Union Blvd Suite 200 Midvale, UT 84047

801-722-8192

| Details | AMOUNT |
|---|---|
| Base Rent June | $5,670.00 |
| Common Area Costs | $1,065.42 |
| Late Fee on base Rent | $404.13 |
| Interest thru 6/11/19 (additional $3.52 per day past 6/11/19) | $38.72 |
| Unpaid May Late Fees | $404.13 |
| Interest on Unpaid May Late Fees | $6.38 |
| TOTAL | $7,588.78 |

Make all checks payable to BS Property, LLC.

If you have any questions concerning this invoice please contact:

Rocky Taylor:  rockyhtaylor@me.com

# EXHIBIT "E"

| | |
|---|---|
| **From:** | Scott B. Cohen |
| **Sent:** | Friday, June 21, 2019 11:09 AM |
| **To:** | pgardner@davismiles.com; pmcguire@davismiles.com; athomas@davismiles.com |
| **Cc:** | rockyhtaylor@me.com; Marie K. Kelly; Michael P. Rolland |
| **Subject:** | RE: Even Stevens; Nonpayment of Late Fees; Third Notice of Default |
| | |
| **Importance:** | High |

Preston, Pernell, and Aubrey,

On June 13, 2019, BS Property, LLC ("Landlord") for Even Steven Utah, LLC, a tenant, debtor, and debtor-in-possession (the "Tenant"), gave notice of monetary defaults and demanded that the Tenant cure the default. Eight (8) days have passed and the Tenant has not cured the defaults. The Landlord hereby agrees to accept the cure payments no later than **5:00 p.m. (M.S.T.), on Monday, June 24, 2019**. If the cure payments are not received, then the Landlord will move for relief from the automatic stay.

Time remains of the essence. Nothing in this email shall constitute a waiver of the rights and remedies of the Landlord. In fact, the Landlord hereby reserves all of its rights under the Lease (as amended), under the U.S. Bankruptcy Code, at law, and in equity.

Regards,

Scott B. Cohen
**ENGELMAN BERGER, P.C.**
2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004
602.222.4960 | eblawyers.com | sbc@eblawyers.com | bio | vcard | linkedin
**Engelman Berger has moved to 2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004. Please update your records. Thank you.**

**From:** Scott B. Cohen
**Sent:** Thursday, June 13, 2019 1:26 PM
**To:** 'pgardner@davismiles.com' <pgardner@davismiles.com>; 'pmcguire@davismiles.com' <pmcguire@davismiles.com>; 'athomas@davismiles.com' <athomas@davismiles.com>
**Cc:** 'rockyhtaylor@me.com' <rockyhtaylor@me.com>; Marie K. Kelly <mkk@eblawyers.com>; Michael P. Rolland <mpr@eblawyers.com>
**Subject:** RE: Even Stevens; Nonpayment of Late Fees; Third Notice of Default

Preston, Pernell, and Aubrey,

As you know, we represent BS Property, LLC as landlord ("Landlord") for Even Stevens Utah, LLC ('Debtor') concerning the lease of 1346 E. Fort Unions Blvd, Cottonwood Heights, UT 84121. The Landlord has previously issued two post-petition notices of default for monetary defaults. It also issued a reservation of rights regarding the nonpayment of late fees.

This email shall constitute the third notice of default.  Attached please find the June rent statement.   June rent remains unpaid as well as the late fees for May.  Interest and attorneys' fees continue to accrue.

Pernell, on June 11th at the hearing on the Motion for Substantive Consolidation, I asked you to do your best to ensure that the Debtor stays current on its rental obligations to the Landlord.  No sooner did I return to the office to find that the Debtor had defaulted (for the third time).  Please have the Debtor rectify this default ASAP.  This email shall trigger any cure period that the Debtor has under the Lease as amended.

The Landlord reserves all of its rights and remedies under the Lease (as amended) and under the U.S. Bankruptcy Code.  Thank you in advance for your attention to this matter.

Scott B. Cohen
**ENGELMAN BERGER, P.C.**
2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004
602.222.4960 | eblawyers.com | sbc@eblawyers.com | bio | vcard | linkedin

**Engelman Berger has moved to 2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004.  Please update your records. Thank you.**

# EXHIBIT "F"



ENGELMAN | BERGER, PC
ATTORNEYS AT LAW

SCOTT B. COHEN
(602) 222-4960
sbc@eblawyers.com

July 10, 2019

<u>VIA U.S. MAIL AND E-MAIL</u>

M. Preston Gardner
Pernell W. McGuire
**DAVIS MILES MCGUIRE GARDNER PLLC**
40 E. Rio Salado Pkwy., Suite 425
Tempe, AZ 85281
Email: pgardner@davismiles.com
Email: pmcguire@davismiles.com

Aubrey Laine Thomas
**DAVIS MILES MCGUIRE GARDNER PLLC**
9 W. Cherry Avenue, Suite B
Flagstaff, AZ 86001
Email: athomas@davismiles.com

> **Re:** *In re: Even Stevens Arizona, LLC. et al,* Case No. 2:19-bk-03235-DPC ("Bankruptcy Case") | Lease of 1346 E. Fort Unions Blvd, Cottonwood Heights, UT 84121 ("Premises") |<u>Fourth</u> Notice of Default for Nonpayment of Rent to Tenant and Guarantor

### *FOR NOTICE PURPOSES ONLY*

*This statement is not intended to collect, assess, or demand payment from any person protected by the U.S. Bankruptcy Code. Be advised that this communication is for informational purposes only.*

Messrs. Gardner, McGuire, and Ms. Thomas,

As you know, this firm represents BS Property, LLC ("BS Property") with respect to the Bankruptcy Case and the lease agreement dated October 31, 2016, as amended from time-to-time thereafter ("Lease") between Even Stevens Utah, LLC ("Even Stevens") and BS Property. In connection with the Lease, Even Stevens Sandwiches, LLC ("Guarantor") executed the *Guaranty,* thereby personally guarantying the payment and performance of all obligations of Even Stevens under the Lease.

**Even Stevens and Guarantor are hereby notified that Even Stevens has failed to pay rent due under the Lease for July 2019. If July rent remains unpaid for five (5) days from the date of this notice, Even Stevens and Guarantor shall be in default pursuant to paragraph 28.1 of the Lease.**

In particular, under Article 5 of the Lease, Even Stevens is obligated to pay rent in advance on the first day of each month without notice or demand. Under Article 30, failure to

timely pay any installment of rent when due results in a late charge equal to 6% of the overdue amount. Interest accrues on all delinquent charges at an interest rate not less than 18.00% per annum, as set forth in Article 31. As of July 10, 2019, the outstanding amount owed by Even Stevens under the Lease is **$7,174.75** ("Outstanding Balance"), composed of July Base Rent of $5,670, Common Area Costs of $1,065.42, Late Fees on delinquent July rent of $404.13, and accrued interest of $35.20. Interest continues to accrue on the delinquent charges at the rates prescribed in the Lease until paid in full.

This letter is not and shall not be construed to constitute a demand, an attempt to collect a debt, or as an act that otherwise violates 11 U.S.C. § 362(a). This letter is sent for notice purposes only to inform Even Stevens and Guarantor that a default shall arise under the Lease in the event the Outstanding Balance is not paid within five (5) days.

Payment of only a portion of the Outstanding Balance will not prevent a default from occurring, and BS Property's acceptance of an amount less than the Outstanding Balance will not constitute a waiver, or an accord and satisfaction. Landlord does not waive and expressly reserves all rights and remedies under the Lease, at law, or in equity. Without limiting the foregoing, BS Property will be moving for relief from the automatic stay in the event the Outstanding Balance is not timely cured. Alternatively, BS Property will consider an offer to surrender the Premises, subject to a reservation of rights and preservation of BS Property's monetary claim.

Sincerely,

**ENGELMAN BERGER, P.C.**

Scott B. Cohen

SBC/mkk
cc:     R. Taylor

# EXHIBIT "G"

| **From:** | Scott B. Cohen |
| **Sent:** | Monday, July 22, 2019 11:07 AM |
| **To:** | Pernell McGuire |
| **Cc:** | Michael P. Rolland |
| **Subject:** | Even Stevens; Rent for Utah owed to BS Property; Past Due (Again) |
| | |
| **Importance:** | High |

Pernell,

You have received notice that rent is past due for BS Property.  Without waiving any of our rights or remedies, BS Property will only accept rent if paid by **5:00 p.m., Monday, July 22, 2019**. After that, we have been instructed to move forward with relief from the automatic stay.  BS Property affirmatively reserves all of its rights.  Time remains of the essence.

Regards,

Scott B. Cohen
**ENGELMAN BERGER, P.C.**
2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004
602.222.4960 | eblawyers.com | sbc@eblawyers.com | bio | vcard | linkedin
**Engelman Berger has moved to 2800 North Central Avenue, Suite 1200, Phoenix, Arizona 85004.  Please update your records. Thank you.**