19

William J. Baer
Karen D. Baer

9705 Moss Rose Circle
Highlands Ranch, CO 80129

Telephone: (303) 791-2225
E-mail: billandscottie@reagan.com

*Even Stevens Creditors and Shareholders*

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

| In Re: | Chapter 11 |
|---|---|
| EVEN STEVENS SANDWICHES, LLC, *et al.*, | Case No. 2:19-bk-03236-DPC |
| Debtors. | (Jointly Administered) |
| This Filing Applies to:<br>☐ All Debtors<br>☒ Specified Debtors:<br>Even Stevens Sandwiches, LLC | **WRITTEN RESPONSE TO THE "OBJECTION TO PROOFS OF CLAIM 105 AND 110 FILED BY WILLIAM J. BAER AND KAREN D. BAER" FILED BY DAVIS MILES MCGUIRE GARDNER, PLLC** |

Mr. William J. Baer and Ms. Karen D. Baer (collectively, the "Creditors") in the above-captioned jointly administered bankruptcy proceeding, hereby respectfully submit the following *Written Response to the "Objection to Proofs of Claim 105 and 110 Filed by William J. Baer and Karen D. Baer"* ("Response"). This Response is provided to speak to certain specific statements that have been asserted via the Davis, Miles McGuire Gardner, PLLC ("DMMG") Objection which was filed with the court on 10/09/19 as PACER DOC #73 and DOC #75.

## I. GENERAL BACKGROUND OF THE DMMG OBJECTION TO OUR PROOFS OF CLAIM

1. In their October 9, 2019, Objection, DMMG set about to argue that the secured treatment of each of our two claims should be denied.

2. Upon our review of the representations that DMMG have offered in support of their objection to the security status nature of our two claims, we found statements that were made therein which reveal to us a need for each of our two claims to be examined more closely because with certainty in the case of POC 105, and possibly also in the case of POC 110, these claims each involve characteristics that are likely to be uniquely different from many of the other claims that DMMG have recently filed Objections against in a collective and systematic manner.

3. We thus plead with the Court to consider and recognize that the nature of these claims warrants a more careful examination due to the supplemental facts that we provide within this Response. We believe that each one of these claims involves unusual circumstances which may require that they be given some manner of special handling so as to properly determine their true status with respect to their Absolute Priority.

4. In submitting this Response, it is our aim to assist the Court and its participants with the information that they need in order to arrive at a right and accurate determination as to the actual standing of these claims, whatever that determination is proven to be.

5. Each of these claims is addressed in separate sections below. The relevant statements asserted in the DMMG Objection which we wish to address herein were presented within Objection Line Items II-5 through II-10, which are here repeated from the text of the Objection for ease-of-reference:

> "5. On June 27, 2019, the Claimant filed Proof of Claim No. 105 ("POC 105") in the amount of $358,500."

"6. In response to part 9 of POC 105—"Is all or part of the claim secured?"—the Claimant checked the "no" box. However, the official Claims Register in the Debtor's case lists POC 105 as a secured claim in the amount of $358,500."

"7. The Claimant did not include with POC 105 any security agreement or evidence of perfection regarding a secured claim."

"8. On June 27, 2019, the Claimant also filed Proof of Claim No. 110 ("POC 110"), asserting a secured claim in the amount of $5,290."

"9. POC 110 left the description of property securing the claim blank and described the basis for perfection as "Security Agreement & Utah UCC Record Filing."

"10. Attached to POC 110 is a copy of a Secured Convertible Promissory Note dated July 31, 2018 between the Debtor and Claimant (the "Note"). The Note is not signed by the Debtor."

## II. CREDITOR'S RESPONSE TO THESE STATEMENTS

### A. REGARDING POC 105

6. We, the Creditors, at this date in time, are actually uncertain as to the security status of our $358,500 POC 105 Claim.

7. Although on the date upon which we had initially filed this Claim, we had indeed checked the "No" box in response to part 9 of the claim form based upon some general guidance for completing these POC forms which had been graciously provided by Mr. Brooks Pickering during two back-to-back Investor Conference Calls on 6/18/19 and 6/20/19 that were held specifically for that purpose, at this time we now see some reason to doubt that "Unsecured" is the correct classification for our three (3) $100,000 Even Stevens Promissory Note loans.

8. As Line Item #6 of the DMMG Objection itself notes, "...the official Claims Register in the Debtor's case lists POC 105 as a secured claim in the amount of $358,500."

It thus appears that someone associated with the Court's official Claims Register had some reason to believe that the Promissory Note debt that is owed to us was a secured debt, and had therefore listed our Claim as such. We, the Creditors, are not aware of any actions taken or representations made on our part that had led to our POC being classified as a secured claim, and do not know why someone had thought that it was appropriate to do so. We are thus reasonably desirous to make every effort to be doubly certain to confirm the actual security status of this substantially large loan asset.

9. Objection Line Item #7 makes the valid observation that, "The Claimant did not include with POC 105 any security agreement or evidence of perfection regarding a secured claim." It is indeed true that we did not submit a copy of a signed Security Agreement with our initial submission of our POC 105. The reasons for this are as follows:

    a. At the time of filing, we were under tight time constraints and had to act quickly to get our Proofs Of Claim filed by their due date, and only filed the basic set of documentation that we believed to be necessary and adequate to get our Claims filed by the deadline, and were advised that once we had filed our claims, there would be an opportunity to provide any additionally needed documentation upon request, should the need for that ever arise.

    b. At the time of filing, we were also of the understanding all of the Even Stevens Promissory Notes were likely Unsecured, and thus assumed that our three (3) $100,000 Notes were also Unsecured, so we did not look for any signed Security Agreement among our records to send in with our POC. We have since learned that the Even Stevens Company had issued many different kinds of Promissory Notes, some of which may have been uniquely Secured, although many of them were not and were clearly labeled as being "Unsecured" in their title. Our Notes do not bear any

- 4 -

such clear title indicating that they either are or are not Secured.

   c. At the time of filing, we were also under the understanding that the key objective of our duty to file our Proof of Claim was to register with the Bankruptcy Court from our own independent record of knowledge of the <u>nature</u> and the <u>amount</u> of our claims, and that the Even Stevens Company management would do likewise, so that the Court could then take both independently presented records and verify that they are in agreement. Along with that main objective, we have understood that should any additional, supporting documentation be required by the process, that the Even Stevens Company management would both be able and eager to help present such supporting document, if needed.

10. We do not know with certainty at this time whether or not there exists a signed Security Agreement for these three (3) $100,000 Promissory Notes.

11. The Steve Down Companies management had provided us with a USB thumb drive bearing an "Even Stevens Sandwiches" label that was intended to contain softcopies of all of our official Company documents, but upon checking this documentation thumb drive now, we have just discovered that the thumb drive that had been provided to us for archiving softcopies of these documents is entirely <u>empty</u>. We are quite certain that we had not accessed this thumb drive prior to now, so we believe that the prior Company management staff had inadvertently sent us an empty storage device. We are thus unable to examine this particular source of document records so as to confirm or disprove the existence of a signed Security Agreement for these three Promissory Notes.

12. Upon discovery that the aforementioned Even Stevens documentation thumb drive is empty, on October 23, 2019, we have requested from the current Even Stevens Company management that a copy of this same documentation be delivered to us, and Mr. Brooks Pickering had assured us that we would receive it by October 25th; however it has

- 5 -

not arrived by the time that we need to get this Response in the mail for timely delivery to the Court in Arizona by the established bar date of 21 days past the October 9, 2019 DMMG Objection filing.

13. Given the above material facts and circumstances, we believe that a more thorough examination of security status of this particular set of Promissory Notes is warranted so as to affirmatively determine their correct security status.

**B.    REGARDING POC 110**

14. The matter of the other, smaller claim that we have with respect to POC 110 has been a matter of a great deal of frustration to us (the Creditors), for it is our contention that these particular funds should have never been included in either the tranche of Rescue Note or Bridge Funding money at all, due to the history associated with these funds which we briefly outline here.

15. We initially wired $5,000 to the care of the Even Stevens management of Pickering and Spencer on 8/6/18. We did so with a great deal of reluctance, but had chosen to do so with an understanding, from what Mr. Brooks Pickering had been relating via multiple Investor Calls, that these funds would likely be returned to us within a short time-frame—soon after the timeframe which Mr. Pickering had been publicly estimating that the Company would achieve a break-even turnaround to a net positive cash flow "by the end of January of 2019." Although we really could not easily spare contributing $5,000 toward this turn-around effort, for doing so was really "cutting our liquid finances close to the bone," we judged that we could do so *only on a short, 5-6 month basis* and thus do what we could to at least make some kind of "fair share" effort to help contribute to an overall effort to turn the Company's cash flow issues around in the kind of short-term effort that Mr. Pickering had been amply describing.

16. Nonetheless, in spite of our desire to do so, we soon realized that we really could not afford to lend even this small amount of $5,000 to this Rescue effort at this time,

- 6 -

and as early as 9/21/18, we requested that these funds be promptly returned to us.

17. We repeated our request to have these $5,000 funds returned to us on 10/11/18.

18. On 10/14/18, we were assured in writing from Mr. Brooks Pickering that Company management "would have the money back to [us]" and that we "should receive it in the next ten days."

19. On 10/14/19 we acknowledged in writing to Mr. Pickering that this assurance that we would receive these funds back soon "sounded good" to us.

20. On 11/12/19, we informed Company management in writing that we had not as yet received the promised, and much-anticipated, return of these funds.

21. We repeated our request to have these $5,000 funds returned to us on 10/11/18.

22. When it became abundantly clear that Company management was not even replying to our communications about this particular subject, even while we were able to exchange communications with them on other, unrelated subjects, we raised this issue again with increasingly clear terms and repeated our protest regarding the failure to return these funds in an unmistakably clear manner in writing to Company management on 3/28/19 and did so again on 5/1/19.

23. For documentation of each of the above inter-communications, we refer the Court to the email communication thread which we include herein as Exhibit A.

24. Finally, upon discovering that this particular amount of $5,000 had somehow actually become included as part of the set of "Rescue Note and Bridge Funding" loans that were tallied up among the bankruptcy records, we thus filed a Proof of Claim (POC 110) in regard to these funds.

25. From 9/21/18 until today, we have never wanted this Loan, but as the documented communication history presented here in Exhibit A clearly shows, we have rather repeatedly asked for this money to be returned to us.

26. We honestly do not know what else we could have done to make ourselves

- 7 -

Case 2:19-bk-03236-DPC    Doc 212    Filed 10/29/19    Entered 10/29/19 13:54:26    Desc
Main Document    Page 7 of 19

more clear to the Company management with respect to this matter, but all of our requests have gone unheeded.

27. So, when Line Item #10 of the DMMG Objection to our POC 110 claim makes the observation that, "The Note is not signed by the Debtor," well, yes, this is no surprise to us, for we had not on our end ever received, nor witnessed any copy of a signed Note being returned to us in exchange for these $5,000, and had we ever received an executed Note, we would have objected vehemently to seeing that being done, for we have not anticipated that there would ever be such an executed Note, for what we have instead repeatedly asked for is simply for our money to be returned to us.

28. And now, after enduring all of the above, we now find the DMMG Objection coming against us with a complaint that we do not have in our possession a signed, executed copy of a Rescue Note.

29. We honestly do not know what more we can say in this matter, nor are we able to imagine what even the Court could now say on our behalf in this matter at this juncture.

30. For our part, as a practical matter, it feels that this particular set of funds has been effectively "stolen" from us, although we do not believe that the current Company management had that in mind as any kind of intentional goal or intent. We rather prefer to assume that this likely falls under the category of this item "falling through the cracks" as a matter of mismanagement of "details" while management was presumably doing their best to deal with much larger problems than our "small" contribution of just $5,000. But, unfortunately for us and our financial situation, $5,000 is no longer a small amount of discretionary funding for us. We are only saying here that *as a practical matter*, the effect upon us and our current financial situation is the same *as if these funds had been* willfully stolen from us. We are at a loss as to what to say or think about it at this point in time. This money should have been returned to us a long time ago, yet here we find ourselves, still talking about it now more than one full year after-the-fact of our asking for these funds to

be returned to us, without any further resolution to this matter in hand.

31. If the Court can somehow find a way to help rectify this matter for us, then we would wholeheartedly welcome that. However, given the circumstances that we all now find ourselves in, since the current management has chosen to move our Company into a state of Chapter 11 bankruptcy, we understand that it may not even be possible for anyone to give any care to our grievance with respect to the particular circumstances surrounding this "$5,000 Note."

### III. CONCLUDING SUMMARY

We, the Creditors, are not at this time able to dispute nor argue for the Security status of our POC 105. We are currently awaiting additional documentation from the Even Stevens management staff which has been promised to us and which we expect to receive in the very near future.

And as for the Secured status of POC 110 which DMMG has also objected to, for our part we see a much more fundamental issue involved here, which is the fact that to our mind and knowledge, there never should have been a "$5,000 Rescue Note" associated with our name or with this Company, for we had in fact early and often requested that those $5,000 worth of funds be returned to us without any Note being executed in exchange for them.

In terms of "Absolute Priority," to our mind these particular funds should have been handled in a manner which would classify them as being "more than Secured," because they should have been returned long before anyone was even thinking about entering into a state of bankruptcy. If anyone now wants to "down-grade" their status even further to "Unsecured" funds, then this comes as yet another "kick in the teeth" to people such as us who have only purposed to do what we could to try to establish, build, and grow this Company into a profitable blessing to all other partnering founders, investors, and

- 9 -

customers.

We filed our POC 110 as best we were able, given the strange circumstances surrounding these funds, so as cooperate in assisting the Court in the arduous task that it has at hand of properly sorting out all of the issues that surround bankruptcy proceedings.

We respectfully submit the foregoing supplemental information to the specific points of Objections that were raised by DMMG in order to further explain and clarify why our two Proofs of Claim were filed in the manner that they were. If any further information is required in this matter, we will endeavor to provide that promptly.

DATED this 26th day of October, 2019.

WILLIAM J. BAER

KAREN D. BAER


By /s/ William J. Baer
William J. Baer
Karen D. Baer
9705 Moss Rose Circle
Highlands Ranch, CO  80129
Even Stevens Creditors and Shareholders

COPY of the foregoing mailed or e-mailed*
this 26th day of October, 2019, to:

M. Preston Gardner*
Pernell W. McGuire*
Aubrey Laine Thomas*
Davis Miles McGuire Gardner PLLC
40 E. Rio Salado Pkwy, #425
Tempe, AZ 85281
pgardner@davismiles.com
pmcguire@davismiles.com
athomas@davismiles.com
*Attorneys for Debtors*

Jennifer A. Giaimo*
Office of the United States Trustee
230 N. First Avenue, Suite 204
Phoenix, AZ 85003-1706
Jennifer.A.Giaimo@usdoj.gov
*Attorney for U.S. Trustee*

Emily G. Wagner*
Snell & Wilmer L.L.P.
One Arizona Center
400 E. Van Buren St., Ste 1900
Phoenix, AZ 85004-2202
ewagner@swlaw.com
*Attorney for the Official Committee of Unsecured Creditors*

/s/ William J. Baer

Exhibit A

| | |
|---|---|
| 1 | **From:** Bill/Scottie <billandscottie@reagan.com><br>**Sent:** Wednesday, May 1, 2019 3:02 PM |
| 2 | **To:** 'Brooks Pickering' <bpickering@evenstevens.com>; 'Spencer Viernes' <sviernes@evenstevens.com>; Kim Johnston (at ES) <kjohnston@evenstevens.com> |
| 3 | **Cc:** 'Scottie Baer' <scottie.baer@dcsdk12.org><br>**Subject:** RE: The Return of our $5,000 |
| 4 | **Importance:** High |
| 5 | Brooks, Spencer, and/or Kim, |
| 6 | We have now asked for these funds to be returned to us FIVE TIMES as per the documented email thread below—this May 1, 2019 correspondence is now the SIXTH time for us to do so, |
| 7 | because, as I have previously noted below: 1) these particular funds were not qualified funds and 2) we now know that we also should have never sent in these funds to begin with because we |
| 8 | actually were not able to afford loaning out these funds at that time. We had only believed that this was something that was reasonably within our reach to do last Fall based on the progress |
| 9 | projections that Brooks had repeatedly conveyed at that time as to how soon Even Stevens would be able to "break even," and when we might expect to be receiving the past-due interest on the |
| 10 | $3,000 monthly, fixed income interest on our ES Promissory Notes which we have been doing without for many months now, as well as the resumption of currently due interest payments, |
| 11 | and/or the full repayment of the principal amount on our Notes. Any one of those four expected payments would have been a great help to us at this time, but to receive none of them, nor even |
| 12 | any kind of answer regarding our inquiries about this matter is really reaching a ridiculous level of futility in trying to work with you. |
| 13 | |
| 14 | We have received no reply whatsoever regarding these multiple requests from anyone of you for a period of more than six months now. We have been exceedingly patient regarding this issue in |
| 15 | order to give you space to work the many other issues that you have on your plate, but surely, you should be able to take a moment and give us some kind of REPLY rather than stressing our |
| 16 | patience on this matter to the maximum reaches of "good faith." |
| 17 | William J. and Karen D. Baer<br>(H) 303-791-2225 |
| 18 | **From:** Bill/Scottie <billandscottie@reagan.com><br>**Sent:** Thursday, March 28, 2019 3:44 PM |
| 19 | **To:** 'Brooks Pickering' <bpickering@evenstevens.com>; 'Spencer Viernes' <sviernes@evenstevens.com>; Kim Johnston (at ES) <kjohnston@evenstevens.com> |
| 20 | **Cc:** 'Scottie Baer' <scottie.baer@dcsdk12.org><br>**Subject:** RE: The Return of our $5,000 |
| 21 | **Importance:** High |
| 22 | Brooks/Spencer/Kim, |
| 23 | Having just read through the abundance of the approximate 90 pages worth of legal documents that were sent to us this week, I was quite surprised to discover that the "Declaration of Brooks |
| 24 | Pickering" document has listed our previously pledged $5,000 among the "secured creditor's security interest ('Cash Collateral')" funds that were itemized among the convertible notes and |
| 25 | other loans that investors had recently invested into the Even Stevens Company. |
| 26 | What takes us by surprise with this is the idea the new Even Stevens management has somehow |

come to consider that those particular funds actually belong within that category of secured creditor funds. Upon seeing this, I realize that there exists a need for me to remind you of history that is documented in the email thread below in which:

- We here on our end have repeatedly advised you that soon after pledging and promptly transferring these funds to you, we had come to realize that based upon your answers to my questions (below), we no longer qualify as accredited investors,
- Thus these particular funds are not eligible for this use, so
- We then promptly informed you that these funds ought to and need to be returned to us at your earliest convenience, which is
- A fact you also concurred with in the course of the discussion below, along with the stated assurance that
- These funds would be returned to us as soon as possible.

We have since then been patiently awaiting the fulfillment of that assurance since that time.

So, this is why I say that we were quite taken by surprise this week to see these particular "unqualified" funds appearing in the context of a list of secured creditor notes and loans which did qualify for such use.

Also, as we had stated below (on October 11, 2018), when it became clear to us that the resumption of the accumulating interest that we have not been receiving from our much larger, $300,000 Promissory Notes that we had established some years ago (at a time when we did qualify as fully accredited investors) was going to be delayed well beyond the timeframe when we had anticipated, it then also became clear to us "*we actually should not have reckoned ourselves to be well positioned to pledge these $5,000 funds even if we did otherwise qualify to do so.*" Given that the delayed interest that is now due to us has accumulated to a whopping $39,000, it is all-the-more important to us that these pledged (but unqualified) funds of $5,000 be returned to us post haste.

I imagine that might not seem like a lot of money with respect to the overall operations of a company, but since you had last communicated to us that we "should receive it in the next ten days," our own personal financial situation here has devolved (due to other unrelated and unforeseen events) such that the need for the timely return of this "small" amount of money to us is becoming all-the-more critically important to us.

Bill Baer
(H) 303-791-2225

**From:** Bill/Scottie <billandscottie@reagan.com>
**Sent:** Monday, November 12, 2018 10:47 AM
**To:** 'Brooks Pickering' <bpickering@evenstevens.com>; 'kjohnston' <kjohnston@evenstevens.com>; 'Spencer Viernes' <sviernes@evenstevens.com>
**Cc:** 'Scottie Baer' <scottie.baer@dcsdk12.org>
**Subject:** RE: The Return of our $5,000

The "next ten days" was now over two weeks ago. I am here referring to the notice below, which reads, "You should receive it in the next ten days."

On our end, we have not as yet received these funds.

Is this because some of our investors have become nervously hesitant to follow through on their pledged funding?

Bill Baer
(H) 303-791-2225

**From:** Bill/Scottie <billandscottie@reagan.com>
**Sent:** Sunday, October 14, 2018 9:03 PM
**To:** 'Brooks Pickering' <bpickering@evenstevens.com>; 'kjohnston' <kjohnston@evenstevens.com>; 'Spencer Viernes' <sviernes@evenstevens.com>
**Cc:** 'Scottie Baer' <scottie.baer@dcsdk12.org>
**Subject:** RE: The Return of our $5,000

That sounds good for both you and for the greater good of the enterprise, and we trust your judgment on how to best juggle the management of the timing of all of that.

Thanks much for all that all of you do,

Respectfully Yours,

Bill

**From:** Brooks Pickering <bpickering@evenstevens.com>
**Sent:** Sunday, October 14, 2018 7:23 PM
**To:** kjohnston <kjohnston@evenstevens.com>; Spencer Viernes <sviernes@evenstevens.com>; Bill/Scottie <billandscottie@reagan.com>
**Cc:** Scottie Baer <scottie.baer@dcsdk12.org>; Bill/Scottie Baer <billandscottie@reagan.com>
**Subject:** Re: The Return of our $5,000

Bill,

We'll have the money back to you as soon as we close the current funding and have some free cash flow. You should receive it in the next ten days.

Thanks for your support.

Best,

Brooks

Get Outlook for Android

---

**From:** Bill/Scottie <billandscottie@reagan.com>
**Sent:** Thursday, October 11, 2018 5:50:01 PM

**To:** kjohnston; Brooks Pickering; Spencer Viernes
**Cc:** Scottie Baer; Bill/Scottie Baer
**Subject:** The Return of our $5,000

I realize that you have plenty of bigger fish to fry, and we desire that you continue to work off your many important tasks in good, priority order. This note serves as *a reminder that we await the return of our $5,000 as soon as you are conveniently able to process that return.*

Given the recent vote to re-price our Even Stevens shares at the 21 cent level, it is now clear that we no longer qualify as accredited investors. Also, given the new information that was related in the investor letter that was sent out to investors a few days prior to that same vote which presented an estimated timeframe for the payment of the delayed monthly interest on our $300,000 ES Promissory Notes that falls well beyond the early 2019 timeframe that we were understanding to be when such payments to begin (soon after achieving company profitability), as well as the news regarding the estimated timeframe for the eventual full repayment of those same Notes, it is now also clear to us that we actually should not have reckoned ourselves to be well positioned to pledge these $5,000 funds even if we did otherwise qualify to do so.

Thank you,

Bill


**From:** Bill/Scottie <billandscottie@reagan.com>
**Sent:** Friday, September 21, 2018 2:45 PM
**To:** 'kjohnston' <kjohnston@evenstevens.com>; 'Brooks Pickering' <bpickering@evenstevens.com>; 'Spencer Viernes' <sviernes@evenstevens.com>
**Cc:** Scottie Baer <Scottie.Baer@dcsdk12.org>
**Subject:** RE: Even Stevens | Accreditation | Rescue Note

Well, again, whether or not we were to ever retain a third party evaluation or not, if is not possible for us to say that we qualify at the $1M asset level (or at the $300K joint income level) apart from both of the two factors outlined by my two questions below, so if it is not possible to answer those particular questions (as I can readily understand), then sure, I believe that we cannot help you out any further financially at this time, and we will be pleased to have that $5,000 returned to us. We are regretful that we cannot do more, even much more with this, and I hope that we do not have many other investors falling into our particular category.

Cheers,

Bill


**From:** kjohnston <kjohnston@evenstevens.com>
**Sent:** Friday, September 21, 2018 2:04 PM
**To:** Bill/Scottie <billandscottie@reagan.com>; Brooks Pickering <bpickering@evenstevens.com>; Spencer Viernes <sviernes@evenstevens.com>
**Subject:** RE: Even Stevens | Accreditation | Rescue Note

Hi Bill,

Unfortunately, we cannot give you advise on how you can or cannot determine accreditation. Given the circumstances (the recent SEC investigation of Steve) we as a company have to take extra precautions when taking in funds. If you are not able to have a third party verify your accreditation, it is to my understating that we would then need to send you your funds back.

I will be working with Brooks and Spencer on what the appropriate next steps will be.

Thank you,

**Kim Johnston** / Investor Relations
kjohnston@evenstevens.com / **435.650.2023**
**Even Stevens Sandwiches**
evenstevens.com

**From:** Bill/Scottie <billandscottie@reagan.com>
**Sent:** Friday, September 21, 2018 8:36 AM
**To:** kjohnston <kjohnston@evenstevens.com>; Brooks Pickering <bpickering@evenstevens.com>; Spencer Viernes <sviernes@evenstevens.com>
**Subject:** RE: Even Stevens | Accreditation | Rescue Note

Brooks/Spencer/Kim,

Unfortunately this clarifying email notice actually does not address the specific questions that I had inquired about several weeks ago, which are:

When calculating our current net worth, I do not know:

1. Whether we are permitted to count any of the net worth that we have tied up in Steve Down Company Stock Shares and Promissory Notes. If we are not able to include such assets among our total assets, then we do not qualified as Accredited Investors at this time of writing.

2. What the value of our Steve Down Company stock shares is at this time. We are holders of nearly 700,000 shares of stock in TFEC, ES and FF. We do not know at this time how to accurately appraise the value of any of those shares. If they were to all be appraised at merely $1 per share, and if we are permitted to count such value among our other net worth assets, then I believe that we probably do qualify as Accredited Investors at this time, however, we would probably come in somewhere around the $1.1M level, so we are currently standing fairly close to the cut-off threshold of that AI status.

Also, we do not at this time have any CPA, attorney or broker in our employ, nor have we had any need to retain any of these financial professionals for some time as I handle all taxes and financial matters myself.

I used to have a stock broker many years ago, but replaced his services with my own E*Trading

Case 2:19-bk-03236-DPC    Doc 212    Filed 10/29/19    Entered 10/29/19 13:54:26    Desc
Main Document    Page 17 of 19

account with which I am currently gaining about 4% monthly through my own direct management of that account. The primary reason that I am have returned to doing anything with E*Trade these days is because I had retired last year from a six-digit income partly on the basis that we expected that we would continue to receive the $3,000 fixed monthly income from our ES Promissory Notes OR that we would soon receive back a full repayment of the $300,000 that we have loaned to ES and we would then move those frozen funds into some other interest-bearing or satisfactory return-on-investment vehicle that would also add to the sharply reduced fixed income that we are now relying upon. You might imagine that I would love to be obtaining a 4% monthly ROI on our $300,000 which the Even Stevens company is now holding in a frozen state without any forthcoming interest for the past six months and for possibly the next 3-9 months or so.

I have zero desire to expend any time or money at this time seeking the services of a CPA, attorney or broker at this time.

So, I still do not know the answers to either of the above questions, and we certainly are not in a position to follow either of the two paths that you have identified below.

Given that, it appears to me that you will probably need to return our small, pledged $5,000 amount to us so that we can put that to good use here, because I do not believe that we qualify based on what I am reading below.

Bill
(H) 303-791-2225

**From:** kjohnston <kjohnston@evenstevens.com>
**Sent:** Thursday, September 20, 2018 7:42 PM
**To:** Brooks Pickering <bpickering@evenstevens.com>; Spencer Viernes <sviernes@evenstevens.com>
**Subject:** Even Stevens | Accreditation | Rescue Note

Dear Even Stevens Investors,

First I would like to apologize for all of the information that has gone out about accreditation this far. It has been very confusing, and there have been a lot of questions around the issue. Today I received confirmation from counsel on what is needed. Since you all have participated in the Rescue Note, the SEC rules and regulations require us to verify your status as an accredited investor. To do so, we will need one of the following:

- A signed letter from your CPA, attorney or broker stating that they have conducted a reasonable investigation into your financial status or are otherwise aware of your financial position, and that you qualify as an accredited investor under Rule 501 of Regulation D. This investigation should have been conducted within the last three months, and the letter should confirm that.
- Copy of your federal tax returns for the past two years showing income in excess of $200,000.00 for those who file as single, and $300,000.00 for those that file

- 18 -

jointly. Along with those documents, we will also need a letter from you stating that you expect to reach those same levels of income this year.

Again, I'm sorry for all the confusion around this topic, and I hope this clears it up. Some of you have sent in letters, or documents already. I will be reaching out to you if any additional action will be required. Please don't hesitate to reach out to me with any questions you might have.

Sincerely,



**Kim Johnston** / Investor Relations
kjohnston@evenstevens.com / **435.650.2023**
**Even Stevens Sandwiches**
evenstevens.com