**GUTTILLA MURPHY ANDERSON, P.C.**
Ryan W. Anderson (Ariz. No. 020974)
Dawn M. Maguire (Ariz. No. 20368)
5415 E. High St., Suite 200
Phoenix, Arizona 85054
Email: randerson@gamlaw.com
Email: dmaguire@gamlaw.com
Phone: (480) 304-8300
Fax: (480) 304-8301

Attorneys for Chapter 7 Trustee Dina L. Anderson

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 7 |
| EVEN STEVENS SANDWICHES, LLC, *et al.* | Case No. 2:19-bk-03236-DPC |
| Debtors. | (Jointly Administered) |
| This filing applies to: | **MOTION FOR APPROVAL OF SALE OF BUSINESS FREE AND CLEAR OF LIENS AND ENCUMBRANCES, PURSUANT TO 11 U.S.C. §363; -and- MOTION FOR ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND COMMERCIAL REAL PROPERTY LEASES** |
| _X_ All Debtors | |
| ___ Specified Debtors | |

Dina L. Anderson, the Chapter 7 Trustee assigned in the above-captioned case ("Trustee" or "Seller") pursuant to 11 U.S.C. §§ 363 and 365, by and through her undersigned counsel, moves this Court for an Order: (i) approving the Asset Purchase Agreement for the sale of the property listed in this Motion and the attached Asset Purchase Agreement, which is attached as **Exhibit "A"** under the terms and conditions contained therein, subject to higher and better offers that may be presented at the hearing to approve the sale; (ii) authorizing the assumption and assignment of certain executory contracts and commercial real property leases, and (iii) establishing bidding guidelines to be used to elicit and control submission of competing bids at the sale hearing (the "Motion"). This Motion is supported by the Memorandum of Points and Authorities which is attached hereto and incorporated herein by this reference, and the entire record before the Court in this case.

1    DATED: June 1, 2021

2                                             **GUTTILLA MURPHY ANDERSON, P.C.**

3
                                             */s/ Dawn M. Maguire #20368*
4                                             Ryan W. Anderson
                                             Dawn M. Maguire
5                                             Attorneys for Chapter 7 Trustee

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     FACTUAL BACKGROUND.

1.     "Even Stevens Sandwiches" is a casual dining restaurant that started operating in June 2014 when it opened its first location in downtown Salt Lake City, Utah.

2.     There are currently 7 operating casual dining restaurants known as "Even Stevens Sandwiches" involved in this bankruptcy case:

      a.     Store No. 1 – 815 W. Bannock St., Boise, ID 83702;

      b.     Store No. 2 – 131 Main St., Logan, UT 84321;

      c.     Store No. 3 – 2214 Washington Blvd., Ogden, UT 84401;

      d.     Store No. 4 – 414 East 200 South, Salt Lake City, UT 84111;

      e.     Store No. 5 – 2030 South 900 East, Salt Lake City, UT 84105;

      f.     Store No. 6 – 1346 Fort Union Blvd, Cottonwood Heights, UT 84121; and

      g.     Store No. 7 – 541 East 12300 South, Draper, UT 84020.

3.     On March 21, 2019, Even Stevens Sandwiches, LLC filed a chapter 11 bankruptcy case[1].

4.     On September 28, 2020, the United States Trustee's Motion to Convert or Dismiss was filed.  See Docket No. 567.

5.     Ultimately the case was converted to a chapter 7 case on May 6, 2021.

6.     Dina Anderson was appointed as the Chapter 7 Trustee for this case.

7.     The Trustee has worked diligently with Debtors' prior Chapter 11 counsel, Brooks Pickering and the general managers of the Restaurant Shops to understand the operations.

---

[1] On March 22, 2019, an *Ex Parte* Motion for an Order Authorizing and Directing (1) Joint Administration; (2) Transfer of Assignment of Case to Judge; and (3) Use of Consolidated Caption regarding the following cases was filed:
    a.     Even Stevens Arizona, LLC - Case No.: 2:19-bk-03235-DPC;
    b.     Even Stevens Sandwiches, LLC – Case No.: 2:19-bk-03236-PS;
    c.     Even Stevens Sandwiches, LLC – Case No.: 2:19-bk-03237-MCW; and
    d.     Even Stevens Sandwiches, LLC - Case No.: 2:19-bk-03239-BKM.
See Docket No. 5.

8. The Trustee obtained approval on May 24, 2021, to continue operating the Restaurant Shops, for the sole purpose of positioning the Restaurant Shops for this proposed sale.

9. The Debtors' interests in the furniture, fixtures, equipment, inventory, and other personal property located at the Restaurant Shops and the Debtors' interest in the various executory contracts and leasehold agreements are property of the estate pursuant to 11 U.S.C. § 541.

10. The Debtors entered into, among other things, a Security Agreement with Take 2, LLC, which was approved by the Court on January 03, 2020, at Docket Number 294, as part of the Debtor's Emergency Motion For Authority To Obtain Post-Petition Financing on a Secured Bases and Set Final Hearing.

11. Therefore, Take 2, LLC has a security interest in the Collateral[2] of the Debtors.

12. Trustee has received an offer from Even Stevens Acquisition Partners LLC (or its designee) (collectively the "Buyer") to purchase the estate assets more particularly described below and in the Asset Purchase Agreement.

13. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

/ / /

---

[2] "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Borrower is giving to Lender a security interest for the payment of the Obligations and performance of all other obligations under the Note and this Agreement: All right, title and interest now or hereafter acquired in and to all of the following described personal property and all substitutions, replacements, increases, additions, accessions, attachments, insurance refunds, products and proceeds for or to any of the following described personal property without limitation (collectively, the "Collateral"); (a) all inventory, (b) all accounts, contract rights, documents, documents of title, payment intangibles, investment property, letter of credit rights, commercial tort claims, chattel paper, instruments, (including promissory notes), deposit accounts, and supporting obligations, (c) all fixtures and equipment including but not limited to, any equipment, tools, parts, supplies, attachments, accessories, (d) all general intangibles, including, but not limited to, all intellectual property, including but not limited to all trade secrets, payment intangibles, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals and rights in processes; (e) all rents and profits of any Collateral, all rights under warranties and insurance contracts covering the Collateral, and any causes of action related to the Collateral; and (f) books, data and records pertaining to any Collateral, in whatever form, all equipment including but not limited to any computer readable memory and any computer hardware or software necessary to utilize, create, maintain and process such memory, records and data on electronic media.

## II. SUMMARY OF PROPOSED SALE.

1. **General.** **The terms of the proposed sale are summarized hereafter and they are fully described and set out in the Asset Purchase Agreement ("Agreement") executed by Seller and Buyer. A true and correct copy is attached hereto as Exhibit "A". Interested parties are encouraged to review the attached Agreement in its entirety, and in the case of any discrepancy between the following summary and Exhibit "A", the terms of Exhibit "A" shall control.[3]**

2. Assets to be Sold. The assets to be sold consist of the estate's interest in:

    (a)    the actual Restaurant Shops and the operations of such:

        i.    Store No. 1 – 815 W. Bannock St., Boise, ID 83702 ("Boise");

        ii.    Store No. 2 – 131 Main St., Logan, UT 84321 ("Logan");

        iii.    Store No. 3 – 2214 Washington Blvd., Ogden, UT 84401 ("Ogden");

        iv.    Store No. 4 – 414 East 200 South, Salt Lake City, UT 84111 ("Downtown SLC");

        v.    Store No. 5 – 2030 South 900 East, Salt Lake City, UT 84105 ("Sugarhouse");

        vi.    Store No. 6 – 1346 Fort Union Blvd, Cottonwood Heights, UT 84121 ("Cottonwood"); and

        vii.    Store No. 7 – 541 East 12300 South, Draper, UT 84020 ("Draper").

(Hereinafter collectively referred to as "Acquired Restaurants").

    (b)    all Furniture and Equipment of Seller, all motor vehicles[4] of Seller, and other personal property of Seller, to the extent located at any of the Acquired Restaurants or any storage facilities (wherever located) that are owned or leased by Seller as of the Closing Date;

---

[3] Capitalized terms not otherwise defined in this Motion retain the definition given to them in the Agreement.

[4] The list of vehicles and VIN numbers for each vehicle included in this sale will be provided in a Supplement to this Sale Motion.

(c)     all Inventory that is located at (or in transit to) any of the Acquired Restaurants as of the Closing Date, and all rights of Seller to take delivery of any Inventory ordered by Seller before the Closing Date for delivery to any of the Acquired Restaurants, which Inventory has not been delivered as of the Closing Date;

(d)     75% of Net Cash on Hand;

(e)     all Acquired Restaurants petty cash;

(f)     all Intangible Property Assets of this Agreement;

(g)     any interest of Seller under the Restaurant Leases for the Acquired Restaurants and the other Contracts of Seller that are described on Schedule 1.1(f) of the Agreement (collectively, "Purchased Contracts");

(h)     Copies of Seller's personnel records[5] pertaining to all Seller's employees to be hired by Buyer at Closing;

(i)     to the extent transferable and assignable, all of the Seller's interest in those Business Permits and all Liquor Licenses held by Seller relating to the Acquired Restaurants of this Agreement, in each case to the extent transferable, other than alcohol Business Permits (including Liquor Licenses) in jurisdictions where the law does not permit Buyer to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Body; Seller will transfer, assign convey and deliver to Buyer such Business Permits in each instance only upon issuance of the requisite approvals from the relevant Governmental Body (collectively, "Business Permits"); and

(j)     any Avoidance Action or Claim known or unknown, suspected or unsuspected, in law or equity, against Buyer, Brooks Pickering, or ESBE

---

[5] Buyer is acquiring all of the personnel records and has controlled the operations of the Restaurant Shops since January 1, 2020, Buyer has agreed to be responsible to produce and provide all 2020 W-2 Wage and Tax statements and 1099s to all employees and independent contractors for all of 2020, along with all W-3 Employer forms (and any other form or reporting required under federal law), not just the post-sale period.

Strategic Partners, Inc., including (without limitation) any Avoidance Action or Claim that may have arisen or may relate to events, activities, or occurrences that took place on or before the Closing Date (including any Avoidance Actions or Claims that were asserted or could have been asserted in Adversary Proceeding Nos: 2:21-ap-00068-DPC and 2:21-ap-00069-DPC).

(collectively hereinafter referred to as "Purchased Assets").

3.    <u>Excluded Assets</u>:  The Purchased Assets include only those assets and interests specifically listed as Purchased Assets and exclude all right, title or interest of Seller in or to any of the following (the "Excluded Assets"):

(a)    any bank accounts of Seller;

(b)    25% Net Cash on Hand;

(c)    all accounts receivable (whether current or non-current) of the Business attributable to the operation of the Acquired Restaurants as of the Closing even if such accounts receivable becomes due and payable after the Closing and all causes of action specifically pertaining to the collection of the foregoing (collectively, "Receivables");

(d)    the Purchase Price and Seller's rights under the Agreement

(e)    any Excluded Contracts, including any refund, rebate, credit or payment due to Seller thereunder;

(f)    any Claims with respect to or arising in connection with any Excluded Contract or Excluded Asset;

(g)    any books and records relating to any pre-Closing Period that the Seller is under Legal Requirement to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other Entity filings (*provided, however*, that Buyer will have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock

certificates of any Subsidiaries of Sellers, and (iii) documents relating to proposals to acquire the Business by Persons other than Buyer;

(h)     all intercompany claims by any Seller against any subsidiary or other affiliate of any Seller; and

(i)     Any Avoidance Action, other than those specifically identified as a Purchased Asset.

4.     Liability Assumption: Effective on the Closing Date, the Buyer is assuming the following liabilities through this Sale:

(a)     any obligation of Seller to honor Gift Certificates issued in the ordinary course of Seller's business that remain outstanding as of the Closing Date whether or not such Gift Certificates were issued prior to or after the commencement of Seller's bankruptcy cases;

(b)     any Liabilities of Seller under any customer reward program and all liabilities for any catering order placed with Seller at any time before Closing;

(c)     Liabilities relating to the ownership or operation of the Purchased Assets after the Closing Date;

(d)     there will be an adjustment between Seller and Buyer at the Closing such that (regardless of when the same become due and payable) Seller will bear and be responsible for all Liabilities relating to the ownership and operation of the Purchased Assets that are attributable to the period prior to the Closing Date (including, without limitation, Liabilities for sales tax relating to the operation of the Business and real property or ad valorem Taxes, and personal property Taxes applicable to the Purchased Assets) and Buyer will bear and be responsible for all such Liabilities to the extent such Liabilities are attributable to the period from and after the Closing Date;

(e)  Liabilities of Seller under any of the Purchased Contracts, to the extent such Liabilities arise and are payable (whether as part of a reconciliation under such Purchased Contract or otherwise) after the Closing Date, including but not limited to, in the case of any Restaurant Leases for Acquired Restaurants included among the Purchased Assets, any rent, common area maintenance, Tax, and Utilities;

(f)  all environmental Liabilities arising from and after the Closing Date under federal, state and local law relating to or arising out of or in connection with the Purchased Assets or the Business;

(g)  Post-Petition trade payables of the Business that come due after the Closing and post-Petition obligations to customers of Seller for refunds, rebates, returns, discounts and the like as of the Closing Date, but in each of the foregoing cases described in this clause only to the extent the same were incurred by Seller in the ordinary course of the Business from and after the commencement of Seller's bankruptcy cases; and

(h)  all other Liabilities and obligations of Seller listed or described on Schedule 2.3(i) hereto.

5.  Excluded Liabilities:  Notwithstanding anything to the contrary contained in the Agreement, other than the Assumed Liabilities, Buyer is not obligated to assume or to perform or discharge any Liability of Seller (such Liabilities not assumed by Buyer, the "**Excluded Liabilities**"). The Excluded Liabilities include those listed on Schedule 2.4 and the following:

a.  claims arising under section 503(b)(9) of the Bankruptcy Code;

b.  claims or liabilities arising under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.,* the Packers and Stockyards Act, 7 U.S.C. §181 *et seq., or their state law correlates;*

c.  any costs or expenses incurred by Seller in connection with, or related to, the administration of Seller's bankruptcy cases, including, without limitation, any professional fees and expenses of attorneys, accountants,

financial advisors and other professional advisors, any US Trustee fees, or liabilities arising from or related to the Seller's Chapter 7 Cases; and/or

d. All Cure Costs are the responsibility of the Seller and must be paid with the proceeds of the Purchase Price in connection with the Closing Date.

6. Executory Contracts and Leases:

The Trustee requests, pursuant to sections 363 and 365 of the Bankruptcy Code, authority to assume, assign and sell the estates' interests in the Purchased Contracts to the Buyer (or successful bidder), subject to payment of the cure amount designated for each Purchased Contract on the Notice of Assumption, Assignment and Sale and any adequate assurance of future performance which the Court may order Buyer to provide upon the request of a party in interest.

The Trustee further requests that the order approving the proposed Sale provides that the Purchased Contracts will be assigned and sold to, and remain in full force and effect for the benefit of, Buyer, notwithstanding any provisions therein, including those described in sections 365(b)(2) and (f)(1) and (3) of the Bankruptcy Code, that prohibit such assignment. The Bankruptcy Code provides, in pertinent part, that:

The trustee may assign an executory contract or unexpired lease of the debtor only if –

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). A debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).

Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for

assuming an unexpired lease or executory contract of a debtor, providing in relevant part that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> > (A) cures, or provides adequate assurance that the trustee will promptly cure, such default ….;
> >
> > (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1). Although section 365 of the Bankruptcy Code does not set forth standards for courts to apply in determining whether to approve a decision to assume an executory contract, courts have consistently applied a "business judgment" test when reviewing such a decision. *See, e.g.*, *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.*, 318 U.S. 523, 550 (1953); *In re Talco, Inc.*, 558 F.2d 1369, 1173 (10th Cir. 1977). A trustee satisfies the "business judgment" test when he or she determines, in good faith, that assumption of an executory contract will benefit the estate. *In re FCX, Inc.*, 60 B.R. 405, 411 (Bankr. E.D.N.Y. 1986). Here, the assumption and assignment of the Purchased Contracts as part of the sale will yield benefits by minimizing unsecured claims that would arise if such contracts were rejected.

Assignees must, under appropriate circumstances, "cure" defaults under contracts to be assigned and provide "adequate assurance of future performance," the meaning of which depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989). *See also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y.

1985); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985). Here, the Buyer will promptly pay any valid cure amounts for contracts it selects. Further, information regarding the Buyer's adequate assurance of future performance will be available upon request by parties to potential Purchased Contracts.

With these safeguards in place, assumption, assignment and sale of the Purchased Contracts is appropriate and should be approved.

All Purchased Contracts will be assumed by Seller and assigned to Buyer at the Closing. Any Contract of any Seller that is as an Excluded Contract may be assumed or rejected by Seller in Seller's sole discretion and shall be deemed an Excluded Asset.

7. As part of this Sale Motion, Seller seeks approval by the Bankruptcy Court of the sale, assumption and assignment by Seller to Buyer of all Purchased Contracts. Seller will serve the Sale Motion on all counterparties to all such Purchased Contracts along with a notice specifically stating that Seller is or may be seeking the sale, assumption and assignment of such Purchased Contracts and will notify such parties of the deadline for objecting to the Cure Costs listed on Schedule 1.3(b) (collectively, "Cure Costs") of the Agreement, which deadline will be not less than three Business Days prior to the Sale Hearing. As part of the Sale Motion, Seller seeks authority to file with the Bankruptcy Court the list identifying Purchased Contracts and the amounts necessary to cure defaults under each as determined by Seller in accordance with Schedule 1.3(b) of this Agreement, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. The Cure Costs will be paid by the Seller with the proceeds from the Purchase Price in connection with the Closing.

8. Good Faith Purchaser: The reversal or modification on appeal of an authorization of a sale or lease of property under section 363 of the Bankruptcy Code does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal. 11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," one court has held:

> [t]he requirement that a Buyer act in good faith . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (citations omitted). The proposed sale to Buyer was negotiated in good faith, at arm's length and without collusion or fraud of any kind. Further, all of the material terms of the sale have been fully disclosed. Accordingly, this Court should find that Buyer acted in good faith within the meaning of section 363(m) of the Bankruptcy Code. *See generally Paulman v. Gateway Venture Partners III, L.P. (In re Filtercorp, Inc.)*, 163 F.3d 570 (9th Cir. 1998); *Ewell v. Diebert (In re Ewell)*, 958 F.2d 276, 280 (9th Cir. 1992); *Marin v. Coated Sales, Inc. (In re Coated Sales, Inc.)*, 1990 WL 212899 (S.D.N.Y. Dec. 13, 1990) (holding that to show lack of good faith, a party must demonstrate "fraud, collusion, or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sassoon Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1998 (7th Cir. 1978)).

9. <u>Purchase Price</u>. The purchase price for the Assets is the sum of Two Million Eight Hundred Thousand Dollars ($2,800,000.00) payable in readily available funds as follows:

        a.      Buyer will provide Seller with an earnest money deposit in the amount of Eighty-Four Thousand Dollars ($84,000.00), which will be applied against the Purchase Price at Closing. This earnest money deposit is due within two business of the Asset Purchase Agreement days (2) and is non-refundable to Buyer upon the Bankruptcy Court's approval

of Buyer as purchaser under the Agreement, and

b. Two Million Seven Hundred Sixteen Thousand Dollars ($2,716,000.00) paid at closing.

10. <u>Due Diligence</u>. Seller is not warranting the condition of any of the Purchased Assets to be sold; they are being sold "as is/where is." Purchaser currently has and shall, be afforded unfettered access to the Acquired Restaurants and to any and all books and records in the possession of the Seller or the business for a period of the later of thirty (30) days following the execution of the Agreement or ten (10) days prior to the hearing on the approval of the sale (the "Due Diligence Period") so that the Buyer may assure itself that the Purchased Assets are in a condition acceptable to Buyer. If, during the Due Diligence Period, the Buyer determines that the Assets are not suitable, Buyer shall have the right to terminate the Agreement upon written notice to Seller. Upon such termination, any monies deposited by Buyer to ensure its performance under the Agreement shall be returned to Buyer.

11. <u>Conditions of Buyer:</u> The close of escrow ("COE") shall be contingent upon the following (which conditions may be waived by Buyer):

a. <u>Agreements; Covenants.</u> Each of the obligations of the Seller required by the Agreement to be performed by the Seller at or prior to the closing shall have been fully performed and complied with as of the closing.

b. <u>Bankruptcy Court Approval.</u> The sale of the Assets to Buyer and all actions of the Trustee needed to perform under the Agreement and to consummate the transaction contemplated thereby shall have been approved by an order of the Bankruptcy Court (the "Approval Order") and the Approval Order shall have become a final order.

c. <u>Form of the Approval Order.</u> The Approval Order shall be in form and substance reasonably satisfactory to Buyer and shall provide that the sale of the Assets to Buyer is free and

clear of all claims, liens and interests.

d. Buyer's application for financing from Fountain Business Finance and guaranty form SBA Nevada District Office for the Contemplated Transactions are approved and funded.

e. <u>Accuracy of the Trustee's Representations and Warranties</u>. The representations and warranties of the Trustee contained in the Agreement, shall be true to the best of the Trustee's knowledge, information and belief as of the date of the Agreement, and as of the closing date as though made at that time, except for changes permitted by the Agreement.

f. <u>Assignments</u>. Each assignment of each lease for each restaurant shall in the form and substance satisfactory to the Buyer, which may contain amendments to each lease in the form and substance satisfactory to the Buyer.

g. <u>Consents and Approvals</u>. The Trustee has obtained all necessary consents from any person or entity that may have an interest in the identified properties of the estate to sell such property free and clear of any such interest, lien, offset, guaranty, or other legal or equitable ownership mentioned in 11 U.S.C. Section 363.

12. <u>"AS IS" Transaction</u>. Purchaser hereby acknowledges and agrees that, except only as provided previously, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Restaurant Lease, the zoning of any real property or improvements which are the subject of any Restaurant Lease, the value of the Purchased Assets (or any portion thereof),

the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Seller's Contract, the merchantability or fitness of the Furniture and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof). Without in any way limiting the foregoing, Seller disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Buyer further acknowledges that Buyer has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in <u>Section 5</u> of the Agreement, Buyer will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

13. <u>Conditions of the Trustee</u>. The Trustee's obligation to consummate the transaction and deliver the Purchased Assets at closing shall be subject to the satisfaction, on or prior to the closing date, of each of the following conditions (which conditions may be waived by the Trustee):

a. <u>Agreements; Covenants</u>. Each of the obligations of Buyer required by the Agreement to be performed by Buyer at or prior to the closing shall have been fully performed and complied with as of the closing.

b. <u>Authorization of Agreement</u>. All actions of Buyer necessary to authorize the execution, delivery, and performance of the Agreement and the consummation of the transaction contemplated thereby shall have been duly and validly taken by Buyer.

c. <u>Bankruptcy Court Approval</u>. The Approval Order, in form

and substance reasonably satisfactory to the Trustee, shall

have been entered by the Bankruptcy Court and shall have

become a final order.

    d.    <u>Accuracy of Buyer's Representations and Warranties</u>.  The

representations and warranties of Buyer contained in the

Agreement, shall be true to the best of the Buyer's

knowledge, information and belief as of the date of the

Agreement, and as of the closing date as though made at

that time, except for changes permitted by this Agreement.

14.    <u>Buyer's Options</u>.  If the Trustee or the Buyer cannot, for any reason, satisfy the above contingencies as it relates to any one or more properties listed in Exhibit "A", then at Buyer's option:

    a.    Buyer may elect that any such property(s) shall be removed

from the list of identified Purchased Assets and the

Purchase Price shall be reduced by agreement of the

parties, or

    b.    Buyer may elect to terminate the Agreement and in such

event, the Earnest Money shall be returned to Buyer.

15.    <u>Closing</u>.   The purchase and sale of the Purchased Assets (the "COE" or "Closing") shall occur by or before July 31, 2021 (the "Closing Date").  At the Closing, Buyer shall deliver to the Trustee the Purchase Price and the Trustee shall deliver to Buyer a duly executed Bill of Sale and Lease Assignment for each property.  Each Lease Assignment and the Bill of Sale shall be prepared in a form satisfactory to the Buyer and the Trustee.

    a.    <u>Closing Fees and Costs</u>.  Except as otherwise provided in

the Agreement, any and all costs and expenses imposed

relative to the purchase of the Purchased Assets shall be

paid equally by Buyer and Trustee, including, without

limitation, any escrow fee charged by an escrow company.

Trustee shall pay all documentary transfer taxes, and recording fees. Each party shall be responsible for their own attorney's and other professional's fees and costs.

b. <u>Tax Proration</u>. Trustee shall pay all general real property taxes, personal property taxes, and any Rent Taxes assessed against the real property, assessed against the personal property, or assessed against the Landlord and due under the terms or any lease which are due and payable prior to the close of escrow, except all such taxes and annual installments of special assessments payable during the year in which the close of escrow occurs shall be prorated between Trustee and Buyer as of the close of escrow. All subsequent annual installments of special assessments, including, but not limited to supplemental taxes, including the annual installment payable for the year in which the close of escrow occurs (subject to the proration as provided herein) shall be assumed by Buyer.

c. <u>Lease Proration, Security Deposit and Utility Deposits.</u> Any lease payments, all additional rent, all CAMs and any other obligation of or affecting the Purchases Assets shall be current as of COE. All lease payment, additional rent, all CAMs shall be prorated to COE. All Security Deposits shall be credited to Buyer, for which Buyer shall not be required to pay any additional amount. Any utility deposits shall be credited to Buyer, for which Buyer shall not be required to pay any additional amount.

16. <u>Brokerage Fees</u>. Seller and Buyer agree that there shall be no commission in regards to the sale of the Purchased Assets. Buyer hereby represents that it has not retained the

services of any real estate broker or associate in connection with this transaction. Buyer agrees that if any claim should be made for commissions allegedly arising from the execution of the Agreement, pertaining to the sale of the Purchased Assets and the assignment of rights as to the real property, by a broker other than a broker for the Seller, by reason of any acts of Buyer, Buyer will protect, defend, indemnify, and hold Seller harmless from and against any and all losses, liabilities, and expenses, including reasonable attorneys' fees and costs of suit in connection therewith.

## III.    **MAINTAINING OPERATIONS**

1.    On May 21, 2021, the Trustee filed a Motion for Authority to Operate the Restaurant Shops. As the Restaurant Shops required the use of the funds for ongoing operations such as inventory replacement and wages (including payroll tax payments), the Trustee agrees to allow the Restaurant Shops to use the daily revenue for operational costs. On a weekly basis, every Monday, each of the Restaurant Shops will provide the weekly financials, inventory reports, payroll reports, tax listing, and evidence of all tax and trade debt payments to the Trustee.

2.    Upon information and belief, based on the documents on file in this case, the previous Court record, and information from the operations manager, there are no secured debts for any of the Restaurant Shops operations, collateral, intellectual property, cash, furniture, fixtures, receivables and/or inventory except the post-petition debt financing from Take 2, LLC.

3.    Any vehicles subject to the Asset Purchase Agreement will be conveyed with free and clear titles. To the extent that any vehicles have a valid lien against the title, the lien on the title will be paid off from the sales proceeds and the Buyer will receive clean title.

4.    Upon information and belief, based on the documents on file in this case, the previous Court record, and information from the operations manager, there are no outstanding 941 payroll tax claims for any of the Acquired Restaurants.

5.    Upon information and belief, based on the documents on file in this case, the previous Court record, and information from the operations manager, there are no outstanding post-petition sales taxes due for any of the Acquired Restaurants.

# IV. LEGAL ANALYSIS AND AUTHORITIES.

1. Pursuant to 11 U.S.C. § 363(b)(1), the Trustee is authorized to use or lease property of the estate outside the ordinary course of business. The Trustee has determined that the sale of the Purchased Assets on the terms set forth in Exhibit "A" is in the best interest of the bankruptcy estate and the creditors herein.

2. Pursuant to Bankruptcy Code § 363(f), the Trustee is authorized to sell assets of the estate free and clear of all liens, claims, and interests, with all valid liens to attach to the proceeds of the sale. A sale free and clear of liens under Bankruptcy Code § 363(f) may be approved only upon satisfying one of several conditions set forth in the statute. As there is only one secured creditor holding a lien in the assets to be sold, the sale will satisfy the conditions set forth under Bankruptcy Code § 363(f).

3. Based on the financial information obtained during the case, the sale as set forth herein will provide a benefit to the US Trustee's Office, the administrative creditors of this case, the priority creditors of this case, and likely the unsecured creditors of this case.

4. The Trustee understands inclusion of any Avoidance Actions and Claims against Buyer, Brooks Pickering, or ESBE Strategic Partners, Inc. is a requirement of Buyer to proceed with the Sale. The Trustee has investigated whether the estate has any viable Avoidance Actions and Claims against Buyer, Brooks Pickering, or ESBE Strategic Partners, Inc. that any such Avoidance Actions and Claims, to the extent there are any at all, are unlikely to yield significant net value for the estate. Therefore, the Trustee believes it is in the best interest of the estate to proceed with the sale to Buyer.

# V. GUIDELINES FOR HIGHER AND BETTER OFFERS.

1. This proposed sale is subject to higher and better offers to ensure that a fair and equitable value is paid for the Purchased Assets. Buyer's initial bid is a "stalking horse" offer in a process to elicit potentially more advantageous sale terms for the creditors of this estate. By subjecting the offer set forth in Exhibit "A" to competing bids, the Bankruptcy Court ensures that the value of Purchased Assets to be sold is maximized for the estate. The Bankruptcy Court retains authority to control the bidding process to ensure that any competing

1  bids are higher and/or better offers before they are accepted.

2      2.     In order to ensure that the value of the Purchased Assets is maximized, the

3  Trustee respectfully requests the Court to impose the following guidelines for the submission of

4  competing bids.

5            a.     The initial bid at the Sale Hearing will be Buyer's offer set

6                    forth in Exhibit "A" attached hereto; specifically, the Two

7                    Million Eight Hundred Thousand Dollar ($2,800,000.00)

8                    offer for the Purchased Assets;

9            b.     Other than Buyer, all other bidders must qualify to bid at

10                    the Auction Sale Hearing.  To qualify, a bidder must (at

11                    least ten (10) days prior to the Sale Hearing) provide to the

12                    Trustee, Trustee's counsel, the following:

13                i.     A written notice of intend to bid;

14                ii.     Bidder's current financial statements, including the

15                       most recent monthly and annual income statements,

16                       balance sheets, and any other documents reasonably

17                       requested by the Trustee that demonstrate bidder's

18                       financial condition;

19                iii.     A complete description of bidder's intended use and

20                       operation for each of the property locations;

21                iv.     Delivery to the Trustee an Eighty-Four Thousand

22                       Dollar ($84,000.00) deposit in certified funds to be

23                       returned if a bidder is not the successful bidder or

24                       back up bidder as that term is defined below; and

25                v.     Documentation establishing each bidder's ability to

26                       close within the time frame set forth in Exhibit "A";

27            c.     At the Sale Hearing, the initial higher and better offer shall

28                    be at least $100,000.00.

d.     If Buyer is the successful bidder, Buyer must comply with the terms of the Asset Purchase Agreement, as they may be amended at the Sale Hearing. If a third party is a successful bidder or back up bidder, those parties shall comply with the terms set forth in Exhibit "A" as well as any additional terms set forth at the Sale Hearing;

e.     An unsuccessful bidder at the hearing may remain eligible to purchase the Purchased Assets in the event the successful purchaser defaults on any term of the Asset Purchase Agreement or the Order approving the sale. To remain eligible as a back-up bidder, the unsuccessful bidder's $84,000.00 bid deposit shall continue to be held by or for the benefit of the bankruptcy estate. If the successful purchaser defaults, the Trustee will immediately notify by telephone and facsimile (the "Termination Notice"), the second highest eligible purchaser, who shall thereafter have twenty-four (24) hours to open escrow and ten (10) days thereafter to close on the sale. Any unsuccessful bidder who elects to remain as an eligible back-up bidder shall be entitled to the immediate return of its bid deposit upon a closing by and between Seller and any other party.

3.     The Trustee will not object to any qualified bidders seeking a determination that such bidder is entitled to the protection afforded under 11 U.S.C. § 363(m).

4.     The Trustee is authorized to advertise the sale and provide any due diligence materials in her possession to potential bidders that express an interest in the Purchased Assets. Notwithstanding the above, the Trustee will not disseminate any information deemed to be proprietary or confidential.

/ / /

VI.     **CONCLUSION.**

For the reasons set forth above, the Trustee respectfully requests that the Court enter an Order (i) approving the sale of the Purchased Assets listed as Exhibit "A" hereto under the terms and conditions contained herein, subject to higher and better offers that may be presented at the hearing to approve the sale; (ii) authorizing the assumption and assignment of the executory contracts and Lease Agreements; (iii) establishing bidding guidelines to be used to elicit and control submission of competing bids at the sale hearing; and (v) providing for any and all other relief this Court deems appropriate.

DATED:  June 1, 2021

**GUTTILLA MURPHY ANDERSON, P.C.**


*/s/ Dawn M. Maguire #20368*
Ryan W. Anderson
Dawn M. Maguire
Attorneys for Chapter 7 Trustee

**E-FILED** on June 1, 2021 with the
U.S. Bankruptcy Court and copies served
via ECF notice on all parties that have appeared in the case.

## SERVICE LIST

Dina L. Anderson
21001 N. Tatum Blvd., #1630-608
Phoenix, AZ 85050
danderson@dlatrustee.com
*Chapter 7 Trustee*

Jennifer A. Giaimo
Office of The U.S. Trustee
230 N. First Ave., #204
Phoenix, AZ 85003-1706
Jennifer.A.Giaimo@usdoj.gov

Bradley A. Cosman
Benjamin C. Calleros
Perkins Coie LLP
2901 N. Central Ave. Suite 2000
Phoenix, AZ 85012
BCosman@perkinscoie.com
BCalleros@perkinscoie.com
*Counsel for Even Stevens Acquisition
Partners, LLC*

Even Stevens Sandwiches, LLC
2030 S. 900 E. Suite A
Salt Lake City, UT 84105-3280
*Debtor*

Harold Campbell
HAROLD E. CAMPBELL, P.C.
910 W McDowell Road
Phoenix, AZ 85007
heciii@haroldcampbell.com
*Counsel for Take 2, LLC and John Quinn*

Internal Revenue Service
Bankruptcy and Collection Enforcement
P.O. Box 7346
Philadelphia PA 19101-7346

John R. Clemency
Janel M. Glynn
Mike Mazzella
POLSINELLI P.C.
One E. Washington, Suite 1200
Phoenix, AZ 85004
jclemency@polsinelli.com
jglynn@polsinelli.com
mmazzella@polsinelli.com
*Counsel for Examiner Lynton Kotzin*

James L. Ugalde
QUARLES & BRADY LLP
Renaissance One
Two North Central Ave.
Phoenix, Arizona 85004-2391
james.ugalde@quarles.com
*Attorneys for CBDG Grant Road Car Wash,
LLC*

Scott B. Cohen
Michael P. Rolland
ENGELMAN BERGER, P.C.
2800 N. Central Avenue Suite 1200
Phoenix, AZ 85004
sbc@eblawyers.com
mpr@eblawyers.com
*Counsel for BS Property, LLC*

Thomas H. Allen
Cody D. Vandewerker
ALLEN BARNES & JONES, PLC
1850 N. Central Ave., Ste. 1150
Phoenix, AZ 85004
tallen@allenbarneslaw.com
cvandewerker@allenbarneslaw.com
*Attorneys for Skyline JSY, LLC*

/ / /

/ / /

/ / /

Christopher J. Dylla
Office of the Arizona Attorney General
2005 N Central Ave
Phoenix, AZ 85004-1592
christopher.dylla@azag.gov
Counsel for *Attorney for the State of Arizona
ex rel. Arizona Department of Revenue*

Arizona Department of Revenue
Attention Bk Payment Unit
2005 North Central Avenue
Phoenix, AZ 85004

Kasey C. Nye
WATERFALL ECONOMIDIS CALDWELL
HANSHAW & VILLAMANA, P.C.
5120 E. Williams Cir., Ste. 800
Tucson, AZ 85711
knye@waterfallattorneys.com
*Attorneys for Ally Financial*

Alan C. Hochheiser
Maurice Wutscher LLP
23611 Chagrin Blvd., Suite 207
Beachwood, OH 44122
ahochheiser@mauricewutscher.com
*Attorney for AmTrust North America, Inc. on
behalf of AmTrust Insurance Company of
Kansas, Inc.*

Pernell W. McGuire
M. Preston Gardner
DAVIS MILES MCGUIRE
GARDNER, PLLC
40 E. Rio Salado Parkway, Suite 425
Tempe, AZ 85281
pmcguire@davismiles.com
pgardner@davismiles.com

James B. Ball
Ball, Santin & McLeran, PLC
2999 N. 44th Street, Suite 500
Phoenix, Arizona 85018
ball@bsmplc.com
*Attorney for Santander Consumer USA Inc.
dba Chrysler Capital as servicer for CCAP
Auto Lease Ltd. and Santander Consumer
USA Inc. dba Chrysler Capital as servicer for
CCAP Auto Lease Ltd.*

Janel M. Glynn
THE BURGESS LAW GROUP
3131 East Camelback Road, Suite 224
Phoenix, AZ 85016
janel@theburgesslawgroup.com
*Counsel for Lynton Lotzin*

Patrick A. Clisham
Michael P. Rolland
ENGELMAN BERGER P.C.
3636 N. Central Ave., Ste. 700
Phoenix, AZ 85012
pac@eblawyers.com
mpr@eblawyers.com
*Attorneys for USBC Real Estate, LLC*

Amber K. Kauffman
Idaho Office Of The Attorney General
PO BOX 36
Boise, ID 83722
Fax: 208-364-7387
*Counsel for Idaho State Tax Commission*

George U. Winney
GAMMAGE & BURNHAM
Two N. Central Ave., 15th Floor
Phoenix, AZ 85004
gwinney@gblaw.com
*Attorneys for 40th Street Developers, LLC
and E. N. Richmond Trust*

Benjamin William Reeves
Emily Gildar Wagner
SNELL & WILMER LLP
One Arizona Center
400 E Van Buren St
Phoenix, AZ 85004-2202
breeves@swlaw.com
ewagner@swlaw.com
*Counsel for Official Committee of Unsecured
Creditors*

Susan M. Freeman
Nicholas Bauman
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
201 E. Washington St., Ste. 1200
Phoenix, AZ 85004
sfreeman@lrrc.com
nbauman@lrrc.com
*Attorneys for University Village Limited
Partnership*

Jason Sherman
JANEWAY LAW FIRM LLC
3636 N. Central Ave., Ste. 400
Phoenix, AZ 85012-2582
jsherman@janewaylaw.com
Counsel for Citizens Bank

Dina L. Yunker
Assistant Attorney General
Bankruptcy & Collections Unit
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
Fax: (206) 587-5150
*Attorneys for the State of Washington*

Brian N. Spector
SCHNEIDER & ONOFRY, P.C.
365 E. Coronado Road
Phoenix, AZ 85004
bspector@soarizonalaw.com
*Counsel for John Paul Blakely*

Kathryn Ore
PIMA COUNTY ATTORNEY'S OFFICE,
CIVIL DIVISION
32 N. Stone Ave., Ste. 2100
Tucson, Arizona 85701
kathryn.ore@pcao.pima.gov
pcaocvbk@pcao.pima.gov
*Attorneys for Pima County*

Michael Scott Steck
STECK LAW PLLC DBA CLARIOR LAW
1173 South 250 West #206
St. George, UT 84770
Michael@clariorlaw.com
*Counsel for Steven Down*

Weltman, Weinbert & Reis
3705 Marlane Drive
Grove City, OH 43123
AZNotices@logs.com
*Attorneys for Citizens Bank, N.A.*

Bannock Block 44, LLC
c/o Baum Development LLC
1030 W. Chicago Ave., Suite 300
Chicago, IL 60642
*Landlord Store No. 1*

Neuman C. Petty, Manager
Nupetco Associates, LLC
2001 Windsor Street
Salt Lake City, UT 84105
*Store No. 5*

Watermark Property Management, LLC
1030 W. Chicago Ave., Suite 300
Chicago, IL 60642
*Store No. 1*

Wayne G. Petty
Prince, Yeates & Geldzahler
15 West South Temple #1700
Salt Lake City, UT 84101
*Store No. 5*

RBF Properties, LLC
Attn: Mark Fjeldsted
129 North Main Street
Logan, UT 84321
*Landlord Store No. 2*

BS Property, LLC
Attn: Russ Taylor
1535 Wasatch Drive
Salt Lake City, UT 84108
*Landlord Store No. 6*

2214 Washington, LLC
2444 Washington Blvd.
Ogden, UT 84401
*Landlord Store No. 3*

BS Property, LLC
Attn: Rocky Taylor
2015 Laird Drive
Salt Lake City, UT 84108
*Landlord Store No. 6*

/ / /

/ / /

/ / /

| | |
|---|---|
| Fourth East Properties, LLC<br>1831 S. Connor St.<br>Salt Lake City, UT 84108<br>*Landlord Store No. 4* | BS Property, LLC<br>c/o Scott B. Cohen<br>Engelman Berger, P.C.<br>3636 N. Central Ave., Ste. 700<br>Phoenix, AZ 85012<br>sbc@eblawyers.com<br>*Landlord Store No. 6* |
| DRMH, LLC<br>PO Box 65727<br>Salt Lake City, UT 84165<br>*Landlord Store No. 5* | Day Dairy Village Shoppes<br>Holdings, LLC<br>595 South Riverwoods Pkwy<br>Logan, UT 84321<br>*Landlord Store No. 7* |

*/s/ Monica Baca*