# Exhibit "A"

## ASSET PURCHASE AGREEMENT

**by and among**

**Even Stevens Acquisition Partners, LLC, a
Utah limited liability company,**

**as Purchaser,**

**and**

**Even Stevens Sandwiches, LLC; Even Stevens Utah, LLC; and Even Stevens Idaho, LLC, each by
and through Dina L. Anderson as chapter 7 trustee,**

**as Sellers**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is made and entered into as of June 1, 2021 ("**Effective Date**") by and among Even Stevens Sandwiches, LLC, Even Stevens Utah, LLC, and Even Stevens Idaho, LLC (each a "**Seller**" and collectively, "**Sellers**") by and through Dina L. Anderson as the Sellers' chapter 7 trustee, and Even Stevens Acquisition Partners, LLC, a Utah limited liability company ("**Purchaser**"). Sellers and Purchaser are sometimes collectively referred to as the "**Parties**."

## RECITALS

The Parties hereby acknowledge that:

A.        Sellers are engaged in the business of owning and operating restaurants in Utah and Idaho (such restaurants located in such states, the "**Restaurants**" and such business as conducted in such states, the "**Business**").

B.        Sellers filed chapter 11 bankruptcy cases in the United States Bankruptcy Court for the District of Arizona ("**Bankruptcy Court**") on March 21, 2019. On May 6, 2021 ("**Conversion Date**"), the Bankruptcy Court converted the Sellers' chapter 11 bankruptcy cases to chapter 7 bankruptcy cases, which are jointly administered under Case No. 2:19-bk-03236-DPC (Bankr. D. Ariz.) ("**Chapter 7 Cases**") under title 11 of the United States Code, 11 U.S.C. sections 101 *et seq.* ("**Bankruptcy Code**").

C.        Dina L. Anderson ("**Trustee**") was appointed as the chapter 7 trustee in the Chapter 7 Cases.

D.        On the terms and conditions of this Agreement, and under sections 105, 363 and 365 of the Bankruptcy Code, Sellers wish to sell to Purchaser, and Purchaser wishes to purchase from Sellers, certain of the assets and properties of Sellers relating to the Business, and the assumption and assignment of certain executory contracts and unexpired leases, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code (such transactions, "**Contemplated Transactions**").

## AGREEMENT

In consideration of their respective covenants set forth herein, the Parties agree as follows:

1.        <u>Transfer of Assets.</u>

1.1        <u>Purchase and Sale of Assets</u>.  On the Closing Date and on the terms and conditions set forth in this Agreement and under sections 363 and 365 of the Bankruptcy Code and the Sale Order, Sellers sell, assign, transfer, convey and deliver to Purchaser, and Purchaser purchases, acquires, accepts, and receives from Sellers, free and clear of all Encumbrances to the extent provided in the Sale Order, all of each Seller's respective right, title and interest as of the Closing Date in and to the following assets and properties used by Sellers in connection with the operation of the Business including the Schedules referenced in this Agreement, other than any Excluded Assets (such assets and properties described below, other than the Excluded Assets, are collectively referred to as the "**Purchased Assets**"):

(a)        all Furniture and Equipment of Sellers identified on <u>Schedule 1.1(a)</u>, all motor vehicles of Sellers, and other personal property of Sellers, to the extent located at any of

the Acquired Restaurants or any storage facilities (wherever located) that are owned or leased by Seller as of the Closing Date;

(b)      all Inventory that is located at (or in transit to) any of the Acquired Restaurants as of the Closing Date, and all rights of Sellers to take delivery of any Inventory ordered by Sellers before the Closing Date for delivery to any of the Acquired Restaurants, which Inventory has not been delivered as of the Closing Date;

(c)      all Restaurant Petty Cash;

(d)      75% of Net Cash on Hand;

(e)      all Intangible Property Assets identified on <u>Schedule 1.1(e)</u> of this Agreement;

(f)      any interest of Sellers under the Restaurant Leases for the Acquired Restaurants and the other Contracts of Sellers that are described on <u>Schedule 1.1(f)</u> of this Agreement (collectively, **"Purchased Contracts"**);

(g)      any Avoidance Action or Claim known or unknown, suspected or unsuspected, in law or equity, against Purchaser, Brooks Pickering, or ESBE Strategic Partners, Inc., including (without limitation) any Avoidance Action or Claim that may have arisen or may relates to events, activities, or occurrences that took place on or before the Closing Date (including any Avoidance Actions or Claims that were asserted or could have been asserted in Adversary Proceeding Nos: 2:21-ap-00068-DPC and 2:21-ap-00069-DPC);

(h)      Copies of Sellers' personnel records pertaining to any employee of Sellers that is to be hired by Purchaser at Closing; and

(i)      to the extent transferable and assignable, all of the Sellers' interest in those Business Permits and all Liquor Licenses held by Sellers relating to the Acquired Restaurants that are described on <u>Schedule 1.1(i)</u> of this Agreement, in each case to the extent transferable, other than alcohol Business Permits (including Liquor Licenses) in jurisdictions where the law does not permit Purchaser to take title to such Permits until it obtains the requisite approvals from the pertinent Governmental Body; Sellers will transfer, assign convey and deliver to Purchaser such Business Permits in each instance only upon issuance of the requisite approvals from the relevant Governmental Body (collectively, "**Business Permits**").

1.2    <u>Excluded Assets</u>. The Purchased Assets include only those assets and interested specifically listed in Section 1.1 above and in all events exclude all right, title or interest of Sellers in or to any of the following (collectively, "**Excluded Assets**"):

(a)      any bank accounts of Sellers;

(b)      25% of Net Cash on Hand;

(c)      all accounts receivable (whether current or non-current) of the Business attributable to the operation of the Acquired Restaurants as of the Closing even if such accounts receivable becomes due and payable after the Closing and all causes of action specifically pertaining to the collection of the foregoing (collectively, "**Receivables**");

2

152593542.4
Case 2:19-bk-03236-DPC    Doc 716-1    Filed 06/01/21    Entered 06/01/21 15:56:18
Desc Exhibit A    Page 4 of 38

(d)     the Purchase Price and Sellers' rights under this Agreement;

(e)     any Excluded Contracts, including any refund, rebate, credit or payment due to Sellers thereunder;

(f)     any Claims with respect to or arising in connection with any Excluded Contract or Excluded Asset;

(g)     any books and records relating to any pre-Closing Period that the Sellers are under Legal Requirement to retain, including, without limitation, (i) Tax Returns, financial statements, and corporate or other Entity filings (*provided, however*, that Purchaser will have the right to make copies of any portions of such retained books and records that relate to the Business or any of the Purchased Assets), (ii) minute books, stock ledgers, and stock certificates of any Subsidiaries of Sellers, and (iii) documents relating to proposals to acquire the Business by Persons other than Purchaser;

(h)     all securities, whether capital stock or debt, and other ownership interests issued by any of the Sellers;

(i)     all assets of any Section 401(k) or other Seller benefit plan, if any;

(j)     all intercompany claims by any Seller against any other Seller or any Subsidiary or other Affiliate of any Seller;

(k)     any item expressly excluded under the provisions of Section 1.1 of this Agreement;

(l)     Any Avoidance Action, other than those excluded under Section 1.1(g) of this Agreement;

(m)     any asset, right, or interest described or listed on Schedule 1.2(m).

1.3     Executory Contracts.

(a)     All Purchased Contracts will be assumed by Sellers and assigned to Purchaser at the Closing. Any Contract of any Seller that is as an Excluded Contract may be assumed or rejected by Sellers in Sellers' sole discretion and shall be deemed an Excluded Asset.

(b)     As part of the Sale Motion, Sellers must seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all Purchased Contracts. Sellers will serve the Sale Motion on all counterparties to all such Purchased Contracts along with a notice specifically stating that Sellers are or may be seeking the sale, assumption and assignment of such Purchased Contracts and will notify such parties of the deadline for objecting to the Cure Costs listed on Schedule 1.3(b) (collectively, **"Cure Costs"**) of this Agreement, which deadline will be not less than three Business Days prior to the Sale Hearing. As part of the Sale Motion, Sellers must seek authority to file with the Bankruptcy Court the list identifying Purchased Contracts and the amounts necessary to cure defaults under each as determined by Sellers in accordance with Schedule 1.3(b) of this Agreement, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. The Cure Costs will be paid by the Sellers with the proceeds from the Purchase Price in connection with the Closing.

3

2.     <u>Consideration.</u>

    2.1    <u>Purchase Price</u>. In consideration of the transfer of the Purchased Assets to Purchaser and the other undertakings set forth in this Agreement, the purchase price ("**Purchase Price**") for the Purchased Assets is $2,800,000 in cash.

    2.2    <u>Deposit</u>.

    (a)    Within two Business Days of execution of this Agreement, Purchaser will provide Sellers with an earnest money deposit in the amount of $84,000 ("**Deposit**"), which will apply against the Purchase Price at Closing. The Deposit is non-refundable to Purchaser upon the Bankruptcy Court's approval of Purchaser as buyer under the Agreement.

    (b)    The Deposit must be held by Sellers in a segregated escrow account in accordance with the terms and conditions of this Agreement.

    (c)    At Closing, the Deposit shall be credited and applied toward the Cash Purchase Price.

    2.3    <u>Assumed Liabilities</u>.  Effective as of the Closing Date, Purchaser will assume the following, and only the following, Liabilities of Sellers (collectively, "**Assumed Liabilities**"):

    (a)    any obligation of Sellers to honor Gift Certificates issued in the ordinary course of Sellers' business that remain outstanding as of the Closing Date whether or not such Gift Certificates were issued prior to or after the commencement of Sellers' bankruptcy cases;

    (b)    any Liabilities of Sellers under any customer reward program and all liabilities for any catering order placed with Sellers at any time before Closing;

    (c)    Liabilities relating to the ownership or operation of the Purchased Assets after the Closing Date;

    (d)    there will be an adjustment between Sellers and Purchaser at the Closing such that (regardless of when the same become due and payable) Sellers will bear and be responsible for all Liabilities relating to the ownership and operation of the Purchased Assets that are attributable to the period prior to the Closing Date (including, without limitation, Liabilities for sales tax relating to the operation of the Business and real property or ad valorem Taxes, and personal property Taxes applicable to the Purchased Assets) and Purchaser will bear and be responsible for all such Liabilities to the extent such Liabilities are attributable to the period from and after the Closing Date;

    (e)    Liabilities of Sellers under any of the Purchased Contracts, to the extent such Liabilities arise and are payable (whether as part of a reconciliation under such Purchased Contract or otherwise) after the Closing Date, including but not limited to, in the case of any Restaurant Leases for Acquired Restaurants included among the Purchased Assets, any rent, common area maintenance, Tax, and Utilities;

    (f)    all environmental Liabilities arising from and after the Closing Date under federal, state and local law relating to or arising out of or in connection with the Purchased Assets or the Business;

(g)     accrued vacation, sick pay, and other paid time off of the Transferred Employees as set forth on Schedule 2.3(g), as such amounts may change (increase or decrease) in the ordinary course of the Business pending the Closing Date;

(h)     Post-Petition trade payables of the Business that come due after the Closing and post-Petition obligations to customers of Sellers for refunds, rebates, returns, discounts and the like as of the Closing Date, but in each of the foregoing cases described in this clause only to the extent the same were incurred by Sellers in the ordinary course of the Business from and after the commencement of Sellers' bankruptcy cases; and

(i)     all other Liabilities and obligations of Sellers listed or described on Schedule 2.3(i) hereto.

2.4     Excluded Liabilities.  Notwithstanding anything to the contrary contained in this Agreement, other than the Assumed Liabilities, Purchaser is not obligated to assume or to perform or discharge any Liability of Sellers (such Liabilities not assumed by Purchaser, the "**Excluded Liabilities**"). The Excluded Liabilities not include those listed on Schedule 2.4 and the following:

(a)     claims arising under section 503(b)(9) of the Bankruptcy Code;

(b)     claims or liabilities arising under the Perishable Agricultural Commodities Act, 7 U.S.C. §499a *et seq.,* the Packers and Stockyards Act, 7 U.S.C. §181 *et seq., or their state law correlates;*

(c)     any costs or expenses incurred by Sellers in connection with, or related to, the administration of Sellers' bankruptcy cases, including, without limitation, any professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors, any US Trustee fees, or liabilities arising from or related to the Sellers' Chapter 7 Cases;

2.5     Payment of Cure Costs.  All Cure Costs are the responsibility of the Sellers and must be paid with the proceeds of the Purchase Price in connection with the Closing Date.

2.6     Utilities Transition.  Before the Closing Date, Sellers and Purchaser must make mutually satisfactory arrangements with respect to, or take readings or other measurements of, gas, water, electricity and other utilities at the Acquired Restaurants ("**Utilities**"); *provided*, *however*, that to the extent any post-Petition claims for Utilities services comes due after the Closing, such claims shall be the responsibility of the Purchaser.

2.7     Transitional Matters.

(a)     From and after Closing, Sellers will retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets.

(b)     From and after the Closing, Purchaser will retain and make available to Sellers or any trustee or other bankruptcy estate representative and their respective representatives acting on behalf of Sellers' estates, during normal business hours and upon reasonable advance notice to Purchaser and for a period of one (1) year following the Closing Date, the Documents delivered by Sellers to Purchaser, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably

5

cooperate to minimize inconvenience to Purchaser. Further, during the same period, Purchaser will promptly provide such reports as Sellers may reasonably request to facilitate Sellers' post-Closing activities for the purposes described above in this <u>Section 2.7(b)</u>.

        (c)    <u>INTENTIONALLY OMITTED</u>.

        (d)    <u>Previously Omitted Contracts</u>.

        (i)    If prior to or following Closing it is discovered that a Contract should have been listed on <u>Schedule 1.1(f)</u> but was not listed on <u>Schedule 1.1(f)</u> (any such Contract, a "**Previously Omitted Contract**"), Sellers will, promptly following the discovery thereof (but in no event later than five Business Days following the discovery thereof), notify Purchaser in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Purchaser will thereafter deliver written notice to Sellers, no later than five Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "**Previously Omitted Contract Designation**"). A Previously Omitted Contract designated in accordance with this <u>Section 2.7(d)(i)</u> as "Rejected," or with respect to which Purchaser fails to timely deliver a Previously Omitted Contract Designation, will be an Excluded Contract.

        (ii)    If Purchaser designates a Previously Omitted Contract as "Assumed" in accordance with <u>Section 2.7(d)(i)</u>, (A) <u>Schedule 1.1(f)</u> will be amended to include such Previously Omitted Contract and (ii) Sellers will serve a notice ("**Previously Omitted Contract Notice**") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this <u>Section 2.7(d)</u> with no adjustment to the Purchase Price. The Previously Omitted Contract Notice will provide the counterparties to such Previously Omitted Contract with seven days to object, in writing to the Sellers and Purchaser, to the Cure Cost and the assumption, assignment and sale of the Previously Omitted Contract. If the counterparties, Sellers, and Purchaser are unable to reach a consensual resolution with respect to the objection, Sellers will seek an expedited hearing before the Bankruptcy Court to determine the Cure Costs and approve the assumption, assignment and sale. If no objection is timely served on Sellers and Purchaser, Sellers will seek an Order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

        (e)    To the extent that the assignment to Purchaser of any Purchased Contract pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, the Parties will use commercially reasonable efforts to obtain consent prior to the Closing. If such consent is not obtained by the Closing, each Seller will, with respect to each such Contract, from and after the Closing and until the earlier to occur of (x) the date on which such applicable consent is obtained and (y) the date on which such Seller liquidates and ceases to exist, use commercially reasonable efforts (subject to restrictions under Law) during the term of such Contract to (i) provide to Purchaser the benefits under such Contract, (ii) cooperate in any reasonable and lawful arrangement (including holding such Contract in trust for Purchaser, pending receipt of the required consent) designed to provide such benefits to

Purchaser, and (iii) enforce for the account of Purchaser any rights of such Seller under such Contract (including the right to elect to terminate such Contract in accordance with the terms thereof upon the direction of Purchaser). Purchaser will cooperate with the applicable Sellers in order to enable Sellers to provide to Purchaser the benefits contemplated by this Section 2.7(e). Purchaser will pay any amount it would have been required to pay under any such Contract had the Contract been assigned (after obtaining the requisite consent) to Purchaser at the Closing in accordance with this Agreement. For the avoidance of doubt, the efforts contemplated by this Section 2.7(e) shall not include any obligation by Sellers to pay money (advance or otherwise) to any third party or to incur out of pocket expenses unless Purchaser advances such amounts.

2.8    Purchase Price Allocation. Purchaser and Sellers shall be free to make their own respective allocations of the Purchase Price for tax or other purposes.

3.    Closing Transactions

3.1    Closing. The Closing of the Contemplated Transactions ("**Closing**") will take place at 10:00 a.m. on or before the third business day following the satisfaction or waiver by the appropriate Party of all the conditions contained in Section 4, or on such other date (no later than the Outside Date) as may be agreed to by the Parties (the date on which the Closing occurs, hereinafter the "**Closing Date**").

3.2    Sellers' Deliveries to Purchaser at Closing. On the Closing Date, Sellers will make the following deliveries to or for the benefit of Purchaser:

(a)    direct payment of a portion(s) of the Purchase Price to be paid at Closing in accordance with Schedule 3.2(a) of this Agreement in an amount(s) sufficient to satisfy the "Claim Amount" listed in Schedule 3.2(a) and the other Liabilities to be satisfied with the proceeds from the Purchase Price as set forth in this Agreement;

(b)    deliver one or more Assignments and Assumption of Restaurant Lease substantially in the form attached as Exhibit "A" to this Agreement, duly executed by Sellers, with respect to the Restaurant Leases for the Acquired Restaurants ("**Assignments of Restaurant Leases**");

(c)    deliver an Assignment and Assumption of Leases and Contracts substantially in the form attached as Exhibit "B" to this Agreement, duly executed by Sellers, pursuant to which Sellers' interest in all Purchased Contracts (other than any Restaurant Leases) will be assigned to Purchaser ("**Assignment of Other Contracts**");

(d)    deliver an Assignment of Intangible Property Assets, duly executed by Sellers, in the form and content of the assignment of intangible property attached as Exhibit "C" to this Agreement, pursuant to which Sellers' interest all the Intangible Property Assets will be assigned to Purchaser ("**Assignment of Intangible Property Assets**");

(e)    deliver a Bill of Sale and Assignment, substantially in the form attached as Exhibit "D" to this Agreement, duly executed by Sellers, pursuant to which Sellers' interest in any Purchased Assets not otherwise assigned at the Closing will be assigned to Purchaser ("**Bill of Sale**");

(f)    INTENTIONALLY OMITTED;

(g)      deliver certificates of title, duly executed by Sellers, required to convey ownership of any motor vehicles or similar equipment included within the Purchased Assets; and

(h)      deliver any such other documents, funds, or other things reasonably requested by Purchaser or contemplated by this Agreement to be delivered by Sellers to Purchaser at the Closing.

      3.3    <u>Purchaser's Deliveries to Sellers at Closing</u>.  On the Closing Date, Purchaser will make the following deliveries to or for the benefit of Sellers:

(a)      Written instructions directing release of the Deposit to Sellers as a credit against the Purchase Price;

(b)      payment to Sellers, by wire transfer of immediately available funds in an amount equal to the Cash Purchase Price, <u>less</u> the credited Deposit;

(c)      deliver the certificate contemplated by <u>Section 4.1(a)</u>, duly executed by Purchaser;

(d)      deliver a counterpart of the Assignments of Restaurant Leases, duly executed by Purchaser;

(e)      deliver a counterpart of the Assignment of Other Contracts, duly executed by Purchaser;

(f)      deliver appropriate evidence of all necessary Entity action by Purchaser in connection with the Contemplated Transactions, including, without limitation:  (i) copies of resolutions or consents approving the Contemplated Transactions and authorizing the execution, delivery, and performance by Purchaser of this Agreement; and (ii) if requested, a certificate as to the incumbency of those officers of Purchaser executing this Agreement and any instrument or other document delivered in connection with the Contemplated Transactions; and

(g)      deliver any such other documents, funds or other things reasonably requested by Sellers or contemplated by this Agreement to be delivered by Purchaser to Sellers at the Closing.

      3.4    <u>Sales, Use and Other Taxes</u>.  Any and all sales, purchase, transfer, stamp, documentary stamp, use or similar taxes under the laws of the states in which any portion of the Purchased Assets is located, or any subdivision of any such state, or under any federal law or the laws or regulations of any federal agency or authority, which may be payable by reason of the sale or transfer of the Purchased Assets under this Agreement or the Contemplated Transactions (collectively, the "***Transfer Taxes***") will be split and paid 50/50 by Purchaser and Sellers.

      3.5    <u>Possession and Risk of Loss</u>.  Right to possession of the Purchased Assets will transfer to Purchaser on the Closing Date.  Sellers will transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Purchased Assets, and will also make available to Purchaser at their then existing locations the originals of all documents in Sellers' actual possession that are required to be transferred to Purchaser by this Agreement.  The risk of loss of or damage or destruction to any of the Acquired Restaurants to be conveyed to Purchaser under this Agreement will be borne by Sellers to the time of Closing.

8

3.6    Closing Date.  All actions to be taken on the Closing pursuant to this Agreement will be deemed to have occurred simultaneously, and no act, document or transaction will be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.  Unless provide otherwise herein or agreed otherwise in writing by the Parties, documents delivered at the Closing will be dated as of the Closing Date.

4.    Conditions Precedent to Closing.

4.1    Conditions to Sellers' Obligations. Sellers' obligation to make the deliveries required of Sellers at the Closing Date and otherwise consummate the Contemplated Transactions will be subject to the satisfaction of each of the following conditions (unless such condition is waived by Sellers):

(a)    All of the representations and warranties of Purchaser contained in this Agreement will continue to be true and correct at the Closing in all material respects, and Purchaser will have substantially performed or tendered performance of each material covenant on Purchaser's part to be performed which, by its terms, is required to be performed at or before the Closing, and Sellers will have received a certificate by an officer of Purchaser, dated as of the Closing Date, to such effect and to the effect that each of the conditions precedent to Closing set forth in Section 4.2 either have been satisfied or have been waived by Purchaser.

(b)    Purchaser shall have tendered delivery of all items required to be delivered by Purchaser under Section 3.3.

(c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court will be pending before any Governmental Body seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a Claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)    The Bankruptcy Court will have entered the Sale Order in accordance with Section 9 below and the Sale Order will not have been stayed as of the Closing Date.

4.2    Conditions to Purchaser's Obligations.  Purchaser's obligation to make the deliveries required of Purchaser at the Closing and otherwise consummate the Contemplated Transactions will be subject to the satisfaction of each of the following conditions (unless such condition is waived by Purchaser):

(a)    All of the representations and warranties of Sellers contained in this Agreement will continue to be true and correct at the Closing in all material respects, and Sellers will have substantially performed or tendered performance of each and every covenant on Sellers' part to be performed which, by its terms, is required to be performed at or before the Closing (provided, however, that Sellers will have performed in all respects its covenants under this Agreement to sell, assign, transfer, convey and deliver to Purchaser all of the Sellers' right, title and interest in and to all Purchased Assets free and clear of all Encumbrances).

(b)    Sellers will have tendered delivery of all items required to be delivered by Sellers under Section 3.2.

(c)    No action, suit or other proceedings that is not stayed by the Bankruptcy Court shall be pending before any Governmental Body seeking or threatening to restrain or

9

prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any law, decree or regulation of any Governmental Body having appropriate jurisdiction.

(d)     The Bankruptcy Court will have entered the Sale Order in accordance with Section 9 below and the Sale Order will not have been stayed as of the Closing Date.

(e)     Purchaser's application for financing from Fountain Business Finance and guaranty form SBA Nevada District Office for the Contemplated Transactions is approved and funded.

5.     Sellers' Representations and Warranties.

Each of the Sellers makes the following representations and warranties to Purchaser:

5.1     Organization. Trustee is authorized carry on the Business as now being conducted, and to enter into this Agreement and to consummate the Contemplated Transactions on behalf of the Debtors.

5.2     Validity and Enforceability.  Subject to the entry and effectiveness of the Sale Order, this Agreement constitutes a valid and binding agreement of each of the Sellers, enforceable against each of the Sellers in accordance with its terms, except as to the effect, if any, of the Standard Exceptions to Enforceability.

5.3     No Conflict.  Subject to the entry of the Sale Order, neither the execution, delivery or performance of this Agreement by any of the Sellers, nor the consummation by any of the Sellers of the Contemplated Transactions, nor compliance by any the Sellers with any of the provisions hereof, (a) violate any Legal Requirement applicable to the Sellers or to the Sellers' properties or assets, (b) result in the creation or imposition of any Encumbrance on any asset of the Sellers, or (c) cause the suspension or revocation of any Business Permits or Licenses.

5.4     Litigation.  There is no material Legal Proceeding pending that, once the Sale Order is given effect, will result in any Liability on Purchaser or, to the Sellers' Knowledge, threatened against or affecting any of the Sellers that would likely result in the imposition of any Liability on Purchaser or in respect of the Purchased Assets, nor is there any material judgment or Order of any Governmental Body outstanding against Sellers.

5.5     Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of any of the Sellers is, or will be, entitled to any commission or broker's or finder's fees from Purchaser in connection with the Contemplated Transactions; *provided*, *however*, the chapter 7 administrative expenses will, once approved by the Bankruptcy Court, be paid by Sellers with proceeds of the Purchase Price.

6.     Purchaser's Warranties and Representations.

In addition to the representations and warranties contained elsewhere in this Agreement, Purchaser makes the following representations and warranties to Sellers as of the Closing Date:

6.1     Organization.  Purchaser is a limited liability company duly formed, validly existing and in good standing under the laws of Utah.  Purchaser has all requisite power and authority to

152593542.4
Case 2:19-bk-03236-DPC    Doc 716-1    Filed 06/01/21    Entered 06/01/21 15:56:18
Desc Exhibit A    Page 12 of 38

own, lease and operate its properties, execute and deliver this Agreement, and to perform its obligations hereunder and consummate the Contemplated Transactions.

6.2     Validity and Enforceability.   This Agreement has been duly executed and delivered by Purchaser and constitutes the valid and binding obligation of Purchaser enforceable against it in accordance with its terms, except as may be limited by the Standard Exceptions to Enforceability.

6.3     No Conflict.  The execution, delivery and performance of this Agreement and all writings relating hereto by Purchaser have been duly and validly authorized.  The execution and delivery of this Agreement, the consummation of the Contemplated Transactions, and the performance of, fulfillment of and compliance with the terms and conditions hereof by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser; (ii) violate any Legal Requirement; or (iii) violate or conflict with or constitute a default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

6.4     Financial Resources.   The Purchaser has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement, and such financial resources are not subject to any constraints, conditions or contingencies that could in any way materially affect the Purchaser's ability to consummate the Contemplated Transactions or perform hereunder.

6.5     Broker's or Finder's Fees.  No agent, broker, person or firm acting on behalf of Purchaser is, or will be, entitled to any commission or broker's or finder's fees from Sellers in connection with the Contemplated Transactions.

7.     "AS IS" Transaction

Purchaser hereby acknowledges and agrees that, except only as provided in Section 5 above, Sellers make no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any Restaurant Lease, the zoning of any real property or improvements which are the subject of any Restaurant Lease, the value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of the Receivables or any Assumed Liabilities or Sellers' Contract, the merchantability or fitness of the Furniture and Equipment, the Inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof).   Without in any way limiting the foregoing, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.  Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation of the physical condition of all portions the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the Contemplated Transactions, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, except only for the representations set forth in Section 5 above, Purchaser will accept the Purchased Assets at the Closing "AS IS," "WHERE IS," and "WITH ALL FAULTS."

8.     Covenants

8.1     Liquor License Approvals. Sellers shall reasonably cooperate with Purchaser in connection with Purchaser's filings with any Governmental Body or third party with respect to any of the Liquor Licenses and obtaining the necessary consents and approvals pertaining to transfer and/or issuance of the Liquor Licenses to Purchaser ("**Liquor License Approvals**"), including, if reasonably requested by Purchaser, initiating and/or participating, at no cost or expense to Sellers and with reasonable assurances from Purchaser against any potential Liability in connection therewith, in such Legal Proceedings reasonably requested by Purchaser to obtain such Liquor License Approvals.

8.2     Adequate Assurance Regarding Purchased Contracts. With respect to each Purchased Contract and Restaurant Lease set forth on Schedule 1.1(f), Purchaser will provide adequate assurance of the future performance of such Purchased Contract and Restaurant Lease by Purchaser as required by sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable and Purchaser will bear all risk associated with any failure by Purchaser to make such showing to the Bankruptcy Court's satisfaction.

8.3     Personally Identifiable Information. Purchaser will honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

9.     Bankruptcy Court Approvals.

9.1     No later than June 1, 2021, Sellers will file a motion ("**Sale Motion**") for an order by the Bankruptcy Court, substantially in the form attached to this Agreement as Exhibit "E," approving the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in this Agreement ("**Sale Order**").  Any material changes to the form of the Sale Order must be approved by Purchaser and Sellers in their respective sole discretion.  If requested by Sellers or the Bankruptcy Court, Purchaser will provide adequate assurance of future performance (satisfactory to the Bankruptcy Court) to the counterparties to the Sellers' Contracts.

9.2     Following the filing of the Sale Motion, Sellers will use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.

10.     Commercially Reasonable Efforts.  Subject to the terms and conditions of this Agreement:

10.1     During the period prior to Closing, Sellers and Purchaser will (a) use their commercially reasonable efforts (i) to cause the conditions in Section 4 to be satisfied, (ii) to deliver or cause to be delivered at the Closing the items to be delivered by Sellers and Purchaser pursuant to Section 3.2 and Section 3.3, and (iii) to take all other actions to consummate the Contemplated Transactions, and (b) not take any action that will have the effect of unreasonably delaying, impairing or impeding the receipt of any authorizations, Consents, or Orders to be sought pursuant to this Agreement.

10.2     From and after the Closing, Sellers and Purchaser will use commercially reasonable efforts to deliver or cause to be delivered such additional documents and other papers and to take or cause to be taken such further actions as may be necessary, proper or advisable to make effective the Contemplated Transactions and to carry out the provisions of this Agreement; provided that nothing in this Agreement requires Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those

imposed on Sellers by the other provisions of this Agreement, (ii) involve any cost or expense (individually or in the aggregate) that is not nominal in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

10.3    From and after the Closing, Purchaser and Sellers will reasonably cooperate in the transition of the Business from Sellers to Purchaser, provided that neither Party will be required to expend other than nominal unreimbursed costs in providing such cooperation.

## 11.    Conduct Pending Closing.

11.1    Except with the prior written consent of Purchaser, as otherwise contemplated or permitted by this Agreement or as required by the Bankruptcy Code, from the Effective Date until the Closing Date, Sellers will operate the Business in the ordinary course of business (taking into account Sellers' status as chapter 7 debtors) and consistent with good industry practices, comply with all Legal Requirements applicable to the operation of its business and preserve its present business organization intact.

11.2    Sellers will promptly inform Purchaser in writing of the occurrence or non-occurrence of any event actually known by Sellers that would cause any condition set forth in Section 4.2 not to be satisfied or the breach of any covenant under this Agreement by Sellers.

11.3    Purchaser and Purchaser's financial advisors, legal counsel, accountants, consultants, financing sources and other authorized representatives are authorized and entitled, in Purchaser's discretion and without the involvement or presence of Sellers or their agents, to contact and to enter into discussions and negotiate with Sellers' landlords, lenders, bankers, vendors, suppliers, strategic business partners and other third parties, including but not limited to Governmental Bodies, regarding the Contemplated Transactions and Purchaser's potential business relationships with such persons following the Closing, and Sellers will provide contact information and other reasonable cooperation to Purchaser in connection with such activities. From the date of this Agreement through the Closing Date, Sellers will afford Purchaser and such persons reasonable access during ordinary business hours to Sellers employees, consultants and independent contractors and to all the books and records of Sellers relating to the Business or to the assets or Liabilities of Sellers and will furnish to Purchaser and such persons, as promptly as practicable, all other information as Purchaser or any of such persons may reasonably request in furtherance of the Contemplated Transactions.

## 12.    INTENTIONALLY OMITTED.

## 13.    Employee Matters.

13.1    Prior to the Closing, Purchaser will offer to employ, commencing immediately following the Closing, all employees of Seller at their salaries, wages, compensation levels, benefits, and terms and conditions of employment applicable to their employment by Sellers immediately prior to the Closing. Such employees who become employees of Purchaser will be collectively referred to as the **"Transferred Employees"**. Purchaser will give Transferred Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by the Purchaser in which such Transferred Employees participate for such Transferred Employees' service with the Seller.

13

13.2    From the Effective Date until the Closing Date, Sellers may not materially alter the salary, wages, compensation level, benefits, terms or conditions of employment for any employee.

14.    <u>Termination.</u>

14.1    <u>Termination by Mutual Consent</u>.  This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

14.2    <u>Termination by Either Purchaser or Sellers</u>.  This Agreement may be terminated at any time prior to the Closing Date by either Purchaser or Sellers if any Governmental Body shall have issued an Order permanently restraining, enjoining or otherwise prohibiting the consummation of the Contemplated Transactions and either (i) 30 days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

14.3    <u>Termination by Sellers</u>.  This Agreement may be terminated at any time prior to the Closing Date by Sellers as follows:

(a)    if there has been a material breach by Purchaser, which breach Purchaser has failed to cure within 14 days following its receipt of written notice thereof from Sellers;

(b)    if any condition precedent of Sellers specified in <u>Section 4.1</u> shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Sellers;

(c)    if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Sellers' failure to meet its obligations hereunder, including without limitation using all diligent and commercially reasonable efforts to obtain approval of the Sale Order.

14.4    <u>Termination by Purchaser</u>.  This Agreement may be terminated at any time prior to the Closing Date by Purchaser as follows:

(a)    If there has been a material breach by Sellers, which breach Sellers have failed to cure within 14 days following its receipt of written notice thereof from Purchaser;

(b)    if any condition precedent of Purchaser specified in <u>Section 4.2</u> shall not have been satisfied or waived or, in the reasonable judgment of Purchaser, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Purchaser;

(c)    if the Bankruptcy Court enters any Order approving any alternative sale transaction related to the Purchased Assets;

(d)    if the Closing Date shall not have occurred on or before 5:00 p.m. Pacific time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Purchaser's failure to meet its obligations under this Agreement;

(e)    if the Chapter 7 Cases are dismissed; or

(f)     if for any reason (other than Purchaser's failure to provide adequate assurance of future performance sufficient to satisfy the relevant requirements of section 365 of the Bankruptcy Code or applicable nonbankruptcy law and section 365(c)1) prohibits assignment without the counterparty's consent) Sellers are unable, or fail, to assume and assign to Purchaser at the Closing all Purchased Contracts.

14.5    <u>Effect of Termination</u>.  In the event of termination by either Party of this Agreement pursuant to this <u>Section 14</u>, written notice thereof must as promptly as practicable be given to the other Party and thereupon this Agreement will terminate and the Contemplated Transactions will be abandoned without further action by the Parties hereto.  Upon termination of this Agreement, (a) except as otherwise provided in this Agreement, this Agreement will cease to have any force or effect, (b) the Parties will not have any liability to each other, except for fraud occurring on or before the date of such termination; <u>provided</u>, <u>however</u>, that if this Agreement is terminated by reason of (i) any material breach hereof by the non-terminating Party or (ii) any material non-compliance by the non-terminating Party with its obligations under this Agreement, which non-compliance shall have been the cause of the failure of one or more of the conditions to the terminating Party's obligations to effect the Contemplated Transactions to have been satisfied, the terminating Party's right to pursue any available remedies at law will survive such termination unimpaired, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to <u>Sections 2.2</u>, <u>14.5</u>, <u>16.1</u>, <u>16.2</u> (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Contemplated Transactions shall, to the extent practicable, be withdrawn from the government authority or person to which made.

14.6    <u>Notification of Certain Events</u>.  Sellers must give notice to Purchaser promptly upon becoming aware of any occurrence, or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Purchaser to effect the Contemplated Transactions not to be satisfied.  If Sellers give Purchaser a notice pursuant to this <u>Section 14.6</u>, then Purchaser will be permitted to terminate this Agreement pursuant to <u>Section 14.4</u>.

15.    <u>Post-Closing Matters</u>.

15.1    <u>Further Conveyances and Assumptions</u>.

(a)     From time to time following the Closing, Sellers will make available to Purchaser such data in personnel records of Transferred Employees as is reasonably necessary for Purchaser to transition such employees into Purchaser's records.

(b)     From time to time following the Closing, Sellers and Purchaser shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and to assure fully to each of the Sellers and its successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Purchaser under this Agreement, and to otherwise make effective the Contemplated Transactions.  For the avoidance of all doubt, nothing in this Agreement will require Sellers to execute any document or take any action that would (i) impose or involve obligations or Liabilities on Sellers over and above those imposed on Sellers by the other provisions of this Agreement, (ii) involve any cost or expense (individually or in the aggregate) that is not nominal in amount, or (iii) include joining or otherwise becoming a party to any action or proceeding of any kind.

15.2 <u>Reasonable Access to Records and Certain Personnel</u>. For a period of one year following the Closing, (i) the Purchaser shall permit Sellers' counsel and other professionals and counsel for any successor to Sellers and their respective professionals (collectively, "**Permitted Access Parties**") reasonable access to the financial and other books and records relating to the Purchased Assets or the Business, which access shall include (xx) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such documents and records as they may request in furtherance of the purposes described above, and (yy) Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they may request, but only to the extent such Permitted Access Parties furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and the applicable Permitted Access Party reimburses the Purchaser for the reasonable costs and expenses thereof, and (ii) Purchaser will provide the Permitted Access Parties (at no cost to the Permitted Access Parties) with reasonable access during regular business hours to assist Seller and the other Permitted Access Parties in their post-Closing activities (including, without limitation, preparation of tax returns), provided that such access does not unreasonably interfere with the Purchaser's business operations.

16. <u>Miscellaneous.</u>

16.1 <u>Attorneys' Fees</u>. In the event that either Party to this Agreement brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, each Party in that action or proceeding will bear its own attorneys' fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees).

16.2 <u>Notices</u>. Unless otherwise provided herein, any notice, tender, or delivery to be given hereunder by any Party to the other shall be deemed effected upon personal delivery in writing, one Business Day after being dispatched by reputable overnight courier (*e.g.*, FedEx), postage prepaid, or in the case of delivery by facsimile, as of the date of facsimile transmission (with answer back confirmation of such transmission) or in the case of delivery by email, as of the date of email transmission (with read-receipt enabled). Notices shall be addressed as set forth below, but each Party may change his address by written notice in accordance with this <u>Section 16.2</u>.

> To Seller(s): Even Stevens Sandwiches, LLC.
> Attn: Dina L. Anderson, Ch. 7 Trustee
> 5415 E. High Street, Suite 200
> Phoenix, AZ 85054
> Email: danderson@gamlaw.com

> With a copy to (which shall not constitute notice):

> Guttilla Murphy Anderson, P.C.
> 5415 E. High Street, Suite 200
> Phoenix, AZ 85054
> Attn:    Ryan W. Anderson
>          Dawn Maguire
> Email:  randerson@gamlaw.com
>          dmaguire@gamlaw.com

> To Purchaser: Even Stevens Acquisition Partners, LLC
> 746 E. Winchester Street, Suite G20
> Murray, UT 84107

16

Attn: Brooks Pickering
Email: brooks@esbepartners.com

With a copy to (which shall not constitute notice):

Perkins Coie LLP
2901 N. Central Avenue
Suite 2000
Phoenix, AZ 85012
Attn: Bradley A. Cosman
Email: bcosman@perkinscoie.com

16.3    Entire Agreement. This Agreement and the documents to be executed pursuant to this Agreement contain the entire agreement between the Parties relating to the sale of the Business and replace the term sheet dated May 19, 2021 in its entirety. Any oral representations or modifications concerning this Agreement or any such other document are of no force and effect excepting a subsequent modification in writing, signed by the Party to be charged.

16.4    Modification. This Agreement may be modified, amended or supplemented only by a written instrument duly executed by all the Parties hereto which expressly indicates the intention to modify, amend or supplement this Agreement.

16.5    Severability. Should any term, provision or paragraph of this Agreement be determined to be illegal or void or of no force and effect, the balance of the Agreement will survive.

16.6    Captions. All captions, Section titles and headings contained in this Agreement are for convenience of reference only and will be without substantive meaning or context of any kind whatsoever and shall not be construed to limit or extend the terms or conditions of this Agreement.

16.7    Waiver. No waiver of any of the provisions of this Agreement will be deemed, or shall constitute, a waiver of other provisions, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver will be binding unless executed in writing by the Party making the waiver; *provided, however*, that the Consent of a Party to the Closing will constitute a waiver by such Party of any condition precedent to Closing not satisfied as of the Closing Date.

16.8    Payment of Fees and Expenses. Except as provided in Sections 12 and 16.1 above, each Party to this Agreement will be responsible for, and will pay, all of its own fees and expenses, including those of its counsel, incurred in the negotiation, preparation and consummation of the Agreement and the Contemplated Transactions.

16.9    Survival. The respective representations and warranties of Purchaser and Sellers under this Agreement will lapse and cease to be of any further force or effect effective upon the Closing. Except as provided in the immediately preceding sentence, the covenants and agreements of Sellers and Purchaser in this Agreement, or in any certificates or other documents delivered prior to or at the Closing, will not be deemed waived or otherwise affected by the Closing.

16.10    Assignments. This Agreement will not be assigned by Sellers or Purchaser without the prior written consent of the other(s), which consent Purchaser or Sellers may grant or withhold in their respective sole and absolute discretion.

17

16.11 <u>Binding Effect</u>. This Agreement will bind and inure to the benefit of the respective heirs, personal representatives, successors, and assigns of the Parties.

16.12 <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code and to the extent not inconsistent with the Bankruptcy Code, the law of the State of Arizona applicable to contracts made and performed in such State.

16.13 <u>Construction</u>. In the interpretation and construction of this Agreement, the Parties acknowledge that the terms of this Agreement reflect extensive negotiations between the Parties and that this Agreement will not be deemed, for the purpose of construction and interpretation, drafted by either Party.

16.14 <u>CONSENT TO JURISDICTION</u>. THE PARTIES AGREE THAT THE BANKRUPTCY COURT SHALL BE THE EXCLUSIVE FORUM FOR ENFORCEMENT OF THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS AND (ONLY FOR THE LIMITED PURPOSE OF SUCH ENFORCEMENT) SUBMIT TO THE JURISDICTION THEREOF; PROVIDED THAT IF THE BANKRUPTCY COURT DETERMINES THAT IT DOES NOT HAVE SUBJECT MATTER JURISDICTION OVER ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THEN EACH PARTY (A) AGREES THAT ALL SUCH ACTIONS OR PROCEEDINGS SHALL BE HEARD AND DETERMINED IN A FEDERAL COURT OF THE UNITED STATES SITTING IN THE CITY OF PHOENIX, ARIZONA, (B) IRREVOCABLY SUBMITS TO THE JURISDICTION OF SUCH COURTS IN ANY SUCH ACTION OR PROCEEDING, (C) CONSENTS THAT ANY SUCH ACTION OR PROCEEDING MAY BE BROUGHT IN SUCH COURTS AND WAIVES ANY OBJECTION THAT SUCH PARTY MAY NOW OR HEREAFTER HAVE TO THE VENUE OR JURISDICTION OR THAT SUCH ACTION OR PROCEEDING WAS BROUGHT IN AN INCONVENIENT COURT, AND (D) AGREES THAT SERVICE OF PROCESS IN ANY SUCH ACTION OR PROCEEDING MAY BE EFFECTED BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL), POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN <u>SECTION 16.2</u> (PROVIDED THAT NOTHING HEREIN WILL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY ARIZONA LAW).

16.15 <u>Counterparts</u>. This Agreement may be signed in counterparts. The Parties further agree that this Agreement may be executed by the exchange of facsimile or electronic pdf signature pages provided that by doing so the Parties agree to undertake to provide original signatures as soon thereafter as reasonable in the circumstances.

16.16 <u>Intentionally omitted</u>.

16.17 <u>Time is of the Essence</u>. Time is of the essence in this Agreement, and all of the terms, covenants and conditions of this Agreement.

16.18 <u>Interpretation and Rules of Construction</u>. In this Agreement, except to the extent that the context otherwise requires:

(a) when a reference is made in this Agreement to an Article, Section, Exhibit or Schedule, such reference is to an Article or Section of, or an Exhibit or a Schedule to, this Agreement unless otherwise indicated;

(b)     the headings and captions used in this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(d)     the words "hereof," "herein" and "hereunder" and works of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(e)     all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(f)     the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(g)     any law defined or referred to herein or in any agreement or instrument that is referred to herein means such law or statute as from time to time amended, modified or supplemented, including by succession of comparable successor laws;

(h)     references to a person are also to its permitted successors and assigns; and

(i)     the use of "or" is not intended to be exclusive unless expressly indicated otherwise.

16.19   <u>Third Party Beneficiaries</u>.  This Agreement is intended to be solely for the benefit of the Parties hereto and is not intended to confer, and shall not be deemed to confer, any benefits upon, or create any rights in or in favor of, any person or entity other than the Parties hereto, and their respective permitted assigns.

16.20   <u>Liquidated Damages as sole Remedy of Sellers</u>.  THE PARTIES ACKNOWLEDGE THAT SELLERS' ACTUAL DAMAGES IN THE EVENT THAT THE CONTEMPLATED TRANSACTIONS ARE NOT CONSUMMATED WOULD BE EXTREMELY DIFFICULT OR IMPRACTICABLE TO DETERMINE.  THEREFORE, THE PARTIES ACKNOWLEDGE THAT THE AMOUNT OF THE DEPOSIT THAT IS THE SUBJECT OF SECTION 2.2 OF THIS AGREEMENT HAS BEEN AGREED UPON, AFTER NEGOTIATION, AS THE PARTIES' REASONABLE ESTIMATE OF THE SELLERS' DAMAGES, AND AS THE SELLERS' SOLE AND EXCLUSIVE REMEDY AGAINST THE PURCHASER (OTHER THAN FOR INTENTIONAL MISREPRESENTATION OR FRAUD), WHETHER AT LAW OR IN EQUITY, FOR ANY LIABILITY UNDER THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES HERETO, INCLUDING THE FAILURE OF THE PURCHASER TO PERFORM ANY OF ITS OBLIGATIONS UNDER THIS AGREEMENT OR ANY OF THE EXHIBITS OR SCHEDULES HERETO.

PURCHASER AND SELLERS ACKNOWLEDGE THAT THEY HAVE READ AND UNDERSTOOD THE ABOVE PROVISIONS COVERING LIQUIDATED DAMAGES, AND THAT EACH PARTY WAS REPRESENTED BY COUNSEL WHO EXPLAINED THE CONSEQUENCES OF THIS LIQUIDATED DAMAGES PROVISION AT THE TIME THIS AGREEMENT WAS EXECUTED.

17.  <u>Definitions</u>.  In addition to the other terms defined elsewhere in this Agreement, for the purposes of same, the following words and terms have the meaning set forth below (such meanings being equally applicable to both the singular and plural form of the terms defined).  The exhibits and schedules referenced in this <u>Section 17</u> and throughout the Agreement are deemed to be part of the Agreement and are incorporated in this Agreement by this reference.

"*Acquired Restaurant*" means those restaurants which are operated at the premises leased pursuant to a Restaurant Lease.

"*Affiliate*" of a Person means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, the first-mentioned Person. For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through ownership of voting securities or by contract or otherwise, and the terms "controlling" and "controlled by" have meanings correlative to the foregoing.

"*Agreement*" shall have the meaning provided for in the preamble.

"*Allocation Schedule*" shall have the meaning provided for under <u>Section 2.7</u>.

"*Assignment of Restaurant Leases*" shall have the meaning provided for under <u>Section 3.2(b)</u>.

"*Assignment of Intangible Property Assets*" shall have the meaning provided for under <u>Section 3.2(d)</u>.

"*Assignment of Other Contracts*" shall have the meaning provided for under Section 3.2(c).

"*Assumed Liabilities*" shall have the meaning provided for under <u>Section 2.3</u>.

"*Assumption of Liabilities*" shall have the meaning provided for under <u>Section 3.3(h)</u>.

"*Avoidance Action*" means all preference or avoidance claims and actions of the Sellers, including, without limitation, any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

"*Bankruptcy Code*" shall have the meaning provided for under <u>Recital B</u>.

"*Bankruptcy Court*" shall have the meaning provided for under <u>Recital B</u>.

"*Bill of Sale*" shall have the meaning provided for under <u>Section 3.2(e)</u>.

"*Business*" shall have the meaning provided for under <u>Recital A</u>.

"*Business Day*" means any day other than a Saturday or Sunday or a legal holiday on which banks in Arizona are closed.

"*Business Permit*" means any business permit, license, certificate of occupancy, registration, certificate of public convenience and necessity, approval, easement, authorization or operating right issued or granted by any Governmental Body having jurisdiction over the Business.

"*Chapter 7 Cases*" shall have the meaning provided for under <u>Recital B</u>.

"*Claim*" means any claim, cause of action, right of recovery, right of set-off, and right of recoupment of every kind and nature including but not limited to prepayments, warranties, guarantees, refunds, reimbursements.

"*Closing*" shall have the meaning provided for under <u>Section 3.1</u>.

"*Closing Date*" shall have the meaning provided for under <u>Section 3.1</u>.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"***Consent***" means any consent, approval, authorization, affirmative vote, waiver, agreement or license by, or report or notice to, any Person.

"***Contemplated Transactions***" shall have the meaning provided for under Recital D.

"***Contract***" means any executory contract or unexpired lease within the meaning of the Bankruptcy Code.

"***Copyright***" means all copyrightable works, and all United States and foreign registered copyrights and applications, registrations and renewals therefor, and any past, present or future claims or causes of actions arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Cure Cost***" means the amount required to be paid as a cure amount under Section 365 of the Bankruptcy Code so that Sellers may sell, assume and assign any Purchased Contract to Purchaser.

"***Deposit***" shall have the meaning provided for under Section 2.2(a).

"***Domain Name***" means the internet domain names owned by Sellers, and all registrations, applications and renewals related to the foregoing.

"***Effective Date***" shall have the meaning provided for in the preamble.

"***Encumbrance***" means any claim, lien, pledge, option, charge, easement, Tax assessment, security interest, deed of trust, mortgage, right-of-way, encroachment, building or use restriction, conditional sales agreement, encumbrance or other right of third parties of any sort whatsoever, whether voluntarily incurred or arising by operation of law, and includes any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof.

"***Entity***" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, cooperative, foundation, society, political party, union, company (including any limited liability company or joint stock company), firm or other enterprise, association, organization or entity.

"***Excluded Assets***" shall have the meaning provided for under Section 1.2.

"***Excluded Contract***" means any Sellers' Contract that is not a Purchased Contract.

"***Excluded Liability***" shall have the meaning provided for under Section 2.4.

"***Final Order***" means an Order of the Bankruptcy Court the operation or effect of which has not been stayed, reversed or amended, and as to which Order the time to appeal or to seek review or rehearing has expired and as to which (i) no appeal or request for review or rehearing was filed, or (ii) if an appeal or request for review or rehearing was filed, such appeal or request for review or rehearing is no longer pending.

"***Furniture and Equipment***" means all fixtures and other Leasehold Improvements, counters, POS system, hoods, washers, disposal systems, ovens, grills, friers, refrigeration units, artwork, racks, stands, displays, counters, desks, chairs, tables, dispensers, and other furniture and furnishings, Hardware, vehicles, tools, smallware, and other equipment (copiers, fax machines, telephone lines and numbers, and other telecommunication equipment), and miscellaneous office and store supplies and other items of tangible personal property owned or used by the Sellers in the conduct of the Business. As used herein, the Furniture and Equipment does not include any tangible property held by the Sellers pursuant to a Contract where Purchaser does not assume at the Closing the underlying Contract relating to such property.

"***Gift Certificates***" means any gift certificates, gift cards, or food/beverage credits that are issued by Seller and required to be honored by Sellers in the ordinary course of business prior to the Closing Date.

"**Governmental Body**" means any: (a) nation, principality, state, commonwealth, province, territory, county, municipality, district or other jurisdiction of any nature; (b) federal, state, local, municipal, foreign or other government; (c) governmental or quasi-governmental authority of any nature (including any governmental division, subdivision, department, agency, bureau, branch, office, commission, council, board, instrumentality, officer, official, representative, organization, unit, body or Entity and any court or other tribunal); (d) multinational organization or body; or (e) individual, Entity or body exercising, or entitled to exercise, any executive, legislative, judicial, administrative, regulatory, police, military or taxing authority or power of any nature.

"**Intangible Property Assets**" means any Intellectual Property Assets or Other Intangible Property owned or held by the Sellers. As used in this Agreement, Intangible Property Assets shall in all events exclude: (i) any materials containing information about employees (other than Transferred Employees), disclosure of which is prohibited under applicable law, and (ii) any software or other item of intangible property held by the Sellers pursuant to a license or other Contract where Purchaser does not assume the underlying Contract relating to such intangible personal property at the Closing.

"**Intellectual Property Assets**" means intellectual property or other proprietary rights of Sellers of every kind throughout the world, both domestic and foreign, which, in each case, are related to the Business, including all inventions and improvements thereon, Patents, Trademarks, Trademark Rights, Copyrights, Domain Names, Technology and trade secrets.

"**Inventory**" means all food, paper products, and other items of inventory owned and held by Sellers or used in connection with the Business, wherever located.

"**Knowledge**" of a Person means such Person's actual, current knowledge and, with respect to Sellers' knowledge, refers only to the knowledge of Steven Micheletti.

"**Leasehold Improvements**" means any leasehold improvements or appurtenances to such improvements (including, without limitation, buildings, structures, storage areas, driveways, walkways, planters, landscaping and parking areas).

"**Legal Requirement**" means any applicable federal, state, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance, code, edict, decree, proclamation, treaty, convention, rule, regulation, ruling, directive, pronouncement, requirement, notice requirement, guideline, Order, specification, determination, decision, opinion or interpretation issued, enacted, adopted, passed, approved, promulgated, made, implemented or otherwise put into effect by or under the authority of any Governmental Body.

"**Liability**" means any direct or indirect liability, Indebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

"**Liquor License**" means all liquor licenses (including, without limitation, beer and wine licenses) held or used by each Seller.

"**Net Cash on Hand**" means all cash in the Seller's bank accounts, if any, in excess of the amount of cash reasonably required by the Sellers to satisfy operating expenses of the Acquired Restaurants that were incurred after the Conversion Date and through the Closing Date.

"**Order**" means any judgment, decision, consent decree, injunction, ruling or order of any Governmental Body that is binding on any Person or its property under applicable law.

"**Other Contract**" means any Sellers' Contract other than the Restaurant Leases.

"**Other Intangible Property Assets**" means all intangible personal property (other than the Intellectual Property Assets) owned or held by Sellers, including, without limitation, (A) the books and

22

records pertaining to the Business; (B) proprietary information relating to the Business, including but not limited to catalogues, customer lists and other customer data bases, correspondence with present or prospective customers and suppliers, advertising materials, software programs, and telephone numbers identified with the Business; and (C) all goodwill of the Business.

"*Other Lease*" means any Sellers' Contract that is a lease other than a Restaurant Lease.

"**Outside Date**" means July 31, 2021.

"**Parties**" shall have the meaning provided for in the preamble.

"**Patent**" means the United States patents and patent applications owned by the Sellers, including, any continuations, divisionals, continuations in part, or reissues of patent applications and patents issuing thereon and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"*Person*" means an individual, Entity or Governmental Body.

"**Petition**" means the petition that commenced the Chapter 11 Cases.

"**Petition Date**" means March 19, 2021.

"**Purchase Price**" shall have the meaning provided for under Section 2.1(a).

"**Purchased Assets**" shall have the meaning provided for under Section 1.1.

"**Purchased Contract**" is defined in Section 1.1(e) hereof.

"**Purchaser**" shall have the meaning provided for in the preamble.

"**Receivables**" shall have the meaning provided for under Section 1.1(f).

"**Restaurant Lease**" means any real property lease set forth on Schedule 1.1(e) by any of the Sellers under which a Restaurant is the leased premises, together with all rights and interests of the Sellers relating thereto, whether held directly by the Sellers or indirectly through an agent or nominee (including but not limited to all security deposits, purchase options, renewal options, rights of first refusal, reconveyance rights and expansion rights, if any, fixtures, systems, equipment and items of personal property of the Sellers attached or appurtenant thereto, all buildings and improvements thereon or forming a part thereof and all easements, licenses, rights and appurtenances thereto and associated with such Purchased Lease).

"**Restaurant Petty Cash**" shall mean petty cash of Sellers on the premises of the Acquired Restaurants.

"**Sale Motion**" shall have the meaning provided for under Section 9.1.

"*Sale Order*" shall have the meaning provided for under Section 9.1.

"**Sellers**" shall have the meaning provided for in the preamble.

"**Sellers' Contract**" means any Contract (a) to which any of the Sellers is a party or by which any of the Sellers is bound and (b) that is related to the Business.

"**Standard Exceptions to Enforceability**" means any bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other laws (whether statutory, regulatory or decisional), now or hereafter in effect, relating to or affecting the rights of creditors generally or by equitable principles (regardless of whether considered in a proceeding at law or in equity).

"**Tax**" means any federal, state, local or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real

23

property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"***Tax Return***" means any return, declaration, report, claim for refund, transfer pricing report or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Technology***" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, know how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"***Trademarks***" means all trademark registrations and applications for trademark registration owned by Sellers, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof, and any past, present or future claims or causes of action arising out of or related to any infringement or misappropriation of any of the foregoing.

"***Trademark Rights***" means all common law rights in the United States in any trade names, corporate names, logos, slogans, designs, trade dress, and unregistered trademarks and service marks owned by Sellers, together with all translations, adaptations, derivations and combinations thereof, and the goodwill associated with any of the foregoing.

"***Transaction Expenses***" shall have the meaning provided for under Section 12.7.

"***Transfer Taxes***" shall have the meaning provided for under Section 3.4.

"***Transferred Employee***" means any employee of any of the Sellers, upon accepting an offer of employment from Purchaser.

"***Utilities***" shall have the meaning provided for under Section 2.6.

"***WARN Act***" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder, or any formulation of similar rights arising under applicable state law.

*[SIGNATURE PAGES FOLLOW; REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

24

IN WITNESS WHEREOF, Purchaser and Sellers have executed this Agreement as of the day and year first above written.

**PURCHASER:**

Even Stevens Acquisition Partners, LLC
a Utah limited liability company

By: _____
Name: ~~BROOKS E. PICKERING~~
Its: ~~MANAGER~~

**SELLERS:**

**Even Stevens Sandwiches, LLC**

By: _____
Name: *Dina L. Anderson*
Its: *Chapter 7 Trustee*

**Even Stevens Utah, LLC**

By: _____
Name: *Dina L. Anderson*
Its: *Chapter 7 Trustee*

**Even Stevens Idaho, LLC**

By: _____
Name: *Dina L. Anderson*
Its: *Chapter 7 Trustee*

25

**SCHEDULES**

**[To be attached]**

*[SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS]*

**Exhibit "A"**

**ASSIGNMENT AND ASSUMPTION OF RESTAURANT LEASE**

This *Assignment and Assumption of Restaurant Lease* ("**Assignment**") made and entered into as of June [__], 2021 by and between [*Insert name of applicable Seller*] ("**Seller**") by and through Dina L. Anderson as chapter 7 trustee ("**Trustee**") for the Seller under Case No. 19-bk-03236-DPC (Bankr. D. Ariz.) ("**Assignor**") and [*Insert name of applicable Purchaser affiliate*] ("**Assignee**").

Assignors and Assignee acknowledge that:

A.        Assignor is the tenant(s) of certain real property premises located at _____ ("**Restaurant**") under that certain real property lease dated _____ between such Assignor, as lessee, and _____, as lessor ("**Landlord**"), as amended _____ (as so amended, the "**Lease**").

C.        Assignor and various affiliates of Assignor, as Sellers, and Assignee, as Purchaser, have entered into that certain *Asset Purchase Agreement* dated June ___, 2021 ("**Purchase Agreement**"). Except for terms specifically defined herein, the capitalized terms used in this Assignment shall have the same meanings as capitalized terms used in the Purchase Agreement.

D.        Concurrently with the mutual execution and delivery of this Assignment, Assignor and Assignee are consummating the Contemplated Transactions.  Assignor and Assignee are executing and delivering this Assignment in satisfaction of certain obligations of Assignor and Purchaser pursuant to Sections 3.2 and 3.3 of the Purchase Agreement.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which Assignor and Assignee hereby acknowledge, and intending to be legally bound hereby, Assignor and Assignee hereby agree as follows:

**Assignment**.  Assignor hereby sells, assigns and transfers to Assignee, all interest of Assignor, as tenant, in and to the Restaurant and the Lease, a copy of which Lease is attached hereto as **Exhibit "A."** Assignor makes no representations and warranties of any kind whatsoever with respect to the Lease.

**Assumption**.  Assignee hereby accepts the foregoing assignment of the Lease, and does hereby assume the duties and obligations of tenant under the Lease, thereunder accruing from and after the Effective Date, and does hereby agree to be bound by and to perform or cause to be performed, as a direct obligation to Landlord, each and all of the terms, conditions, covenants and provisions to be done, kept and performed under such Lease accruing from and after the Closing Date, to the same extent as if Assignee had been an original party thereto.

**Assignee's Indemnification**.   Assignee shall indemnify, defend (with counsel reasonably satisfactory to Assignor) and hold Assignor free, clear and harmless from and against any and all claims, demands, suits, causes of actions, penalties, liabilities, costs, fees and expenses of any kind or nature whatsoever, including, without limitation, reasonable attorneys' fees and costs for the performance or nonperformance of Assignee's obligations under the Lease, which accrued from and after the Closing Date.

**Attorneys' Fees.**  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Assignment, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party therein all such fees, costs

and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

**Amendments.**  This Assignment may only be amended by a writing signed by both Assignor and Assignee.

**Delivery Pursuant to Purchase Agreement.**  Notwithstanding anything to the contrary herein, Assignor and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the exclusions set forth in Section 1.2 of the Purchase Agreement, and the acknowledgement and disclaimer set forth in Section 7 thereof).

**Governing Law.**  This Assignment shall be governed by and construed and enforced in accordance with the laws of [_____], without giving effect to the conflicts of laws provisions thereof.

**Counterparts**.  This Assignment may be executed in separate counterparts, each of which shall be deemed to be an original, but both of which, taken together, shall be deemed one original document.

**Execution in Counterparts.**  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; provided, however, that if the parties exchange facsimile signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature as soon thereafter as possible.

**IN WITNESS WHEREOF**, the parties have executed this Assignment as of the date first written above.

**ASSIGNOR:**

_____, a
_____,
Chapter 7 Debtor


By: _____
Name: _____
Its: _____

**ASSIGNEE:**

_____,
a _____

By: _____
Name: _____
Its: _____

**fex**

## ASSIGNMENT AND ASSUMPTION OF LEASES AND CONTRACTS

This *Assignment and Assumption of Leases and Contracts* ("**Assignment**") is entered into as of June [\_\_] 2021, by and among Even Stevens Sandwiches, LLC, Even Stevens Utah, LLC, and Even Stevens Idaho, LLC (collectively, "**Sellers**") by and through Dina L. Anderson as chapter 7 trustee for the Sellers under Case No. 19-bk-03236-DPC (Bankr. D. Ariz.) ("**Assignors**"), and Even Stevens acquisition Partners, LLC, a Utah limited liability company ("**Assignee**").

Assignors and Assignee acknowledge that:

A.       Assignors, as Sellers, and Assignee, as Purchaser, have entered into that certain *Asset Purchase Agreement* dated as of June [\_\_], 2021 ("**Purchase Agreement**").  Except for terms specifically defined herein, the capitalized terms used in this Assignment have the same meanings as capitalized terms used in the Purchase Agreement.

B.       Concurrently with the mutual execution and delivery of this Assignment, Assignors and Assignee are consummating the Contemplated Transactions.  Assignors and Assignee are executing and delivering this Assignment in satisfaction of certain obligations pursuant to Sections 3.2 and 3.3 of the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which Assignors and Assignee hereby acknowledge, Assignors and Assignee hereby agree as follows:

1.       <u>Assignment</u>.  Effective as of the Closing Date, each of the Assignors hereby assigns to Assignee all of its respective right, title and interest in and to the those of the Purchased Contracts described on **Schedule 1** attached hereto and incorporated herein by this reference (collectively, the "**Assigned Contracts**").

2.       <u>Assumption</u>.  Effective as of the Closing Date, Assignee hereby accepts the foregoing assignment and assumes and agrees to be bound by the terms and provisions of the Assigned Contracts and to perform all of Assignors' obligations thereunder to be performed from and after the Closing Date as though Assignee had been the original contracting party thereunder.

3.       <u>Amendments</u>.  This Assignment may only be amended by a writing signed by both Assignors and Assignee.

4.       <u>Execution in Counterparts</u>.  This Assignment may be executed in counterparts and delivered by the delivery of facsimile signatures; *provided, however*, that if the Parties exchange facsimile or electronic pdf signatures, each of them agrees to provide the other with a copy of this Assignment bearing their original signature promptly thereafter.

5.       <u>Delivery Pursuant to Purchase Agreement</u>.  Notwithstanding anything to the contrary herein, Assignors and Assignee are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

6.       <u>Governing Law</u>.  This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Arizona.

IN WITNESS WHEREOF, Assignors and Assignee have executed this Assignment as of the day and year first set forth above.

**ASSIGNORS:**

Even Stevens Sandwiches, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

Even Stevens Utah, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

Even Stevens Idaho, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

**ASSIGNEE:**

Even Stevens Acquisition Partners, LLC,
a Utah limited liability company

By: _____
Name: _____
Its: _____

**Exhibit "C"**

## ASSIGNMENT OF INTANGIBLE PROPERTY

Even Stevens Sandwiches, LLC, Even Stevens Utah, LLC, and Even Stevens Idaho, LLC (each a debtor in chapter 7 bankruptcy cases jointly administered under Case No. 2:19-bk-03236-DPC (Bankr. D. Ariz.) and collectively, the "**Assignors**") by and through Assignors' chapter 7 trustee Dina L. Anderson ("**Trustee**") are executing this *Assignment of Intangible Property Assets* ("**Assignment**") in favor of Even Stevens Acquisition Partners, LLC, a Utah limited liability company ("**Assignee**"), with respect to the following facts and circumstances:

(A)     Assignors and Assignee have entered into that certain *Asset Purchase Agreement* dated as of June ___, 2021 ("**Purchase Agreement**").  Except for terms specifically defined in this Assignment, the capitalized terms used in this Assignment have the same meanings as such terms when used in the Purchase Agreement.

(B)     Concurrently with the execution and delivery of this Assignment, Assignors and Assignee are consummating the transactions contemplated by the Purchase Agreement.  Pursuant to the Purchase Agreement, Assignors are required to execute and deliver this Assignment at the Closing.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which Assignors hereby expressly acknowledge, each of the Assignors hereby assigns, conveys, transfers and sets over unto Assignee, all of its respective right, title and interest, if any, in and to all Intangible Property Assets.  This Assignment shall inure to the benefit of, and be binding upon, the successors, executors, administrators, legal representatives and assigns of Assignors and Assignee.

Notwithstanding anything to the contrary herein, Assignors are executing and delivering this Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

This Assignment shall be governed by and construed and enforced in accordance with the laws of the State of Arizona.

Dated: July [__], 2021

**ASSIGNORS:**

Even Stevens Sandwiches, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

Even Stevens Utah, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

*[SIGNATURE PAGE TO BILL OF SALE]*

Even Stevens Idaho, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

**ASSIGNEE:**

Even Stevens Acquisition Partners, LLC,
a Utah limited liability company

By: _____
Name: _____
Its: _____

34

**Exhibit "D"**

**BILL OF SALE AND ASSIGNMENT**

Reference is hereby made to that certain *Asset Purchase Agreement*, dated June ___, 2021 ("**Purchase Agreement**"), by and among Even Stevens Sandwiches, LLC, Even Stevens Utah, LLC, and Even Stevens Idaho, LLC (each a "**Seller**" and together "**Sellers**") by and through Dina L. Anderson as chapter 7 trustee ("**Trustee**") for the Sellers under Case No. 19-bk-03236-DPC (Bankr. D. Ariz.), and Even Stevens Acquisition Partners, LLC, a Utah limited liability company ("**Purchaser**"). Except for terms specifically defined in this Bill of Sale and Assignment, all capitalized terms used in herein have the same meanings as such terms have when utilized in the Purchase Agreement.

For good and valuable consideration, the receipt and sufficiency of which Sellers hereby expressly acknowledge, each of the Sellers hereby sells, transfers, assigns and delivers to Purchaser all of its respective right, title and interest in and to the Purchased Assets.

Notwithstanding anything to the contrary herein, Sellers are executing and delivering this Bill of Sale and Assignment in accordance with and subject to all of the terms and provisions of the Purchase Agreement (including, without limitation, the acknowledgement and disclaimer set forth in Section 7 of the Purchase Agreement).

**Dated:** July [__], 2021.

**SELLERS:**

Even Stevens Sandwiches, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

Even Stevens Utah, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

Even Stevens Idaho, LLC,
Chapter 7 Debtor

By: _____
Name: _____
Its: _____

35

**Exhibit "E"**

<u>Form of Sale Order</u>

[To Be Attached]